## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**JUAN SAN AGUSTIN, JR.**                    **Civil Action No.**  18CV2646

*Plaintiff*,

**V.**

**(1) EL PASO COUNTY,**
**(2) DISTRICT ATTORNEY DAN MAY,**
**(3) DEPUTY DISTRICT ATTORNEY SHANNON GERHART,**
**(4) EL PASO COUNTY SHERIFF BILL ELDER,**
**(5) EL PASO COUNTY UNDERSHERIFF JOE BREISTER,**
**(6) EL PASO LEGAL ADVISOR LISA KIRKMAN,**
**(7) EL PASO COUNTY DEPUTY SHERIFF ROBERT JAWORSKI,**
**(8) COLORADO BUREAU OF INVESTIGATIONS,**
**(9) COLORADO BUREAU OF INVESTIGATION AGENT RALPH GAGLIARDI,**
**(10) ARAPAHOE COUNTY,**
**(11) DISTRICT ATTORNEY GEORGE BRAUCHLER**
**(12) ASSISTANT DISTRICT ATTORNEY MARK HURLBERT,**
**(13) DEPUTY DISTRICT ATTORNEY GRANT FEVURLY,**
**(14-22) OFFICERS JOHN DOE 1-11,**
**in their individually and official capacities.**

*Defendants*.

_____

## CIVIL RIGHTS COMPLAINT WITH REQUEST FOR TRIAL BY JURY

_____

Plaintiff Juan San Agustin, Jr. by and through his attorneys, Fisher & Byrialsen, PLLC, and the Polansky Law Firm, brings the following claims against Defendants and requests trial by jury.

## PRELIMINARY STATEMENT

1.      This is a civil rights action based on and arising out of wrongful acts and omissions of employees and agents of the El Paso County Sheriff's Office ("EPCSO"), the El Paso County District Attorney's Office, the Arapahoe County District Attorney's Office, and the Colorado Bureau of Investigations and against named individual employees and agents of these offices, in which the Plaintiff seeks relief for the violation of his rights secured by the Civil Rights Acts of 1866, 1867 and 1964, 42 U.S.C. §§ 1983, 1985, 1988 and of his rights secured by the Fourth and Fourteenth Amendments to the United States Constitution, and of his rights secured under the laws and Constitution of the State of Colorado.

2.      Plaintiff seeks damages, both compensatory and punitive, an award of costs and attorneys' fees, and such further relief as this court deems just and proper, as a result of being maliciously prosecuted, defamed, being the victim of abuse of process and further wrongs detailed below.

## PARTIES

### Plaintiff

3.      Plaintiff, Juan Santos San Agustin, Jr. is a citizen of the United States and was at all times relevant herein a resident of the State of Colorado.

**Defendants**

4.      Defendant El Paso County was, at all times relevant herein, authorized by law to maintain and did maintain a police department known as the El Paso County Sheriff's Office and a prosecuting agency know as El Paso County District Attorney's Office which acted as its agents in the area of law enforcement.

5.      At all times relevant to this Complaint, Defendant Dan May was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of state law in his capacity as the District Attorney employed by the El Paso County District Attorney's Office.

6.      At all times relevant to this Complaint, Defendant Shannon Gerhart was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of state law in her capacity as a Deputy District Attorney employed by the El Paso County District Attorney's Office.

7.      At all times relevant to this Complaint, Defendant Sheriff Bill Elder was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of state law in his capacity as Sheriff employed by the El Paso County Sheriff's Office.

8.      At all times relevant to this Complaint, Defendant Undersheriff Joe Breister was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of state law in his capacity as an officer employed by the El Paso County Sheriff's Office.

9.      At all times relevant to this Complaint, Defendant Sheriff's Legal Advisor Lisa Kirkman was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of state law in her capacity as an employee of the El Paso County Sheriff's Office.

3

10.     At all times relevant to this Complaint, Defendant Deputy Sheriff Robert Jaworski was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of state law in his capacity as an employee of the El Paso County Sheriff's Office.

11.     At all times relevant to this Complaint, Colorado Bureau of Investigations was, a municipal agency was charged State of Colorado with the responsibility of investigating criminal activity among other things.

12.     At all times relevant to this Complaint, Defendant Agent Ralph Gagliardi was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of state law in his capacity as an officer employed by the Colorado Bureau of Investigations.

13.     Defendant Arapahoe County was, at all times relevant herein, authorized by law to maintain and did maintain a prosecuting agency known as the Arapahoe County District Attorney's Office which acted as its agent in the area of law enforcement.

14.     At all times relevant to this Complaint, Defendant George Brauchler was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of state law in his capacity as the District Attorney of Arapahoe County.

15.     At all times relevant to this Complaint, Defendant Mark Hurlbert was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of state law in his capacity as an Assistant District Attorney employed by the Arapahoe County District Attorney's Office.

16.     At all times relevant to this Complaint, Defendant Grant Fevurly was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color

of state law in his capacity as a Deputy District Attorney employed by the Arapahoe County District Attorney's Office.

## JURISDICTION AND VENUE

17.     This action arises under the Constitution and the law of the United States and the State of Colorado and is brought pursuant to Title 42 U.S.C. § 1983.

18.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331.

19.     Jurisdiction supporting Plaintiff's claim for attorney's fees and costs is conferred by 42 U.S.C. § 1988.

20.     The acts complained of occurred in the District of Colorado and venue is lodged in this Court pursuant to 28 U.S.C. 1391(b).

## JURY DEMAND

21.     Plaintiff demands trial by jury in this action.

## NOTICE OF CLAIM

22.     Plaintiff filed a Notice of Claim on all defendants and the Attorney General's Office of the State of Colorado on or about November 18, 2016, within 182 days of the events complained of herein. More than 90 days have elapsed since the filing of the Notice of Claim, and adjustment or payment thereof has been neglected or refused.

## STATEMENT OF FACTS

The Tom Clements Murder and Investigation

23.    In the 1990s, Benjamin Davis founded the "211 Crew," a white supremacist prison gang, during one of his periods of incarceration at Denver County Jail.

24.    Since its inception, this gang has been linked to several high-profile murders and criminal investigations, primarily in the state of Colorado.

25.    From 2004 through 2008 Defendant Dan May was the Chief Deputy District Attorney for Colorado's 18th Judicial District.

26.    During his time with the 18th Judicial District, Defendant May focused considerable efforts on prosecuting members of the Sureños Gang.

27.    As a result of Defendant May's efforts, many Sureños members who were already incarcerated in the Colorado Department of Corrections, primarily the Sterling and Limon facilities, had their sentences lengthened.

28.    Due to his impact on the gang and its members, the Sureños put out an assassination request or "hit" on Defendant May.

29.    The Sureños recruited the 211 Crew to assassinate Defendant May as the 211 Crew had a reputation for being able to reach outside the prison system and there was a debt owed to the Sureños by the 211 Crew from another matter between the gangs.

30.    Sean May was a Deputy District Attorney in the 17th Judicial District, the northern neighbor of the 18th Judicial District, during the same time period that Defendant May was aggressively prosecuting the Sureños.

31.    Tragically, on August 27, 2008, as Sean May was walking home through the alley behind his home in north Denver, he was shot and killed by members of the 211 Crew.

32.    The assassin mistakenly killed Deputy District Attorney Sean May instead of Defendant May.

33.    Although the gang involved in killing Sean May is known, the individual responsible for Sean May's murder has never been found.

34.    In the subsequent years the 211 Crew continued to benefit from the notoriety that came from their ability to commit high profile crimes including the assassination of Sean May.

35.    In early to mid-2010, a number of other white-supremacist gangs, began to expand their foothold in the Colorado and challenge the 211 Crew.

36.    In order to demonstrate that Colorado was the 211 Crew's territory, the hierarchy of the gang including Chris Middleton, Thomas Guolee, and James Lohr decided to order a lower ranking member of the gang to commit a high-profile homicide of an individual who was not incarcerated within the prison system.

37.    The 211 Crew turned to a low-ranking member, Evan Ebel.

38.    Evan Ebel's criminal history was composed of a series of violent crimes including menacing and assault that landed him in the Department of Corrections at a comparatively young age; only 19 when he began his first sentence.

39.    During his first stay in prison, Evan Ebel joined the 211 Crew and was given the nickname "Evil".

40.    As a low-ranking member of the gang, Evan Ebel was required to do a variety of menial tasks including delivering documents to the gang's high-ranking members such as Benjamin Davis.

41.    On one occasion, Evan Ebel was delivering a list of 211 Crew commandments to Benjamin Davis.  Before delivering the document Ebel made changes to it.

42.     After Benjamin Davis realized what Ebel had done, high ranking members of the gang decided that in order for Ebel to remain a member and continue to receive protection from rival gangs he would need to do something significant for the gang.

43.     Because Ebel had incurred a debt to the gang, the hierarchy, specifically James Lohr, turned to him when the gang decided to commit a high-profile murder to prove their strength to the other white supremacy gangs.

44.     Tom Clements, head of the Colorado Department of Corrections, became one of the targets of the 211 Crew.

45.     In or about 2013, law enforcement received a letter from a Department of Corrections inmate, who had heard of the 211 Crew's plot.  The letter warned that Tom Clements' life was in danger.

46.     Law enforcement did not act on the letter at the time it was received.

47.     On March 19, 2013, Tom Clements was assassinated on the doorstep of his home in Monument, Colorado by Evan Ebel.

48.     Evan Ebel had recently been released from the Colorado Department of Corrections early due to a clerical error that resulted in an additional 4-year sentence for assaulting a prison guard being served concurrently rather than consecutively to his other sentence.

49.     After killing Tom Clements, Evan Ebel fled to Texas where he died in a shootout with Texas law enforcement.

50.     Shortly after Evan Ebel's death, Texas Rangers determined Ebel had come from Colorado and Colorado law enforcement became involved with the investigation, specifically Plaintiff and El Paso County Deputy District Attorney Jeffrey Lindsey.

51.     Tom Clements had been personal friends with Governor Hickenlooper who had recruited Mr. Clements from his former position in Missouri.

52.     Governor Hickenlooper initially gave law enforcement use of his plane so that they were able to travel to Texas as quickly as possible and continue the investigation into Tom Clements' death.

53.     Upon arriving in Texas on a second trip, Plaintiff and prosecutor Jeffrey Lindsey were put in contact with a confidential informant who had information relating to the Tom Clements homicide.

54.     The confidential informant had previously been a member of the 211 Crew.

55.     High ranking members of the 211 Crew had ordered the confidential informant to house Evan Ebel after he arrived in Texas so that he could remain hidden until the news of the Tom Clements murder became less widely publicized.

56.     Also in 2013, subsequent to the Tom Clements murder, Defendant May found out that he was in fact the intended target of the 2008 assassination of Sean May.  After learning this, Defendant May upgraded all security at the District Attorney's Office to include metal detectors, armed security, and bullet proof glass at the reception.

57.     Upon meeting with the confidential informant Ranger James Holland, at the direction of Defendant May, immediately asked the information what he knew about the Sean May murder.

58.     The investigative team looking into the Tom Clements murder, including Plaintiff, did an extensive interview with the confidential informant in exchange for full use immunity.

59.     Plaintiff, in his role as inspector with the El Paso County Sheriff's Office, continued to investigate the Tom Clements murder for the majority of 2013.

60.     After approximately 120 days, Plaintiff and other members of the investigation team felt they had probable cause to believe that Evan Ebel had not acted alone and that ranking member of the 211 Crew, James Lohr, Thomas Guolee, and Chris Middleton should be charged with the murder.

61.     All three of these members of the 211 Crew were out of custody and at large in the community at the time.

62.     The criminal informant told Jeffrey Lindsey and Plaintiff that James Lohr had told the informant that Lohr had ordered Evan Ebel to commit the murder.

63.     Additionally, cell site location information obtained by Plaintiff and his team showed that Ebel had met with the members of the 211 Crew immediately before and after Tom Clements was murdered.

64.     In response to Plaintiff's insistence that there was probable cause to prosecute Chris Middleton, Thomas Guolee, and James Lohr, Defendant May decided to remove his top prosecutor, Jeffrey Lindsey, from the case and refused to let charges be brought.

2008 Election

65.     In 2008 there were elections in the 4th Judicial District for, among other positions, District Attorney and Sheriff.

66.     Defendant May and John Newsome ran against one another for District Attorney.

67.     Plaintiff and Terry Maketa publicly supported John Newsome.

68.     After a contentious race that divided the community, Defendant May ultimately won the election and became the new and current 4th Judicial District Attorney.

69.     Under the new leadership Plaintiff continued to push for the prosecution of James Lohr, Thomas Guolee, and Chris Middleton, but was met with tremendous resistance from Defendant May.

70.     Plaintiff has continued to advocate for the prosecution of those who conspired to murder Tom Clements to this day.

71.     Plaintiff made his push for prosecution in a public manner, at times through the news media.

The Kelly Trull Matter

72.     On or about August 12, 2013, Kelly Trull, who was a nurse in the El Paso County Jail, was allegedly assaulted by her boyfriend Travis Garretson.

73.     Travis Garretson was then employed as an El Paso County Deputy Sheriff.

74.     After the assault, Ms. Trull went to her friends Michelle and Scott Mackey's house. The Mackeys were also employees of the El Paso County Sheriff's Office, and they urged Ms. Trull to report the incident.

75.     At work the following day, Ms. Trull reported the assault to Wendy Habert and Defendant Breister, who referred the matter to the Investigations Division.  Detective Lisa Kaiser[1] was assigned to the case.  Travis Garretson was arrested, and his employment with the Sheriff's Office was suspended.

76.     Ms. Trull and Mr. Garretson continued to live together and resumed their romantic relationship.

---

[1] Detective Lisa Kaiser changed her name to Lisa Montville; however, she will be referred to as Detective Kaiser in motion.

77.     Ms. Trull did not want Mr. Garretson to lose his job.

78.     On September 12, 2013, Ms. Trull went to the El Paso County Sheriff's Office ("EPCSO") and informed Detective Kaiser that she had lied when she made her statement to Detective Kaiser and accused Travis Garretson of assaulting her.

79.     When Ms. Trull arrived at the EPCSO, she was escorted to a room on the second-floor of the building by Detective Kaiser for a follow-up interview.

80.     Before the interview began, Sergeant Jaworski called Deputy District Attorney Shannon Gerhart and other employees of the EPCSO who all observed the interview from a nearby conference room.

81.     During the interview, Ms. Trull admitted to driving under the influence of alcohol and to assaulting Mr. Garretson.  Ms. Trull also indicated that Mr. Garretson had acted in self-defense.

82.     At 9:49 a.m., Detective Kaiser left the interview room and met with EPCSO command staff and Deputy District Attorney Shannon Gerhart to determine whether there was probable cause to arrest Ms. Trull (hereinafter the "Trull Arrest Conference").

83.     During the Trull Arrest Conference, Deputy District Attorney Gerhart stated that there was probable cause to arrest Ms. Trull for Harassment and Driving Under the Influence.

84.     Ms. Trull ultimately was arrested and prosecuted on these charges.

85.     Plaintiff was not present for the Trull Arrest Conference; he was not even in the building.

86.     Employee key card records obtained by the Colorado Bureau of Investigation show Plaintiff left the second floor of the EPCSO at 9:30 a.m. (19 minutes before the "Trull Arrest Conference").  Two minutes later his key card was swiped again, this time leaving the parking structure.  He did not return that day.

Sheriff Elder's Internal Affairs File

87.     In 2013, Defendant Elder announced that he was running for Sheriff of El Paso County.

88.     Around the same time, Plaintiff was alerted to the fact that Defendant Elder's internal affairs file had gone missing.

89.     Plaintiff was assigned to investigate what had happened to Elder's missing internal affairs file.

90.     Plaintiff worked with two detectives to attempt to locate the file.  Once they became sure the file was gone, they attempted to find out who had stolen and/or destroyed it but were unable to solve it.

91.     Plaintiff did not support Defendant Elder in his 2014 campaign.

92.     In the fall of 2014, Defendant Elder was elected El Paso County Sheriff.

Plaintiff's Transition into Private Practice

93.     When it became clear that Defendant Elder would win the election, Plaintiff decided to transition into the private sector as Defendant Elder had made statements that Plaintiff was going to be demoted and transferred out of the Investigation's Division.

94.     Plaintiff was able to rapidly build a profitable business as a private investigator and expert in digital forensics.

95.     Between October 2014 and May 2016 Plaintiff was hired privately to work on approximately 70 cases, either at a rate of $100 per hour as a private investigator, or at a rate of $200 -$250 per hour as an expert in digital forensics.

96.     In his practice as a private investigator and expert witness in the field of digital forensics, Plaintiff was often required to testify in court.

2014 Investigation of Sheriff Terry Maketa

97.     In 2014, Defendant May contacted Colorado Bureau of Investigation (CBI) and had the agency initiate an investigation into various allegations of wrongdoing by then Sheriff Terry Maketa.  Part of that investigation included the Kelly Trull Matter.

98.     In 2014, Plaintiff was interviewed numerous times concerning various allegations of wrongdoing by Terry Maketa.

99.     In September 2014, CBI concluded their investigation, finding no wrongdoing with regards to the Kelly Trull Matter.

100.    Plaintiff was never a subject of the 2014 Terry Maketa Investigation, nor was any wrongdoing by Plaintiff discovered during that investigation.

101.    No arrests were made in 2014 in relation to the suspected wrongdoing of Terry Maketa.

2016 Press Interest in the Clements Case

102.    Early March 2016, Plaintiff was interviewed by Kirk Mitchell of the Denver Post. During that interview, Plaintiff expressed his strong views that the murder of Tom Clements was orchestrated by the 211 Crew.  Plaintiff also stated that he had made requests to Defendant Dan May to bring criminal charges.

103.    On March 16, 2016, a Denver Post article by Kirk Mitchell titled "New Details Emerge Three Years After Murder of Colorado Prison's Chief" was published.  The article told the story of the Tom Clements murder and prominently featured a statement by Plaintiff regarding his

urging of Defendant Dan May's office to prosecute the 211 Crew hierarchy for the conspiracy to murder Tom Clements.

104.    Prior to publishing the article, Kirk Mitchell contacted Defendant May and Defendant Elder for a comment regarding Plaintiff's and Terry Maketa's concerns that the Tom Clements investigation was being mishandled and not properly prosecuted.


2016 Investigation of Sheriff Terry Maketa

105.    Shortly after the Denver Post article, in or about mid-March 2016, Defendant May contacted Defendant George Brauchler of the 18th Judicial District in regard to looking into prior Sheriff Terry Maketa again.

106.    Defendant Brauchler, at Defendant May's request, initiated another investigation and a grand jury inquiry into Terry Maketa.  Defendant Hurlbert and Defendant Fevurly were assigned by Defendant Brauchler to run this investigation under his supervision.

107.    Part of this second investigation of Terry Maketa involved looking back into the Kelly Trull Matter.

108.    Defendant Hurlbert and Fevurly traveled to El Paso County with CBI agents to interview Wendy Habert, the supervisor of Kelly Trull at the time when Ms. Trull initially made the report against Mr. Garretson.

109.    Defendants Brauchler, May, Hurlbert and Fevurly directed and supervised the CBI re-investigation.

110.    In or about late March to early April 2016, as part of the second investigation of the Kelly Trull Matter, CBI agents interviewed one current and one former EPCSO deputy sheriff.  In the

recorded interview, CBI agents specifically asked the two sheriff's deputies why Plaintiff had given negative statements to the press in early March 2016 regarding the Clements investigation.

111.    As part of the renewed investigation, CBI agents interviewed Defendant Robert Jaworski regarding the Trull Matter.  During his interviews with CBI, Defendant Jaworski said multiple times that he did not remember the Trull Arrest Conference or who was present.

112.    Additionally, CBI agents interview El Paso County Sheriff's Deputy Mitch Lincoln who informed them that Plaintiff was not at the Trull Interview or Trull Arrest Conference.

113.    In or about April 2016, Defendant Jaworski, while still employed at the EPCSO, referred to President Barack Obama as a "nigger" in front of several other deputies and members of the coroner's office.

114.    Defendant Jaworski, while employed at the EPCSO, also referred to Plaintiff as a "gook".

115.    Defendant Jaworski was subsequently forced to retire from the EPCSO because of the racist remarks against President Obama.

116.     In or about April or May 2016, Defendant Elder made public statements that he would have fired Robert Jaworski if he had not retired voluntarily.


The Grand Jury

117.    In or about April 2016, Defendant May, Brauchler, Hulbert and Fevurly caused a Grand Jury to be convened seeking indictments against Terry Maketa and Paula Presley which included allegations of wrongdoing surrounding the Kelly Trull Matter among others.

118.    Plaintiff was not a target of the grand jury investigation in April 2016.

119.    Defendant Hurlbert and Fevurly were responsible for presenting evidence to the Grand Jury and otherwise overseeing the prosecution.

120.     In April of 2016, Defendant Undersheriff Joe Breister, openly stated that if Maketa, Presley, and Plaintiff "want to talk to the press just wait until this nuke drops on them."

121.     The Grand Jury met on April 27, May 4, May 11, May 18, and May 25, 2016.

122.     Plaintiff was not mentioned in the April 27th proceedings.

123.     Detective Kaiser testified on May 4, 2016 regarding the Trull Arrest Conference.

124.     Detective Kaiser testified numerous times that during the Trull Arrest Conference, it was Defendant Gerhart who told her to charge Kelly Trull.

125.     At no time did Detective Kaiser volunteer that Plaintiff was present during the Trull Arrest Conference, however, when probed by Defendant Hurlbert, she testified that "[t]here was a heavy interest in the case so I believe he was there."

126.     Plaintiff's key card data definitively showed he was not there and Defendant Hurlbert and Fevurly were aware of this when questioning Detective Kaiser in the Grand Jury.

127.     Detective Kaiser also told CBI agents in her 2014 interview that Defendant Gerhart was giving legal advice and when it was determined to charge Ms. Trull with Harassment and DUI, Defendant Gerhart said, "Okay, sounds good."

128.     Detective Kaiser, when asked by CBI agents if Defendant Gerhart was "calling the shots," Kaiser agreed.

129.     Detective Kaiser stated, "I know [Defendant Gerhart] observed my interview, and was in the conference room discussing what she [Trull] would be charged with.  [Defendant] Gerhart, [Defendant] Jaworski were there, but other supervisors were there, there's always, there's gawkers, could have been anyone in there."

130.     In the September 15, 2014, in a two-hour and twelve-minute interview conducted by CBI, Detective Kaiser said absolutely nothing about Plaintiff participating in the decision to arrest Ms. Trull.

131.     Detective Kaiser's testimony was consistent with the statement she provided to CBI investigators on September 15, 2014, where she stated that her direct supervisor in 2012, Defendant Jaworski, came to her desk in the morning and informed her that Kelly Trull was coming in for a second interview.  And that "the decision to arrest Trull came from her chain of command to include Defendant Gerhart [who] was present and observed the interview from the conference room."

132.     During the May 11th Grand Jury proceedings, Defendant Gerhart testified that Defendant Jaworski asked her to come watch the Trull Interview to determine if any charges should be brought.  Defendant Gerhart testified that she did watch the entire interview, but in contrast to Detective Kaiser, she testified that she did not order Ms. Trull's arrest, and that she was laughing in the Arrest Conference about charging Ms. Trull.

133.     Defendants May, Hurlbert and Fevurly did not introduce to the Grand Jury Defendant Gerhart's prior statements from her interview with CBI Agent Martinez, on March 17, 2016 when she told Agent Martinez that she advised the individuals in the Trull Arrest Conference that she believed EPCSO had probable cause to arrest Ms. Trull for harassment and Driving Under the Influence.

134.     Defendants May, Brauchler, Hurlbert and Fevurly had the copy of the tape-recorded interview between Defendant Gerhart and Agent Martinez, however, they did nothing to inform the Grand Jury of Defendant Gerhart's earlier professional determination that there was probable cause to arrest Ms. Trull.

135.    On May 11, 2016, Defendant Jaworski also testified before the Grand Jury.

136.    Defendant Jaworski testified that there was no District Attorney to consult with about the decision to arrest Ms. Trull and he would have rather consulted with a District Attorney but did not do so; in complete contradiction of Detective Kaiser's and Defendant Gerhart testimony.

137.    Defendants May, Hurlbert and Fevurly purposely failed to correct testimony they knew was untrue.  In addition to the card reader information showing Plaintiff was not in the building, they had Defendant Jaworski's March 10, 2016 recorded interview with CBI Agent Shierkolk and Agent Martinez wherein Defendant Jaworski stated numerous times that he did not remember anything about the Trull Interview or the Trull Arrest Conference.  Defendant Jaworski told CBI Agents Shierkolk and Martinez that it was too long ago, and he did not even remember being there, let alone who else was watching the interview.

138.    Two months later, on May 11, 2016, having a copy of Defendant Jaworski's interview with CBI, Defendants May, Hurlbert and Fevurly nonetheless jointly decided to call Defendant Jaworski to testify under oath before the Grand Jury, at which time Defendant Jaworski, with *no* interceding *recorded* interview with law enforcement, suddenly had a clear and detailed recollection about what happened during the Trull Arrest Conference.

139.    Defendant Jaworski testified that not only was he at the Trull Arrest Conference, he was there with Plaintiff, and Plaintiff gave the order to arrest.

140.    Defendants May, Hurlbert and Fevurly purposely and knowingly agreed to use Jaworski's false and misleading testimony to wrongfully indict Plaintiff without probable cause.

141.    Defendant Jaworski was retired at the time he testified in the grand jury.

142.    At the time of Defendant Jaworski's grand jury testimony, Defendants May, Hurlbert,

Fevurly, Elder, and Breister knew that Defendant Jaworski had been forced to retire due to the

racist comments he made about President Obama.

143.    Defendants May, Hurlbert and Fevurly purposely withheld that information from the

Grand Jury as well.

144.    Defendants May, Hurlbert and Fevurly also purposely withheld from the Grand Jury the

fact that Defendant Jaworski greatly disliked Plaintiff and had called Plaintiff many racially

biased slurs including a "Gook".

145.    Plaintiff is a Pacific Islander from the Island of Guam also known as Chamorro.

146.    On or about May 12, 2016, CBI Agent Timothy Martinez served a subpoena on Plaintiff

to testify in the Grand Jury on May 18, 2016.

147.    Plaintiff contacted attorney John Newsome to represent him in connection with the

subpoena.

148.    Mr. Newsome contacted Defendants Fevurly and Hurlbert and inquired as to the purpose

of the subpoena and the testimony requested of Plaintiff.

149.    Several days later, Defendant Hurlbert called Mr. Newsome back and advised him that

Plaintiff was needed to testify regarding a false arrest scenario involving Former Sheriff Terry

Maketa.  Defendant Hurlbert informed Mr. Newsome specifically that they wanted Plaintiff to

testify about an order to make an arrest of a deputy's girlfriend.

150.    Mr. Newsome subsequently, after consulting with Plaintiff, informed Defendant Hulbert

and Defendant Fevurly that Plaintiff had never ordered an arrest in that matter, that Mr. Maketa

had never ordered Plaintiff to make an arrest at any time, that Plaintiff was not a participant in

any conference where it was determined that a deputy's girlfriend would be arrested.

151.    Mr. Newsome also informed Defendant Hulbert and Defendant Fevurly that Plaintiff was willing to testify to those facts and take a polygraph.

152.    On May 17, 2016, Defendant Hulbert Fevurly called Mr. Newsome and informed him that Plaintiff did not need to appear on his subpoena.

153.    Defendant Hulbert then called Mr. Newsome again and informed him that there would be one or two more sessions of the grand jury, and that if Plaintiff changed his mind about what he would say in the grand jury he should let them know.

154.    Plaintiff refused to testify that he had been ordered to arrest Ms. Trull because it was not true.  Plaintiff had not been present for the Trull Arrest Conference.  Plaintiff was not involved in the Trull Matter in any way.

155.    On May 18, 2016, Al Harmon testified in the Grand Jury.

156.    Mr. Harmon was the Bureau Chief of EPCSO and was Plaintiff's commanding officer.

157.    Mr. Harmon testified numerous times that he did not recall being present at the Trull Interview or Trull Arrest Conference.  However, when a juror asked him, "We were told the DDA, Jaworski, and [Plaintiff] San Agustin agreed to arrest her," Chief Harmon, who had testified that he was not there when the decision was made, stated, "It sounds like Kaiser went to Jaworski, who went to San Agustin who was there."

158.    After Chief Harmon's speculation about what happened, Defendants May, Hurlbert and Fevurly did nothing to clarify to the Grand Jury that Chief Harmon was guessing and that there was concrete evidence showing the exact opposite.

159.    Defendants May, Hurlbert and Fevurly also purposely did not present to the Grand Jury, Chief Harmon's card reader data, which was received by the Defendants on May 19, 2016.  The

card reader data proved that Chief Harmon watched the Trull Interview and was present for the entire Trull Arrest Conference.

160.    On May 25, 2016, Defendant Gagliardi falsely testified that the card key data showed Plaintiff was present during the Trull Arrest Conference in room 200b, despite the fact that the key card data unequivocally showed Plaintiff had left the building and parking structure about 19 minutes prior to the Trull Arrest Conference.

161.    The Defendants purposely withheld the exculpatory key card data from the Grand Jury that definitively showed that Plaintiff was not present during the Trull Conference.

162.    Defendant Gagliardi also lied to the Grand Jury about the location of the card reader panels on the second floor of EPCSO.  Defendant Gagliardi falsely conveyed to the Grand Jury that there is a card reader panel outside of the conference room on the second floor, which proved that Plaintiff swiped his card to get into the conference room where the Trull Arrest Conference took place.

163.    However, there is no card reader panel to get into the conference room.

164.    There is only a card reader panel to get access to the second floor but once on the second floor, there is no additional security required to gain access to the interview and conference rooms.

165.    Defendants Brauchler, May, Hulbert, Fevurly, Gagliardi and Jaworski, manipulated and maneuvered the evidence presented to the Grand Jury relating to whom was present in the Trull Arrest Conference.  Specifically, Brauchler, May, Hulbert, Fevurly, Gagliardi and Jaworski knew and presented evidence to the Grand Jury that the commanders' offices were on the fifth floor, including Terry Maketa, Paula Presley and Al Harmon.  For any of the commanders to

leave the fifth floor to go to the second floor would indicate that they were present during the Trull Interview and/or Arrest Conference.

166.     However, during the May 25, 2016, Grand Jury when Defendant Gagliardi was asked who else was in room 200, he responded that "there's a few others that we have heard that we've been named or been talked about here, we asked for access logs on those folks.  They show present in the building, that kind of thing."

167.     When Defendant Gagliardi testified, he and the other Defendants had the actual card reader data which showed the precise floor within the building where people were located at specific times.  Instead of presenting that evidence, the Defendants purposely elicited vague testimony about other people's whereabouts.

168.     Defendant Gagliardi watched Al Harmon testify to the Grand Jury that he did not recall being at the Trull Arrest Conference.

169.     However, Chief Harmon's card reader data not only showed him "present in the building, that kind of thing" it showed him leaving his office on the fifth floor and arriving to the second floor that day just after the Trull interview started at 9:34 a.m. and leaving the second floor after Ms. Trull was arrested at 10:14 a.m.   This evidence was purposely withheld from the grand jury.

170.     Defendant Gagliardi also intentionally omitted testimony that Deputy Lincoln previously admitted that he was at the Trull Arrest Conference and that his card reader data showed him arriving on the second floor at 8:19 a.m. and leaving to go to the fifth floor at 11:09 a.m., after Ms. Trull was arrested.

171.     Defendants Hurlbert and Fevurly purposely did not call Deputy Lincoln to testify.

172.     Deputy Lincoln had been interviewed on March 24, 2016 and recalled being present during the Trull Interview and Arrest Conference.  This is confirmed by the card reader data.

Commander Lincoln stated in his interview that Plaintiff was not present at the Trull Arrest Conference.  This is all exculpatory evidence that the Defendants purposely withheld from the Grand Jury.

Additional Information Purposely Withheld from the Grand Jury

173.    Defendants May, Hurlbert and Fevurly purposely withheld Ms. Trull's prior interviews with law enforcement from the Grand Jury to make is appear as if Ms. Trull was arrested without probable cause, as part of their ploy to have Plaintiff indicted for something he did not do.

174.    Ms. Trull had given numerous different versions of the incident that occurred between her and Mr. Garretson to various officials.  In almost every version, Ms. Trull claimed she changed from the prior version due to some coercion by either her boss, Ms. Habert, or then undersheriff Paula Presley.

175.    However, her very first version to Defendant Breister, provided probable cause to arrest her and that version was purposely not presented to the Grand Jury by Defendants.

176.    On August 13, 2013, Ms. Trull was interviewed by Defendant Breister.  Wendy Habert, Ms. Trull's immediate supervisor, was present during this interview.  Ms. Trull admitted during that interview to being "equally responsible for initiating arguments and fights with Deputy Garreston […] which always occurred after their excessive consumption of alcohol."

177.    Also, on August 13, 2013, the day Ms. Trull was interviewed by Detective Kaiser she claimed that while driving to the interview with Ms. Habert, Ms. Habert told her to leave important things out of the interview.  Ms. Trull claims that Ms. Habert advised her to avoid admitting to be the instigator and to not say she hit or struck Mr. Garretson.  As a result, when

Detective Kaiser interviewed Ms. Trull, she denied being the initial aggressor during her fights with Mr. Garretson, in direct contrast to what she had told Defendant Breister earlier in the day.

178.    On September 12, 2013, Ms. Trull gave a third interview.  At that interview, she reiterated what she had told Defendant Breister, that she was the physical aggressor, and this time Ms. Trull said it was Ms. Habert who advised her to avoid taking responsibility in her prior interview with Detective Kaiser in order to avoid arrest.

179.    On September 10, 2014, in an interview with CBI Agents Slater and Watts, Ms. Trull claimed, for the first time, that she was lying when she said that Ms. Habert told her to lie, and that it was Undersheriff Paula Presley that coerced her into claiming Ms. Habert told her to lie.

180.    Defendants May, Hurlbert and Fevurly purposely only informed the Grand Jury that Ms. Trull gave two interview, the conflicting interviews to Detective Kaiser on August 13, 2013 and September 12, 2013.  The Grand Jury was purposely never told about Defendant Breister's first interview with Ms. Trull where she admitted criminal culpability prior to speaking with Ms. Habert.

181.    Defendant Breister testified before the Grand Jury on May 11, 2016.  Defendants Hurlbert and Fevurly intentionally did not ask him a single question about Ms. Trull's very first and unfiltered interview on August 13, 2013.  Nor did Defendant Breister volunteer any such information.

182.    Defendants Hurlbert, Fevurly, Gagliardi and John Does 1-3, were present in the grand jury room when Defendant Breister testified.  All of them knew that Ms. Trull's initial account to Defendant Breister provided probable cause for her arrest.

<u>Indictment and Criminal Prosecution</u>

183.    On May 25, 2016, Plaintiff was indicted for the kidnapping and false imprisonment of Kelly Trull, docket number 2016-CR-2686.  The indictment was clearly based on the Defendant's fabricated theory that Plaintiff was present during the Trull Arrest Conference and ordered her arrest.

184.    During the pendency of Docket 2016-CR-2686 Plaintiff's defense attorneys analyzed the card reader data and filed motions to dismiss the indictment because the card reader data proved Plaintiff's innocence.

185.    Instead of conceding these motions, Defendants Brauchler, May, Hurlbert, and Fuverly, with the help of Defenant Gagliardi, continued to manipulate and fabricate evidence to keep the case against Plaintiff going.

186.    Defendants Brauchler, May, Hurlbert and Fuverly responded to the motions to dismiss by arguing that the card reader data was of "extremely limited utility."  Again, manipulating facts to perpetuate the fraudulent changes against Plaintiff.

187.    Defendants Brauchler, May, Hurlbert, Fuverly and Gagliardi conspired to fabricate evidence again by stating that Plaintiff had engaged in "ghosting" to get himself into the Trull Arrest Conference without his card reader being used and/or that Plaintiff had called in the order to have Kelly Trull arrested.

188.    Plaintiff's phone records, which the Defendants had access to, show that he did not make or receive a single telephone call to or from Mr. Maketa, Ms. Presley, Ms. Trull, Mr. Garretson, Defendant Jaworski, Defendant Gerhart, Chief Harmon, Commander Lincoln, Defendant Breister, Detective Kaiser, Sergeant Deno, Detective Kelemen or anyone involved in the Trull Arrest on September 12, 2013.

189.     All charges against Plaintiff were dismissed on October 16, 2017.

190.     In the Motion to Dismiss, Defendant Brauchler and Hurlbert falsely state that following the indictment of Plaintiff, information was uncovered that called into question the testimony of their main witnesses, namely that Defendant Jaworski made racist statement about President Obama and that Detective Kaiser testified in another proceeding that Defendant Gerhart made the order to arrest Ms. Trull.  This was not true; Defendant Brauchler and Hurlbert knew this before Plaintiff was indicted by them.

191.     After the charges against Plaintiff were dismissed, Defendant Hurlbert made a public published statement that Plaintiff was guilty despite the dismissal of the charges.  This statement was false.

192.     As described above, the Defendants in this case intentionally conspired to cause the Grand Jury to believe that Plaintiff was physically present at the Trull Arrest Conference and that he gave the order to arrest her, when they all knew this to be completely untrue.

193.     The defendants presented false evidence to the Grand Jury, purposely withheld exculpatory evidence, and purposely failed to present complete evidence to the Grand Jury to usurp the independence of the Grand Jury.

194.  Detective Kaiser's Grand Jury testimony was consistent with the statement she had provided CBI investigators on September 15, 2014, where she stated that her direct supervisor in 2012, Defendant Jaworski, came to her desk early in the morning and told her Ms. Trull was coming in for a second interview.  And, "the decision to arrest Trull came from her chain of command to include Chief District Attorney Shannon Gerhart from the 4th Judicial District Attorney's Office was present and observed the interview from the conference room."

Summer 2016

195.    In the Summer of 2016, Defendant Elder contacted all agencies that had been involved with the investigation of the Tom Clements murder and informed them that the investigation was closed.

196.    When Governor Hickenlooper found out about this, he called Defendant Elder in for a meeting and ordered the investigation re-opened.

197.    Although Defendant Elder complied with Governor Hickenlooper's demand, the investigation is open in name only, virtually no El Paso County Sheriff's Office resources are being put towards the investigation.

*Brady* List

198.    Many judicial districts, including the 4th Judicial District maintain what is commonly known as a "*Brady* List."  The *Brady* List is routinely disclosed to defense counsel through the discovery process and provides a list of sheriff's deputies within the judicial district who have previously strayed from the truth or committed other acts of wrongdoing.

199.    Plaintiff was contacted by an attorney whom he often worked for as a private investigator or expert witness and was told by this attorney that his name had been disclosed on the "*Brady* List" and therefore the attorney could no longer use him as an investigator or expert.

200.    At that time, within the 4th Judicial District the *Brady* List was compiled by the internal affairs unit, at the supervision and direction of Defendant Lisa Kirkman, an attorney and legal advisor to the sheriff's office, Defendant Elder, Undersheriff Breister and Defendant May.

201.    In 2014 when he left the EPCSO, Plaintiff was not on the *Brady* List and had never been.

202.    Plaintiff has never done anything to warrant being placed on the *Brady* List.

203.    Defendants May, Kirkman, Elder and Breister purposely had Plaintiff's name placed on the list without any grounds to do so.

204.    For law enforcement professionals and anyone who frequently testifies in court, having your name on the *Brady* List is commonly considered to be a "career killer."

Damages

205.    As result of the Defendants conduct Plaintiff was indicted, arrested, and prosecuted for a crime he did not commit.

206.    As result of the Defendants conduct Plaintiff spent 509 days defending the charges in criminal case 2016CR2686.

207.    Plaintiff's name and reputation has been irreparably tarnished.

208.    Plaintiff suffered great anguish and emotional distress, including but not limited to depression, severe anxiety, chest pain and insomnia.

209.    Plaintiff suffered great economic loss as a result of Defendants' actions.

## CLAIMS FOR RELIEF

### First Claim for Relief
### 42 U.S.C. § 1983-Malicious Prosecution in violation of the Fourth and Fourteenth
### (All Individual Defendants)

210.    Plaintiff relies on all of the above facts in asserting this claim.

211.    At the time of the events stated above, Plaintiff had the clearly established constitutional right to be free from malicious prosecution under the Fourth and Fourteenth Amendments.

212.   Any reasonable law enforcement officer and/or prosecutor, including the Defendants in this case, knew or should have known of these rights at the time of the allegations above as they were clearly established at that time.

213.   Defendants were acting under the color of state law in their capacity as law enforcement officers and/or prosecutors and their acts or omissions were conducted within the scope of their official duties or employment.

214.   Defendants violated Plaintiff's Fourth and Fourteenth Amendment rights to be free from malicious prosecution without probable cause and without due process when they, among other things, (1) fabricate evidence, (2) manipulate witness testimony, (3) suppress exculpatory evidence, and (4) falsified charges in order to indict, arrest, and prosecute Plaintiff without probable cause, resulting in his unlawful confinement and continued prosecution.

215.   Defendants conduct was malicious, shocking, and objectively unreasonable considering the circumstances.

216.    All charges against Plaintiff were dismissed on October 16, 2017.

217.   The acts or omissions of Defendants intentionally deprived Plaintiff of his constitutional and statutory rights and caused him severe damages.

218.   As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.  As a further result of Defendants' unlawful conduct, Plaintiff incurred special damages, including loss of past and future income and loss of earning capacity, and may continue to incur further economic or other special damages, in amounts to be established at trial.

219.    Plaintiff is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

**Second Claim for Relief**
**42 U.S.C. § 1983-Substantive Due Process**
**(All Individual Defendants)**

220.    Plaintiff relies on all of the above facts in asserting this claim.

221.    Defendants, individually and in concert, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process.

222.    Defendants deliberately withheld exculpatory evidence and purposely fabricated evidence, thereby misleading and misdirecting the grand jury.  Absent this misconduct, the prosecution of Plaintiff could not and would not have occurred.

223.    Defendants acted objectively unreasonably by violating the Due Process Clause.

224.    Defendant's acted intentionally with willful indifference to Plaintiff's constitutional rights.

225.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.  As a further result of Defendants' unlawful conduct, Plaintiff incurred special damages, including loss of past and future income and loss of earning capacity.  and may continue to incur further economic or other special damages, in amounts to be established at trial. Plaintiff is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

**Third Claim for Relief**
**42 U.S.C. § 1983 - Conspiracy**
**(Against all Defendants)**

226.    Plaintiff relies on all of the above facts in asserting this claim.

227.    Defendants together reached an understanding, engaged in a course of conduct and otherwise conspired among and between themselves to deprive Plaintiff of his due process rights by maliciously prosecuting him, fabricating evidence, manipulating witness testimony, suppressing exculpatory evidence, and falsify charges in order to indict, arrest, and prosecute Plaintiff on without probable cause.

228.    Defendants' misconduct was malicious, willful, and committed with reckless indifference to the rights of others.

229.    Defendants also conspired against Plaintiff to abuse the judicial process, to defame him, intentionally cause emotional distress, and to interfere with his prospective economic advantage.

230.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.

231.    Plaintiff is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

**Fourth Claim for Relief -*Monell***
**42 U.S.C. Section 1983 *Monell* Claim Against El Paso County for the Actions and Omissions of the Individual Law Enforcement Defendants**
**(Against El Paso County)**

232.    Plaintiff realleges and incorporates by reference the foregoing paragraphs as if the same were fully set forth at length herein.

233.    El Paso County, through its law enforcement agencies and law enforcement officers, had

in effect, both before and at the time of the events alleged in this complaint, several interrelated

*de facto* policies, practices and customs, *inter alia*,

> a.      a policy, practice and custom of suppressing, destroying or otherwise secreting
>
> exculpatory or exonerating evidence;
>
> b.      a policy, practice and custom of manipulating and fabricating evidence;
>
> c.      a policy, practice and custom of failing to properly train or supervise officers and
>
> employees;
>
> d.      a policy, practice and custom of failing to properly discipline officers and
>
> employees who violate the United States Constitution or law, or otherwise transgress the
>
> rights of individuals during their investigations.

234.    The policies, practices and customs, separately and/or together, were implemented with

deliberate indifference, and were a direct and proximate cause of the Plaintiff's constitutional

violations and injuries, as set forth above.

235.    These policies, practices and customs, separately and/or together, were the direct and

proximate cause of the injury and damage to Plaintiff and violated his rights as guaranteed by the

United States Constitution, as well as his statutory and common law rights as guaranteed by the

laws and Constitution of the State of Colorado.

236.    The existence of these policies, practices and customs, can be inferred from numerous

incidents reflecting a pattern of police and prosecutor misconduct like that alleged herein.

237.    The existence of these policies, practices and customs, can be inferred from the fact that

the incidents of police misconduct laid out herein were authorized by individuals with

policymaking authority in the Police Department.

238.     Defendant Elder, as Sheriff of El Paso County, is the final decision-maker for El Paso County with regard to the investigative, arrest, custodial and administrative acts, omissions, and decisions which he made or participated in, as alleged above.

239.     As the leading member of the El Paso County Sheriff's Office with policy making authority, Defendant Elder's ratification and participation in the above described police misconduct is sufficient to infer a policy or custom of ratifying misconduct in the Sheriff's Office.

240.     The acts by Defendant Elder and the other law enforcement Defendants directly and proximately caused the Constitutional violations and injury to the Plaintiff.  These acts are directly chargeable to Defendant El Paso County because of Defendant Elder's status as final decision maker for El Paso County with respect to matters involving the El Paso County Sheriff's Office.


### Fifth Claim for Relief - *Monell*
**42 U.S.C. Section 1983 *Monell* Claim Against El Paso County and Arapahoe County for the Actions and Omissions of the Defendant Prosecutors and District Attorney's Offices (Against El Paso and Arapahoe Counties)**

241.     Plaintiff realleges and incorporates by reference the foregoing paragraphs as if the same were fully set forth at length herein.

242.     El Paso and Arapahoe Counties, through district attorneys and district attorneys' offices, had in effect, both before and at the time of the events alleged in this complaint, several interrelated *de facto* policies, practices and customs, *inter alia*,

> a. a policy, practice and custom of suppressing, destroying or otherwise secreting exculpatory or exonerating evidence; and

b.  a policy, practice and custom of failing to properly train or supervise

prosecutors;

c.  a policy, practice and custom of failing to properly discipline prosecutors who

violate the United States Constitution or law, or otherwise transgress the rights of

individuals during their investigations;

e.  a policy, practice and custom of failing to properly supervise, train, instruct

and discipline prosecutors in regards to their *Brady* obligations,

f.  a policy, practice and custom of failing to properly supervise, train, instruct,

and discipline prosecutors with regard to proper investigatory techniques and

adequate evidence of crimes and failure to discipline those who unjustifiably

charge and prosecute or continue to prosecute persons accused of in crimes in

absence of probable cause.

243.    The policies, practices and customs, separately and/or together, were implemented with

deliberate indifference, and were a direct and proximate cause of the Plaintiff's constitutional

violations and injuries, as set forth above.

244.    These police, practices and customs, separately and/or together, were the direct and

proximate cause of the injury and damage to Plaintiff and violated his rights as guaranteed by the

United States Constitution, as well as his statutory and common law rights as guaranteed by the

laws and Constitution of the State of Colorado.

245.    The existence of these policies, practices and customs, can be inferred from numerous

incidents reflecting a pattern of police and prosecutor misconduct like that alleged herein.

246.    The existence of these policies, practices and customs, can be inferred from the fact that

the incidents of prosecutor misconduct laid out herein were authorized by individuals with

policymaking authority in the District Attorney's Office, including but not limited to, Defendants Brauchler and May.

247.    All of the acts by Defendant prosecutors described above were carried out with the actual or constructive knowledge, consent, acquiescence, ratification and/or cooperation of the highest-ranking members of the El Paso and Arapahoe District Attorney's Offices, including by not limited to Defendants May and Brauchler.

248.    Defendant May, as El Paso County District Attorney, is, by operation of state law and as a matter of fact, the final decision-maker from El Paso County with regard to the investigative, arrest, custodial, prosecutorial and administrative acts, omissions, and decisions which he made or participated in, as laid out above.

249.    As a member of the El Paso County District Attorney's Office with municipal policymaking authority, Defendant May's ratification and participation in the above described prosecutorial misconduct is sufficient to infer a policy or custom of ratifying prosecutorial misconduct by El Paso County.

250.    Defendant Brauchler, as Arapahoe County District Attorney, is, by operation of state law and as a matter of fact, the final decision-maker from Arapahoe County with regard to the investigative, arrest, custodial, prosecutorial and administrative acts, omissions, and decisions which he made or participated in, as laid out above.

251.    As a member of the Arapahoe County District Attorney's Office with municipal policy making authority, Defendant Brauchler's ratification and participation in the above described prosecutorial misconduct is sufficient to infer a policy or custom of ratifying prosecutorial misconduct by Arapahoe County.

252.     These acts and omissions by Defendants May and Brauchler directly and proximately

caused the constitutional violations and injury to Plaintiff, and are directly chargeable to the

defendants El Paso and Arapahoe Counties because of Defendants May and Brauchler's status as

final decision-makers for the Counties with respect to matters involving the El Paso and

Arapahoe County District Attorney's Offices.


**Sixth Claim for Relief**
**State Law Claim- Respondeant Superior**
**(Against El Paso County, Arapahoe County, Colorado Bureau of Intelligence)**

253.     Plaintiff relies on all of the above facts in asserting this claim.

254.     In committing the acts alleged in the preceding paragraphs, each of the Defendant

officers were members of the El Paso County Sheriff's Department acting at all relevant times

within the scope of employment and under color of law.

255.     In committing the acts alleged in the preceding paragraphs, each of the Defendant

prosecutors were members of El Paso and Arapahoe County District Attorney's Offices acting at

all relevant times within the scope of employment under color of law.

256.     Defendant El Paso and Arapahoe Counties are liable as principal for all torts committed

by their agents.

257.     In committing the acts alleged in the preceding paragraphs, each of the Defendant CBI

agents were employed by Colorado Bureau of Intelligence, acting at all relevant times within the

scope of employment under color of law.

258.     Defendant Colorado Bureau of Intelligence is liable as principal for all torts committed

by its agents.

259.     As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.

### Seventh Claim for Relief
### State Law Claim-Intentional Infliction of Emotional Distress
### (Against all Individual Defendants)

260.     Plaintiff relies on all of the above facts in asserting this claim.

261.     The acts and conduct of Defendants were extreme and outrageous.  Defendants intended to cause or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to plaintiff.

262.     Defendants extreme and outrageous conduct directly and proximately caused severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

263.     Defendants acted with malice, willfulness, and reckless indifference to the rights of others.

264.     As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.  Defendants actions constituted intentional infliction of emotional distress under the law of the State of Colorado and the Defendants are liable for the damage it caused.  Pursuant to 28 U.S.C. Section 1367, this Court has pendent jurisdiction to hear and adjudicate such claims.

265.     As a further result of Defendants' unlawful conduct, Plaintiff incurred special damages, including loss of past and future income and loss of earning capacity, and may continue to incur further economic or other special damages, in amounts to be established at trial.

266.     Plaintiff may also be entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988,

pre-judgment interest and costs as allowable by federal law.

**Eighth Claim for Relief**
**State Law Claim- Abuse of Process**
**(Against Defendant May, Brauchler, Hurlbert, Fevurly, Gerhart, Elder, Breister, Jaworski**
**and Gagliardi)**

267.     Plaintiff relies on all of the above facts in asserting this claim.

268.     Defendants May, Brauchler, Hurlbert, Fevurly, Gerhart, Elder, Breister, Jaworski, and

Gagliardi initiated or participated in initiating grand jury proceedings with the ulterior purpose of

maliciously prosecuting Plaintiff for a crime Defendants knew Plaintiff did not commit.

269.     Grand jury proceedings are not brought in the usual course of criminal proceedings when

prosecutors know there is less than probable cause to indict.

270.     In order to secure an indictment, Defendants knowingly presented false, fabricated and

misleading evidence, and withheld exculpatory evidence from the grand jury.  The grand jury

relied on the false, fabricated, and omitted evidence in indicting Plaintiff for crimes he did not

commit.

271.     As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual

physical and emotional injuries, and other damages and losses as described herein entitling him

to compensatory and special damages, in amounts to be determined at trial.

272.     As a further result of Defendants' unlawful conduct, Plaintiff incurred special damages,

including loss of past and future income and loss of earning capacity, and may continue to incur

further economic or other special damages, in amounts to be established at trial.

273.     Plaintiff may also be entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988,

pre-judgment interest and costs as allowable by federal law.

## Ninth Claim for Relief
### State Law Claim- Defamation
### (Against Defendant Mark Hurlbert)

274.    Plaintiff relies on all of the above facts in asserting this claim.

275.    Defendant Mark Hurlbert negligently or maliciously published false, defamatory statements about Plaintiff, a private individual.

276.    After the charges against Plaintiff were dismissed, Defendant Mark Hurlbert made a public published statement that Plaintiff was guilty despite the dismissal of the charges.  This statement was false.

277.    This statement has tainted Plaintiff's reputation, affected his business and personal relationships, and has caused him embarrassment and humiliation.

278.    Plaintiff has suffered substantial injury as a result of Defendant Hurlbert's defamatory statement, including injury to character and reputation, mental anguish, loss of past and future income and loss of earning capacity.

279.    As a proximate result of Defendant Hurlbert's unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.

280.    As a further result of Defendant Hurlbert's unlawful conduct, Plaintiff incurred special damages, including loss of past and future income and loss of earning capacity, and may continue to incur further economic or other special damages, in amounts to be established at trial.

281.    Pursuant to 28 U.S.C. Section 1367, this Court has pendent jurisdiction to hear and adjudicate such claims.

**Tenth Claim for Relief**
**State Law Claim- Defamation**
**(Against Defendants Lisa Kirkman, Bill Elder, Joe Breister and Dan May)**

282.     Plaintiff relies on all of the above facts in asserting this claim.

283.     Defendants Kirkman, Elder, Breister and May negligently or maliciously published false, defamatory statements of fact about Plaintiff, a private individual.

284.     Defendants May, Kirkman, Elder and Breister purposely had Plaintiff's name placed on the *Brady* list without any grounds.  There was no basis for Plaintiff to be placed on the *Brady* list.  Placing Plaintiff's name on the *Brady* list is a statement that Plaintiff has been untruthful and/or committed other wrongs that would impede on his credibility.  This was untrue, Plaintiff had done no such thing.

285.     This statement has tainted his reputation, affected his business and personal relationships, and has caused him embarrassment and humiliation.

286.     Plaintiff has suffered substantial injury as a result of Defendant's defamatory statement, including injury to character and reputation, mental anguish, loss of past and future income and loss of earning capacity.

287.     As a proximate result of Defendant's unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.

288.     As a further result of Defendant May's unlawful conduct, Plaintiff incurred special damages, including loss of past and future income and loss of earning capacity, and may continue to incur further economic or other special damages, in amounts to be established at trial.

289.     Pursuant to 28 U.S.C. Section 1367, this Court has pendent jurisdiction to hear and adjudicate such claims.

**Eleventh Claim for Relief**

**State Law Claim- Tortious Interference with Prospective Economic Advantage
(Against All Defendants)**

290.     Plaintiff relies on all of the above facts in asserting this claim.

291.     Plaintiff had established relationships with the community, local agencies, clients and/or businesses who utilized Plaintiff's services to his economic benefit.

292.     At the time of the incidents described above, Plaintiff owned a profitable business as a private investigator and expert in digital forensics.  Between October 2014 and May 2016 Plaintiff was privately hired to work on approximately 70 cases either at a rate of $100 per hour as a private investigator or at a rate of $200 -$250 per hour as an expert in digital forensics.  In his practice as a private investigator and expert witness in the field of digital forensics, Plaintiff was often required to testify in court.

293.     Defendants knew of Plaintiff's business as a private investigator and the clients, or types of clients, he serviced.

294.     Defendants wrongfully disrupted Plaintiff's economic relationships with past, current, and prospective clients.

295.     Defendants violated Plaintiff's Fourth and Fourteenth Amendment rights to be free from malicious prosecution.  Defendants, among other things, as enumerated above, (1) fabricate evidence, (2) manipulate witness testimony, (3) suppress exculpatory evidence, and (4) falsified charges in order to indict, arrest, and prosecute Plaintiff on without probable cause, resulting in his unlawful confinement and continued prosecution.

296.    Plaintiff's arrest, confinement, and continued prosecution tarnished Plaintiff's reputation and prevented past, current, and prospective customers and merchants from conducting business with Plaintiff.

297.    Furthermore, Defendants May, Kirkman, Elder and Breister purposely had Plaintiff's name placed on the *Brady* list without any grounds.  There was no basis for Plaintiff to be placed on the *Brady* list, and Defendants May, Kirkman, Elder and Breister purposely had Plaintiff's name placed on the list in order to interfere with his prospective economic advantage.

298.    In the absence of Defendants wrongful actions, it is reasonably probable that Plaintiff would have realized an economic advantage or benefit from clients he was prevented from serving.

299.    As a proximate result of Defendants' conduct, Plaintiff suffered damages in an amount to be proven at trial.

300.    Defendants' intentionally and willfully interfered with Plaintiff's economic relationships in order to cause damage to Plaintiff's lawful business.  Defendants' interference was perpetuated with actual malice and ill will toward Plaintiff, and with intentional and improper purpose of causing damages.  There was no justifiable cause for Defendants' actions.

301.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.

302.    As a further result of Defendants' unlawful conduct, Plaintiff incurred special damages, including loss of past and future income and loss of earning capacity, and may continue to incur further economic or other special damages, in amounts to be established at trial.

303.    Pursuant to 28 U.S.C. Section 1367, this Court has pendent jurisdiction to hear and adjudicate such claims.

## REQUEST FOR RELIEF

Plaintiff requests that this Court enter judgment for him and against each of the Defendants and grants:

A.     Compensatory and punitive damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount of $10,000,000, or such greater amount as may be set by a jury;

B.     Economic losses on all claims allowed by law;

C.     Special damages;

D.     Attorneys' fees and the costs associated with this action under 42 U.S.C. §1988, including expert witness fees, on all claims allowed by law;

E.     Pre- and post-judgment interest at the lawful rate; and

F.     Any further relief that this court deems just and proper, and any other appropriate relief at law and equity.

## REQUESTS FOR A TRIAL BY JURY

A trial by jury is hereby demanded on each and every one of the claims as pled herein.


Dated:                 Denver, Colorado
                       October 16, 2018
                                              Respectfully submitted,



                                              _/S/Jane Fisher-Byrialsen (#49133)_
                                              Kaitlin F. Nares (#48419)
                                              David N. Fisher (#48253)
                                              **FISHER & BYRIALSEN, P.L.L.C.**
                                              4600 S. Syracuse Street, 9th Floor
                                              Denver, Colorado 80237
                                              T: 303-256-6345
                                              Jane@FBLaw.org
                                              David@ FBLaw.org
                                              Kaitlin@ FBLaw.org



                                              _/s/ Lisa Polansky (# 31539 )_
                                              **THE POLANSKY LAW FIRM**
                                              4999 Pearl East Circle
                                              Suite 201
                                              Boulder, CO 80301
                                              Lisa@Polanskylawfirm.com