IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-02646-MEH

JUAN SAN AGUSTIN, JR.,

      Plaintiff,

v.

EL PASO COUNTY,
FOURTH JUDICIAL DISTRICT OF COLORADO,
DAN MAY, District Attorney,
SHANNON GERHART, Deputy District Attorney,
BILL ELDER, El Paso County Sheriff,
JOE BREISTER, El Paso County Undersheriff,
LISA KIRKMAN, El Paso Legal Advisor,
ROBERT JAWORSKI, El Paso County Deputy Sheriff,
COLORADO BUREAU OF INVESTIGATIONS,
RALPH GAGLIARDI, Colorado Bureau of Investigation Agent,
GEORGE BRAUCHLER, District Attorney,
MARK HURLBERT, Assistant District Attorney,
GRANT FEVURLY, Deputy District Attorney,
THE EIGHTEENTH JUDICIAL DISTRICT OF COLORADO, and
OFFICERS JOHN DOE 1-11, in their individual and official capacities,

      Defendants.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge.**

      This action arises out of the investigation, arrest, and prosecution of the Plaintiff Juan San

Agustin Jr. ("Plaintiff"), a former inspector with the El Paso County Sheriff's Office. Plaintiff

brings eleven claims for relief against the various Defendants, five pursuant to 42 U.S.C. § 1983 and

six under state law, as follows:

| Claim 1 | § 1983 Malicious Prosecution | All Individual Defendants |
|---|---|---|
| Claim 2 | § 1983 Substantive Due Process | All Individual Defendants |

| Claim 3 | § 1983 Conspiracy | All Defendants |
| Claim 4 | § 1983 *Monell* Claim | El Paso County (EPC) |
| Claim 5 | § 1983 *Monell* Claim | 4th and 18th District Attorney Offices (DAO) |
| Claim 6 | State Law *Respondeat Superior* | EPC, 4th and 18th DAOs, Colorado Bureau of Investigation (CBI) |
| Claim 7 | State Law - Intentional Infliction of Emotional Distress | All Individual Defendants |
| Claim 8 | State Law - Abuse of Process | May, Brauchler, Hurlbert, Fevurly, Gerhart, Elder, Breister, Jaworski, Gagliardi |
| Claim 9 | State Law - Defamation | Hurlbert |
| Claim 10 | State Law - Defamation ("Brady List") | Kirkman, Elder, Breister, May |
| Claim 11 | Tortious Interference with Economic Advantage | All Defendants |

*See* Am. Compl., ECF No. 50. In response, Defendants filed a "combined" motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) arguing the Court lacks jurisdiction to hear certain claims and the Plaintiff fails to plausibly state the remaining claims. For the reasons that follow, the Court will grant in part and deny in part the Defendants' motion.

## STATEMENT OF FACTS

The following are relevant factual allegations (as opposed to legal conclusions, bare assertions, or merely conclusory allegations) made by Plaintiff in his Second Amended Complaint, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(1) pursuant to *Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995) and under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

From 2004 through 2008, Defendant Dan May was the Chief Deputy District Attorney for Colorado's 18th Judicial District. During his time with the 18th Judicial District, Defendant May focused considerable efforts on prosecuting members of the "Sureños Gang." Due to his impact on the gang and its members, the Sureños put out an assassination request or "hit" on Defendant May. The Sureños recruited the "211 Crew," a white supremacist prison gang linked to several high-profile murders and criminal investigations in Colorado, to assassinate Defendant May.

Sean May was a Deputy District Attorney in the 17th Judicial District, the northern neighbor of the 18th Judicial District, during the same time period that Defendant May was aggressively prosecuting the Sureños. On August 27, 2008, as Sean May was walking home through the alley behind his home in north Denver, he was shot and killed by members of the 211 Crew. The assassin mistakenly killed Deputy District Attorney Sean May instead of Defendant May. Although the gang involved in killing Sean May is known, the individual responsible for Sean May's murder has never been found.

In early to mid-2010, a number of other white-supremacist gangs began to expand their foothold in Colorado and to challenge the 211 Crew. To demonstrate that Colorado was 211 Crew's territory, the hierarchy of the gang ordered a lower ranking member of the gang to commit a high-profile homicide of an individual who was not incarcerated within the prison system. The 211 Crew chose a low-ranking member, Evan Ebel, who had incurred a debt to the gang.

Tom Clements, head of the Colorado Department of Corrections, became one of the targets of the 211 Crew. On March 19, 2013, Mr. Clements was assassinated at his home by Ebel, after which Ebel fled to Texas where he died in a shootout with Texas law enforcement. Shortly after Ebel's death, Texas Rangers determined Ebel had come from Colorado and Colorado law enforcement, specifically the Plaintiff and Deputy District Attorney Jeffrey Lindsey of the Fourth

Judicial District, became involved with the investigation. Colorado Governor John Hickenlooper gave law enforcement use of his plane so that they were able to travel to Texas as quickly as possible to investigate Mr. Clements' death. On arriving in Texas on a second trip, Plaintiff and Lindsey were put in contact with a confidential informant, previously a member of the 211 Crew, who had information relating to the Tom Clements' homicide: high-ranking members of the 211 Crew had ordered the confidential informant to house Ebel after he arrived in Texas so that he could remain hidden until the news of Mr. Clements' murder became less widely publicized.

At or about the same time in 2013, Defendant May (who had been elected District Attorney ("DA") of the Fourth Judicial District) discovered that he was in fact the intended target of the 2008 assassination of Sean May. After learning this, May upgraded all security at the District Attorney's Office to include metal detectors, armed security, and bullet proof glass in the reception area. Also, when meeting with the confidential informant, Texas Ranger James Holland, at the direction of May, immediately asked the informant what he knew about the Sean May murder.

After approximately 120 days, Plaintiff and other members of the investigation team felt they had probable cause to believe that Evan Ebel had not acted alone, and that certain high-ranking members of the 211 Crew, who were out of custody and at large in the community at the time, should be charged with the murder. Despite Plaintiff's insistence that probable cause existed to prosecute these members, May decided to remove Lindsey from the case and refused to bring charges. Plaintiff continued to advocate for the prosecution of those who conspired to murder Tom Clements, at times through the news media.

Meanwhile, on or about August 12, 2013, Kelly Trull, who was a nurse in the El Paso County Jail, was allegedly assaulted by her boyfriend Travis Garretson, an El Paso County Deputy Sheriff. After the alleged assault, Trull went to the house of her friends, Michelle and Scott Mackey,

who were also employees of the El Paso County Sheriff's Office ("EPCSO"), and they urged Trull to report the incident. At work the following day, Trull reported the assault to Wendy Habert and Defendant Undersheriff Joe Breister, who referred the matter to the Investigations Division. Defendant Detective Lisa Kaiser was assigned to the case. Garretson was arrested and his employment with the Sheriff's Office was suspended.

Trull and Garretson continued to live together and resumed their romantic relationship. Trull did not want Garretson to lose his job, so on September 12, 2013, she went to the EPCSO and informed Detective Kaiser that she had lied when she made her statement accusing Garretson of assaulting her. When Trull arrived at the EPCSO, she was escorted to a room on the second floor of the building by Detective Kaiser for a follow-up interview. Before the interview began, Defendant Sergeant Robert Jaworski called in Defendant Deputy District Attorney ("DDA") Shannon Gerhart and other employees of the EPCSO who all observed the interview from a nearby conference room.

During the interview, Trull admitted to driving under the influence of alcohol and to assaulting Garretson. Trull also indicated that Garretson had acted in self-defense. At 9:49 a.m., Detective Kaiser left the interview room and met with Gerhart and EPCSO command staff to determine whether there was probable cause to arrest Trull. During this meeting, Gerhart stated there was probable cause to arrest Trull for Harassment and Driving Under the Influence. Trull was ultimately arrested and prosecuted on these charges. Plaintiff was not present for the meeting. Employee key card records obtained by Defendant Colorado Bureau of Investigation ("CBI") show Plaintiff left the second floor of the EPCSO at 9:30 a.m., nineteen minutes before the meeting. Two minutes later his key card was swiped again, this time leaving the parking structure, and he did not return that day.

When Defendant Bill Elder announced in 2013 that he was running for Sheriff of El Paso County, Plaintiff was alerted to the fact that Elder's internal affairs file was missing. Plaintiff was assigned to investigate what had happened to the missing file, and he worked with two detectives to attempt to locate the file. Once they became sure the file was gone, they attempted to find out who had stolen and/or destroyed the file, but were unable to solve the issue. Plaintiff did not support Elder in his 2014 campaign and, in the fall of 2014, Elder was elected El Paso County Sheriff.

When it became clear that Elder would win the election, Plaintiff decided to transition into the private employment sector, as Elder had made statements that Plaintiff was going to be demoted and transferred out of the Investigations Division. Plaintiff was able to rapidly build a profitable business as a private investigator and expert in digital forensics, and he was often asked to testify in court.

In 2014, DA May contacted the CBI and had the agency initiate an investigation into various allegations of wrongdoing by then El Paso County Sheriff Terry Maketa. Plaintiff was interviewed numerous times in 2014 concerning various allegations of wrongdoing by Sheriff Maketa. Part of the investigation involved the Trull arrest. Detective Kaiser told CBI agents that Gerhart was giving legal advice and when it was determined to charge Trull with Harassment and DUI, Gerhart said, "Okay, sounds good." When asked by CBI agents if Gerhart was "calling the shots," Detective Kaiser agreed. The detective stated, "I know [Gerhart] observed my interview and was in the conference room discussing what [Trull] would be charged with. Gerhart, Jaworski were there, but other supervisors were there, there's always, there's gawkers, could have been anyone in there." In a two-hour-and-twelve-minute interview conducted on September 15, 2014 by the CBI, Detective Kaiser said nothing about Plaintiff participating in the decision to arrest Trull. That same day, she stated that her direct supervisor in 2012, Sergeant Jaworski, came to her desk in the morning and

informed her that Trull was coming in for a second interview, and that "the decision to arrest Trull came from her chain of command to include Gerhart [who] was present and observed the interview from the conference room."  In September 2014, the CBI concluded its investigation, finding no wrongdoing with regard to the Trull matter.  Plaintiff was never a subject of the investigation, and no wrongdoing by Plaintiff was discovered during that investigation. No arrests were made in 2014 in relation to the suspected wrongdoing of Sheriff Maketa.

In early March 2016, Plaintiff was interviewed by Kirk Mitchell of the Denver Post.  During that interview, Plaintiff expressed his opinion that the murder of Tom Clements was orchestrated by the 211 Crew and stated that he had made requests to DA May to bring criminal charges.  An article titled, "New Details Emerge Three Years After Murder of Colorado Prisons' Chief," was published on March 16, 2016.  The article related the story of Tom Clements' murder and prominently featured Plaintiff's statement regarding his urging of DA May's office to prosecute the 211 Crew hierarchy for conspiracy to murder Mr. Clements.  Prior to publishing the article, Mr. Mitchell contacted DA May and Sheriff Elder for comments regarding Plaintiff's and Terry Maketa's concerns that the Tom Clements investigation was being mishandled and not properly prosecuted.

Shortly after publication of the Denver Post article, May contacted Defendant DA George Brauchler of the 18th Judicial District seeking another investigation of former Sheriff Terry Maketa. Brauchler, at May's request, initiated another investigation and a grand jury inquiry into Maketa's conduct.  Defendant Assistant District Attorney ("ADA") Mark Hurlbert and Defendant DDA Grant Fevurly were assigned by Brauchler to perform this investigation under his supervision.

This second investigation of Sheriff Maketa involved looking back into the Trull matter. Hurlbert and Fevurly traveled to El Paso County with CBI agents to interview Wendy Habert,

Trull's supervisor at the time she initially made the report against Garretson. CBI agents also interviewed Sergeant Jaworski regarding the Trull matter; Jaworski said multiple times that he did not remember the Trull arrest meeting or who was present. Additionally, CBI agents interviewed El Paso County Sheriff's Deputy Mitch Lincoln who informed them that Plaintiff was not at the Trull interview or arrest meeting. Then, in or about late March to early April 2016, CBI agents interviewed one current and one former EPCSO deputy sheriff. In the recorded interview, CBI agents specifically asked the two sheriff's deputies why Plaintiff had given negative statements to the press in early March 2016 regarding the Clements investigation.

In or about April 2016, Jaworski, while still employed at the EPCSO, referred to President Barack Obama as a "n----r" in front of several other deputies and members of the coroner's office. He also had referred to Plaintiff, a Pacific Islander from the Island of Guam (also known as Chamorro), as a "g--k." Jaworski was subsequently forced to retire from the EPCSO because of his remark about President Obama. In April or May 2016, Sheriff Elder made public statements that he would have fired Jaworski if he had not retired voluntarily.

Also in or about April 2016, May, Brauchler, Hulbert, and Fevurly caused a grand jury to be convened seeking indictments against Maketa and former Undersheriff Paula Presley, which included allegations of wrongdoing surrounding the Trull matter, among others. Plaintiff was not a target of the grand jury investigation in April 2016. Hurlbert and Fevurly were responsible for presenting evidence to the grand jury and, otherwise, for overseeing the prosecution. In April 2016, Undersheriff Breister openly stated that if Maketa, Presley, and Plaintiff "want to talk to the press just wait until this nuke drops on them."

The grand jury met on April 27, May 4, May 11, May 18, and May 25, 2016. Plaintiff was not mentioned in the April 27, 2016 proceedings. Detective Kaiser testified on May 4, 2016

regarding the Trull arrest meeting, stating numerous times that, during the meeting, it was DDA Gerhart who told her to charge Trull. At no time did Detective Kaiser volunteer that Plaintiff was present during the Trull arrest meeting; however, when asked by Hurlbert, she testified that "[t]here was a heavy interest in the case so I believe he was there." Hurlbert and Fevurly were aware of Plaintiff's key card data showing he was not present at the meeting.

During the May 11, 2016 grand jury proceeding, Gerhart testified that Sergeant Jaworski asked her to come watch the Trull interview to determine whether any charges should be brought. Gerhart testified that she watched the entire interview, but in contrast with Detective Kaiser's testimony, Gerhart testified that she did not order Trull's arrest and was "laughing" in the arrest meeting about charging Trull. May, Hurlbert, and Fevurly did not present to the grand jury Gerhart's prior statements from her March 17, 2016 tape-recorded interview with CBI Agent Martinez, during which she told the agent that she had advised individuals in the Trull arrest meeting that she believed EPCSO had probable cause to arrest Trull for Harassment and Driving Under the Influence.

Undersheriff Breister also testified on May 11, 2016; however, although they knew that Trull's initial statements to Breister on August 13, 2013 provided probable cause for her arrest, Hurlbert and Fevurly did not ask him about the interview. In addition, Breister did not volunteer any information about that interview.

Finally, Jaworski also testified before the grand jury on May 11, 2016 stating there was no District Attorney with whom to consult about the decision to arrest Trull and he would have rather consulted with a District Attorney but did not do so. May, Hurlbert, and Fevurly did not correct this testimony despite the fact that they had Jaworski's March 10, 2016 recorded interview with CBI Agents Shierkolk and Martinez during which Jaworski stated numerous times that he did not

9

remember anything about the Trull interview or the Trull arrest meeting. Jaworski told the agents it was "too long ago" and he did not remember being there, let alone who else was watching the interview.

In addition, Jaworski testified that he was at the Trull arrest meeting, Plaintiff was also there, and Plaintiff gave the order to arrest. Jaworski was retired at the time he testified before the grand jury, and May, Hurlbert, and Fevurly withheld from the grand jury that Jaworski disliked Plaintiff, had called Plaintiff many racially biased slurs, and had been forced to retire due to the comments he made about President Obama.

On or about May 12, 2016, CBI Agent Timothy Martinez served a subpoena on the Plaintiff for his testimony before the grand jury on May 18, 2016. Plaintiff retained John Newsome to represent him in connection with the subpoena. Newsome contacted Fevurly and Hurlbert and inquired as to the purpose of the subpoena and the testimony requested of Plaintiff. Hurlbert responded and advised Newsome that Plaintiff was needed to testify regarding a false arrest scenario involving former Sheriff Maketa, and specifically that they wanted Plaintiff to testify about an order to make an arrest of a deputy's girlfriend. After consulting with Plaintiff, Newsome informed Hurlbert and Fevurly that Plaintiff had never ordered an arrest in that matter, Maketa had never ordered Plaintiff to make an arrest at any time, and Plaintiff was not a participant in any conference where it was determined that a deputy's girlfriend would be arrested. Newsome also informed Hurlbert and Fevurly that Plaintiff was willing to testify to those facts and take a polygraph; however, on May 17, 2016, Newsome was informed that Plaintiff did not need to appear on his subpoena. Hurlbert called Newsome again and informed him that there would be one or two more grand jury sessions, and stated that if Plaintiff changed his mind about what he would say to the grand jury, Plaintiff should let them know.

On May 18, 2016, Al Harmon, EPCSO Bureau Chief and Plaintiff's former commanding officer, testified before the grand jury. Harmon testified repeatedly that he did not recall being present at the Trull interview or arrest meeting; however, when a juror advised him, "we were told the DDA, Jaworski, and [Plaintiff] agreed to arrest her," Harmon stated, "it sounds like Kaiser went to Jaworski, who went to San Agustin, who was there." May, Hurlbert, and Fevurly did not clarify for the grand jury that Harmon was "guessing" and that there was evidence showing Plaintiff was not there. May, Hurlbert, and Fevurly also did not present to the grand jury Harmon's card reader data, which they received on May 19, 2016, reflecting that Harmon watched the Trull interview and was present for the entire Trull arrest meeting.

On May 25, 2016, Defendant CBI Agent Ralph Gagliardi testified that the key card data showed Plaintiff was present during the Trull arrest meeting in Room 200b, despite the fact that the key card data showed Plaintiff had left the building and parking structure about nineteen minutes prior to the Trull arrest meeting. Gagliardi also falsely conveyed to the grand jury that there was a card reader panel outside of the conference room on the second floor, and that Plaintiff swiped his card to get into the conference room where the Trull arrest meeting took place. However, there is a card reader panel for access to the second floor but, once on the second floor, there is no additional security required to gain access to the interview and conference rooms.

With respect to who was present in the Trull arrest meeting, Brauchler, May, Hulbert, Fevurly, Gagliardi, and Jaworski knew and presented evidence to the grand jury that the offices of the commanders, including Terry Maketa, Paula Presley, and Al Harmon, were on the fifth floor. Key card data would demonstrate whether any of the commanders left the fifth floor to go to the second floor during the Trull interview and/or arrest meeting. However, during the May 25, 2016 grand jury proceeding, at which Gagliardi was asked who else was in Room 200, he responded,

"there's a few others that we have heard that we've [sic] been named or been talked about here, we asked for access logs on those folks. They show present in the building, that kind of thing." But, he and the other Defendants had the actual card reader data showing the precise floor within the building where people were located at specific times. Rather than presenting that evidence, the Defendants elicited vague testimony about other people's whereabouts.

Gagliardi watched Harmon testify before the grand jury that he did not recall being present at the Trull arrest meeting. However, Harmon's card reader data not only showed him "present in the building," it showed him leaving his office on the fifth floor and arriving to the second floor that day, just after the Trull interview started at 9:34 a.m., then leaving the second floor after Trull was arrested at 10:14 a.m. This evidence was withheld from the grand jury. Gagliardi also omitted previous testimony from Deputy Lincoln admitting that he was at the Trull arrest meeting and that his card reader data showed him arriving on the second floor at 8:19 a.m. and leaving to go to the fifth floor at 11:09 a.m., after Trull was arrested. Deputy Lincoln also stated during a March 24, 2016 interview that Plaintiff was not present at the arrest meeting. Hurlbert and Fevurly did not call Deputy Lincoln to testify before the grand jury.

Trull had related at least four different versions of the incident between her and Garretson to various officials. In almost every version, Trull claimed she changed from the prior version due to coercion by either Habert, her boss, or Presley, then EPSCO undersheriff. However, the first version provided to Breister, for which probable cause allegedly existed to arrest Trull, was not presented to the grand jury by Defendants.

On May 25, 2016, Plaintiff was indicted for the kidnapping and false imprisonment of Kelly Trull, docket number 2016-CR-2686, based on the theory that Plaintiff was present during the Trull arrest meeting and ordered her arrest. During the pendency of the case, Plaintiff's defense attorneys

analyzed the key card reader data and filed motions to dismiss the indictment. Brauchler, May, Hurlbert, and Fuverly responded to the motions to dismiss by arguing that the key card reader data was of "extremely limited utility," and that Plaintiff had engaged in "ghosting" to get himself into the Trull arrest meeting without his key card being used and/or that Plaintiff had called in the order to have Trull arrested. However, Plaintiff's telephone records, to which the Defendants had access, show that he did not make or receive a single telephone call to or from anyone involved in the Trull arrest on September 12, 2013.

All charges against Plaintiff were dismissed on October 16, 2017. In the motion to dismiss the charges, Brauchler and Hurlbert stated that, following the indictment of Plaintiff, information was uncovered that called into question the testimony of their main witnesses, namely that Jaworski had made a racist statement about President Obama and that Detective Kaiser testified in another proceeding that Gerhart gave the order to arrest Trull. However, Brauchler and Hurlbert knew this information before Plaintiff was indicted. After the charges against Plaintiff were dismissed, Hurlbert made a public statement that Plaintiff was guilty despite the dismissal of the charges.

Judicial districts, including the Fourth Judicial District, maintain what is commonly known as a "*Brady* list." The *Brady* list is routinely disclosed to defense counsel through the discovery process and provides a list of sheriff's deputies within the judicial district who have previously strayed from the truth or committed other acts of wrongdoing. In late 2016, Plaintiff was contacted by an attorney for whom he often worked as a private investigator or expert witness, and was told that his name had been disclosed on the *Brady* list and, therefore, the attorney could no longer use him as an investigator or expert. At that time, within the Fourth Judicial District, the *Brady* list was compiled by the internal affairs unit at the supervision and direction of Defendant Lisa Kirkman, an attorney and legal advisor to the sheriff's office, Sheriff Elder, Undersheriff Breister, and DA May.

13

When he left the EPCSO in 2014, Plaintiff was not on the *Brady* list and had never been, and he has never done anything to warrant being placed on the *Brady* list.

<u>**LEGAL STANDARDS**</u>

**I.      Dismissal under Fed. R. Civ. P. 12(b)(1)**

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of subject matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Dismissal under Rule 12(b)(1) is not a judgment on the merits of the plaintiff's case, but only a determination that the court lacks authority to adjudicate the matter. *See Butler v. Kempthorne*, 532 F.3d 1108, 1110 (10th Cir. 2008) (recognizing federal courts are courts of limited jurisdiction and "there is a presumption against our jurisdiction"). A court lacking jurisdiction "must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking." *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1016 (10th Cir. 2013). A motion to dismiss under Rule 12(b) "admits all well-pleaded facts in the complaint as distinguished from conclusory allegations." *Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir. 2001). The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *See Pueblo of Jemez v. United States*, 790 F.3d 1143, 1151 (10th Cir. 2015). Accordingly, Plaintiff bears the burden in this case of establishing that this Court has jurisdiction to hear his claims.

Generally, Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction take two forms. *Holt v. United States*, 46 F.3d 1000, 1002 (10th 1995).

> First, a facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint. In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true. Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional

facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

*Id.* at 1002–03 (citations omitted); *see also Pueblo of Jemez*, 790 F.3d at 1148 n.4. The present motion launches a facial attack on this Court's subject matter jurisdiction; therefore, the Court will accept the Second Amended Complaint's factual allegations as true for its Rule 12(b)(1) analysis.

## II.      Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* *Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 679. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)). "The

nature and specificity of the allegations required to state a plausible claim will vary based on context." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id.* (quotation marks and citation omitted).

## ANALYSIS

### I.    Federal (Section 1983) Claims

Plaintiff sues the non-entity Defendants in both their individual and official capacities. Am. Compl. ¶¶ 5-10, 12, 14-16. Both entity and non-entity Defendants argue first that they enjoy certain immunities rendering the Court without jurisdiction to hear particular claims against them and, second, that the Plaintiff fails to plausibly allege the remaining claims. Typically, "[w]hen a defendant seeks dismissal under Rule 12(b)(1) and 12(b)(6) in the alternative, the court must decide

first the 12(b)(1) motion for the 12(b)(6) challenge would be moot if the court lacked subject matter jurisdiction." *Glapion v. Castro*, 79 F. Supp. 3d 1207, 1213 (D. Colo. 2015) (citing *Mounkes v. Conklin*, 922 F. Supp. 1501, 1506 (D. Kan. 1996)).

A.   Sovereign Immunity

Defendants argue they are absolutely immune pursuant to the doctrine of sovereign immunity from liability for Plaintiff's Section 1983 claims (Claims 1, 2, 3 and 5) for monetary damages alleged against them as state entities or in their official capacities.

Claims against state officials in their official capacities are essentially claims against the state entity. *Ky. v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent.") (citation and quotations omitted).  It is well-established that "the Eleventh Amendment precludes a federal court from assessing damages against state officials sued in their official capacities because such suits are in essence suits against the state."  *Hunt v. Bennett,* 17 F.3d 1263, 1267 (10th Cir. 1994).  Absent an unmistakable waiver by a state of its Eleventh Amendment immunity, or an unmistakable abrogation of such immunity by Congress, the Eleventh Amendment provides absolute immunity from suit in federal courts for states and their agencies.  *Blatchford v. Native Village of Noatak & Circle Village,* 501 U.S. 775, 785-86 (1991). Thus, an official-capacity lawsuit is appropriate only where the claims could be sustained against the entity in its own name.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

The Supreme Court has recognized an exception to the Eleventh Amendment for such actions where a plaintiff seeks prospective enforcement of his or her federal rights.  *See Ex parte Young,* 209 U.S. 123, 159-60 (1908).  But *Young* makes it clear that this exception "may not be used to obtain a declaration that a state officer has violated a plaintiff's federal rights in the past" or as

a means for seeking money damages. *Buchwald v. Univ. of New Mexico Sch. of Med.,* 159 F.3d 487, 495 (10th Cir. 1998) (citations and quotations omitted).

In this case, the parties do not dispute that the CBI is a state entity (and Gagliardi a state officer) for purposes of an Eleventh Amendment immunity analysis. *See* Resp. 25. However, citing the Colorado Supreme Court's opinion in *Davidson v. Sandstrom*, 83 P.3d 648 (Colo. 2004), Plaintiff argues that the Fourth and Eighteenth Judicial District Attorney's Offices and the Defendants employed by them (sued in their official capacities) are not protected by the Eleventh Amendment. Defendants counter that more recent case law clarifies the *Davidson* opinion does not stand for the proposition that district attorneys are not state officers for a sovereign immunity analysis. The Court agrees with Defendants.

Plaintiff contends that, in *Davidson*, the Colorado Supreme Court clarified that the office of District Attorney is a political subdivision under state law, not an instrumentality of the State of Colorado. Resp. 13. However, the Honorable Neil M. Gorsuch rejected this argument in *Van de Weghe v. Chambers*, 569 F. App'x 617, 621 (10th Cir. 2014) saying, "*Davidson* held no such thing. The decision held only that the state's *judicial districts* (not District Attorneys assigned to them) are political subdivisions of the state." *Id.* The court proceeded to list several decisions in Colorado's appellate courts finding district attorneys to be "state public officers" who "belong to the executive branch," as well as Colorado statutes providing that district attorneys "appear on 'behalf of the state' and may appear in court outside their particular districts 'on behalf of' and 'represent[ing] the people of the state of Colorado' as a whole," which the *Davidson* court "didn't question." *Id.* The court concluded that *Davidson* did not "throw *Rozek* [*v. Topolnicki*, 865 F.2d 1154 (10th Cir. 1989)[1]]

---

[1] In *Rozek*, the Tenth Circuit held that the Eighteenth Judicial District Attorney's Office is an arm of the state, and therefore shares in the state's sovereign immunity. *Id.* at 1158.

overboard." *Id.*; *see also Sanchez v. Hartley*, 65 F. Supp. 3d 1111, 1126 (D. Colo. 2014); *Bragg v. Office of the Dist. Attorney*, 704 F. Supp. 2d 1032, 1064–67 (D. Colo. 2009).

This Court agrees with the more recent opinions and finds that Defendants Fourth and Eighth Judicial District Attorney's Offices, as well as Defendants May, Gerhart, Brauchler, Hurlbert, and Fevurly, in their official capacities, are state entities entitled to sovereign immunity under the Eleventh Amendment against claims for monetary damages and retrospective injunctive and/or declaratory relief.

Here, Plaintiff's Request for Relief in the operative pleading reflects requests for only monetary ("compensatory," "punitive," and "economic") damages against the entity and official-capacity Defendants. ECF No. 50 at 48. Therefore, to the extent that Plaintiff seeks monetary damages and other relief for past harms raised in his Section 1983 claims against Defendants CBI, Fourth Judicial District Attorney's Office, and Eighteenth Judicial District Attorney's Office, and against Defendants Gagliardi, May, Gerhart, Brauchler, Hurlbert, and Fevurly in their official capacities, the Court finds it lacks jurisdiction under the Eleventh Amendment to hear such claims.

Plaintiff argues that, despite the absence of a specific request for prospective injunctive relief, his Second Amended Complaint may be construed as seeking an order removing his name from the *Brady* list. Resp. 8. The Court disagrees. The operative pleading, while alleging that Plaintiff learned his name had been placed on the *Brady* list "in late 2016," contains no allegation that Plaintiff's name remains on the list nor any request that his name be removed. Rather, Plaintiff alleges claims for Defamation and Tortious Interference with Prospective Business Advantage based on the placement of his name on the *Brady* list, and he seeks monetary damages for these claims. See Am. Compl. ¶¶ 302-303, 316-317. Plaintiff is not permitted to add allegations to his pleading through briefing on a dispositive motion. *See* Fed. R. Civ. P. 15.

Accordingly, Claims 1 and 2 against the official-capacity Defendants, Claim 3 against the state-entity and official-capacity Defendants, and Claim 5[2] are dismissed.

B.     Prosecutorial Immunity

Absolute immunity provides protection from suit for some public officials on the basis that "harassment by unfounded litigation would cause a deflection of the [official's] energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Imbler v. Pachtman*, 424 U.S. 409, 423 (1976).  Prosecutors enjoy absolute immunity from civil suits for damages asserted against them for actions taken "in initiating a prosecution and in presenting the State's case." *Id.* at 431.

The question of whether a prosecutor is entitled to absolute immunity for his or her actions depends on the nature of the function performed by the prosecutor at the time of the alleged misconduct. *Buckley v. Fitzsimmons*, 509 U.S. 259, 271 (1993).  Actions taken as an advocate or, more specifically, "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State" support absolute immunity.  *Id.* at 273; *see also Warnick v. Cooley*, 895 F.3d 746, 751 (10th Cir. 2018) ("[p]rosecutors are entitled to absolute immunity" for anything they do in their roles as advocates, including their "decisions to prosecute.") (quoting *Nielander v. Bd. of Cty. Comm'rs*, 582 F.3d 1155, 1164 (10th Cir. 2009)).

---

[2]Claim 5, alleging a claim pursuant to *Monell* against the Fourth and Eighteenth Judicial District Attorney's Offices, also fails to state a plausible claim for relief for the simple reason that in *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989), the Supreme Court specifically noted that *Monell* had limited its holding "to local government units which are not considered part of the State for Eleventh Amendment purposes."

However, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley*, 509 U.S. at 273. Instead, prosecutors performing these acts enjoy only qualified immunity. *Id.* But, "while prosecutors may not enjoy absolute immunity for activities unrelated to advocacy, that does not mean that engaging in such activities removes their immunity for activities that are related to advocacy. . . . absolute immunity is not 'subject to all-or-nothing application'—it can apply to some of the prosecutor's actions while not to others at the same time." *Warnick*, 895 F.3d at 751.

If prosecutorial immunity does attach, it is absolute and, therefore, applies to cases of malicious or bad faith prosecution, *Imbler*, 424 U.S. at 437, even if it is obvious "to the prosecutor that he is acting unconstitutionally and thus beyond his authority." *Lerwill v. Joslin*, 712 F.2d 435, 438 (10th Cir. 1983). "[A]ctivities undertaken by a prosecutor before probable cause exists often lie outside the purview of a prosecutor's role as an advocate." *Warnick*, 895 F.3d at 752 (citing *Buckley*, 509 U.S. at 274).

> But while a lack of probable cause is a good clue a prosecutor is engaging in activity beyond the scope of advocacy, it is not determinative. Some functions—like filing charges—are inherently related to a prosecutor's role as an advocate, and therefore protected by absolute immunity whether or not probable cause exists. Hence the well-settled rule that prosecutors are "entitled to absolute immunity for the malicious prosecution of someone whom [they] lacked probable cause to indict."

*Id.*

In this case, Plaintiff alleges Defendants May, Gerhart, Brauchler, Hurlbert and Fevurly conspired to fabricate evidence, manipulate witness testimony, suppress exculpatory evidence, and falsify charges in an effort to mislead a grand jury to indict him. These Defendants argue they, as "Prosecutors," are protected by prosecutorial immunity stating, "both submitting a case to the grand

jury and bringing charges are intimately associated with a prosecutor's role as an advocate for the State." The "Law Enforcement" Defendants (Elder, Breister, and Kirkman) also contend they are absolutely immune because "they are alleged to have engaged in functions intimately associated with the judicial phase of the criminal process and outside of their normal investigatory roles."

Plaintiff concedes that prosecutors are entitled to absolute immunity for any alleged conduct as advocates, but counters that "because Brauchler, May, Fevurly, and/or Hurlbert took active roles in the investigatory process that resulted in the constitutional deprivation ..., the immunity afforded to them should be the same as the other investigators or law enforcement actors." In addition, Plaintiff asserts that Defendants' case law supporting an argument that the Law Enforcement Defendants are entitled to absolute immunity is abrogated, inapplicable, and/or distinguishable from the facts alleged here.

To determine whether the individual Defendants are absolutely immune from liability for the Plaintiff's Section 1983 claims, the Court must apply the "function" test to the applicable allegations.

### 1. *Eighteenth Judicial District Attorneys*

Plaintiff alleges the following conduct by DA Brauchler:

1.  "initiated another investigation and a grand jury inquiry into Terry Maketa"; and "supervised" this inquiry. Am. Compl. ¶ 106.

2.  "caused a Grand Jury to be convened seeking indictments against Terry Maketa and Paula Presley which included allegations of wrongdoing surrounding the Kelly Trull Matter." *Id.* ¶ 117.

3.  "did nothing to inform the Grand Jury of Defendant Gerhart's earlier professional determination that there was probable cause to arrest Ms. Trull." *Id.* ¶ 134.

4. "knew and presented evidence to the Grand Jury that the commanders' offices were on the fifth floor, including Terry Maketa, Paula Presley and Al Harmon." *Id.* ¶ 165.

5. "responded to the [Plaintiff's] motions to dismiss by arguing that the card reader data was of 'extremely limited utility'" and "by stating that Plaintiff had engaged in 'ghosting' to get himself into the Trull Arrest Conference without his card reader being used and/or that Plaintiff had called in the order to have Kelly Trull arrested." *Id.* ¶¶ 186, 187.

6. "falsely stated [in the motion to dismiss charges] that following the indictment of Plaintiff, information was uncovered that called into question the testimony of their main witnesses" *Id.* ¶ 190.

In addition to these allegations, Plaintiff asserts the following against ADA Hurlbert and DDA Fevurly:

7. " were responsible for presenting evidence to the [April 2016] Grand Jury and otherwise overseeing the prosecution." Am. Compl. ¶ 119.

8. "were aware [that Plaintiff's key card data showed he was not at Trull arrest conference] when questioning Detective Kaiser in the Grand Jury." *Id.* ¶ 126.

9. "did not introduce to the Grand Jury Defendant Gerhart's prior statements from her interview . . . when she told Agent Martinez that she advised the individuals in the Trull Arrest Conference that she believed EPCSO had probable cause to arrest Ms. Trull" *Id.* ¶ 133.

10. "purposely failed to correct [Jaworski's] testimony they knew was untrue." *Id.* ¶ 137.

11. "agreed to use Jaworski's false and misleading testimony to wrongfully indict Plaintiff without probable cause." *Id.* ¶ 140.

12. "did not present to the Grand Jury Chief Harmon's card reader data, which was received by the Defendants on May 19, 2016." *Id.* ¶ 159.

13. "withheld the exculpatory key card data from the Grand Jury that definitively showed that Plaintiff was not present during the Trull Conference." *Id.* ¶ 161.

14. "did not call Deputy Lincoln to testify." *Id.* ¶ 171.

15. "withheld Ms. Trull's prior interviews with law enforcement from the Grand Jury to make is appear as if Ms. Trull was arrested without probable cause." *Id.* ¶ 173.

16. "never told [the Grand Jury] about Defendant Breister's first interview with Ms. Trull where she admitted criminal culpability prior to speaking with Ms. Habert." *Id.* ¶ 180.

The Court finds these allegations reflect conduct by the Eighteenth Judicial District Attorneys that is "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 410. Conduct entitled to immunity "must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." *Buckley*, 509 U.S. 259, 273 (1993). Although Plaintiff alleges he "was not a target of the grand jury investigation in April 2016" and "was not mentioned in the April 27th proceedings," the grand jury met on four additional occasions in May 2016, and it was during these May 2016 proceedings that Brauchler, Hurlbert and Fevurly are alleged to have engaged in the above-referenced conduct; Plaintiff was then indicted on May 26, 2016. The Court finds that Plaintiff's allegations, taken as true, reflect that Defendants must have made a decision in early May 2016 to indict him because Defendants thereafter allegedly presented inculpatory evidence and/or withheld exculpatory evidence during the course of the grand jury proceeding leading to Plaintiff's indictment. *See Imbler*, 424 U.S. at 413 (absolute prosecutorial immunity extends to bar claims that a prosecutor "knowingly used false testimony and suppressed material evidence").

As for the conduct Plaintiff alleges against these Defendants during his own criminal case, such conduct, including statements made in court filings for the prosecution of criminal charges, was clearly taken in the course of the Defendants' roles as advocates for the State of Colorado. *See Buckley*, 509 U.S. at 273. Plaintiff does not argue to the contrary.

24

However, Plaintiff also alleges that Hurlbert and Fevurly "traveled to El Paso County with CBI agents to interview Wendy Habert, the supervisor of Kelly Trull at the time when Ms. Trull initially made the report against Mr. Garretson" (Am. Compl. ¶ 108) and Hurlbert "made a public published statement that Plaintiff was guilty despite the dismissal of the charges" (*id.* ¶ 191). These allegations, taken as true, describe conduct taken in the Defendants' investigative and/or administrative roles and, thus, warrant "only qualified immunity." *Hunt*, 17 F.3d at 1267. Thus, to the extent that Plaintiff states plausible claims for relief based on these allegations, the claims will proceed against Hurlbert and Fevurly.

### 2. *Fourth Judicial District Attorneys*

In addition to the above referenced allegations involving the grand jury proceedings, Plaintiff alleges the following conduct by DA May:

1. In 2008, "Defendant May and John Newsome ran against one another for District Attorney. Plaintiff and Terry Maketa publicly supported John Newsome. After a contentious race that divided the community, May ultimately won the election and became the new and current 4th Judicial District Attorney." Am. Compl. ¶¶ 65-68.

2. "Under the new leadership, Plaintiff continued to push for the prosecution of James Lohr, Thomas Guolee, and Chris Middleton, but was met with tremendous resistance from May. Plaintiff has continued to advocate for the prosecution of those who conspired to murder Tom Clements to this day." *Id.* ¶¶ 69-70.

3. "On March 16, 2016, a Denver Post article by Kirk Mitchell titled 'New Details Emerge Three Years After Murder of Colorado Prisons' Chief' was published. The article told the story of the Tom Clements murder and prominently featured a statement by Plaintiff regarding his urging of Dan May's office to prosecute the 211 Crew hierarchy for the conspiracy to murder Tom Clements. Prior to publishing the article, Kirk Mitchell contacted Defendants May and Elder for a comment regarding Plaintiff's and Terry Maketa's concerns that the Tom Clements investigation was being mishandled and not properly prosecuted." *Id.* ¶¶ 103-104.

4.      "Shortly after the Denver Post article, in or about mid-March 2016, May
        contacted Brauchler of the 18th Judicial District in regard to looking into
        former Sheriff Terry Maketa again. Brauchler, at May's request, initiated
        another investigation and a grand jury inquiry into Terry Maketa." *Id.* ¶¶
        105-106.

6.      That is, "[i]n or about April 2016, Defendants May, Brauchler, Hulbert and
        Fevurly caused a Grand Jury to be convened seeking indictments against
        Terry Maketa and Paula Presley which included allegations of wrongdoing
        surrounding the Kelly Trull Matter among others." *Id.* ¶ 117.

7.      Defendants May, Kirkman, Elder and Breister conspired to and purposely
        had Plaintiff's name placed on the [*Brady*] list without any grounds to do so.

Moreover, Plaintiff alleges the following facts against DDA Gerhart:

8.      On September 12, 2013, Ms. Trull went to the El Paso County Sheriff's
        Office ("EPCSO") and informed Detective Kaiser that she had lied when she
        made her statement to Detective Kaiser and accused Travis Garretson of
        assaulting her. When Ms. Trull arrived at the EPCSO, she was escorted to
        a room on the second-floor of the building by Detective Kaiser for a
        follow-up interview. Am. Compl. ¶¶ 78-79.

9.      Before the interview began, Sergeant Jaworski called [DDA] Shannon
        Gerhart and other employees of the EPCSO who all observed the interview
        from a nearby conference room. *Id.* ¶ 80.

10.     At 9:49 a.m., Detective Kaiser left the interview room and met with EPCSO
        command staff and [DDA] Shannon Gerhart to determine whether there was
        probable cause to arrest Ms. Trull. Gerhart stated that there was probable
        cause to arrest Ms. Trull for Harassment and Driving Under the Influence.
        Ms. Trull ultimately was arrested and prosecuted on these charges. *Id.* ¶¶ 82-
        84.

11.     Detective Kaiser testified on May 4, 2016 [before the grand jury]. Detective
        Kaiser testified numerous times that during the Trull Arrest Conference, it
        was Gerhart who told her to charge Kelly Trull. *Id.* ¶¶ 123-124.

12.     During the May [11, 2016] grand jury proceedings, Gerhart testified that
        [Deputy] Jaworski asked her to come watch the Trull Interview to determine
        if any charges should be brought. Gerhart testified that she did watch the
        entire interview, but in contrast to Detective [Kaiser's testimony], Gerhart
        testified that she did not order Ms. Trull's arrest, and that she was laughing
        in the Arrest Conference about charging Ms. Trull. *Id.* ¶ 132.

13.   In their effort to wrongfully arrest and maliciously prosecute Plaintiff, Defendants Elder, May, Gerhart, Briester, Jaworski, Gagliardi, Brauchler, Hurlbert and Fevurly worked closely together, sharing information, strategizing and putting on false evidence in the grand jury. *Id.* ¶ 206.

With respect to Plaintiff's allegations against May following his election as DA in "resisting" Plaintiff's efforts to prosecute certain individuals in connection with Mr. Clements' death, the Court finds that a decision whether to prosecute is fundamentally linked to the judicial process and, thus, is protected by absolute immunity. *See Warnick*, 895 F.3d at 751 ("[p]rosecutors are entitled to absolute immunity" for anything they do in their roles as advocates, including their "decisions to prosecute."). Likewise, as set forth above, seeking indictments and presenting evidence to the grand jury (or determining not to) regarding Maketa, Presley, and even the Plaintiff are protected conduct, despite Plaintiff's conclusory allegations that such conduct was taken in the Defendants' "investigative" roles.

Furthermore, as discussed more fully below, Plaintiff's allegation that DA May was involved in the decision to place Plaintiff's name on a *Brady* list reflects conduct that is also associated with the judicial phase of a criminal process and, thus, DA May is protected from liability for all conduct alleged against him. With respect to Gerhart, the only conduct alleged against her leading to Plaintiff's injuries is her grand jury testimony; no party disputes that such testimony is not protected by absolute prosecutorial immunity but the Court will address whether she is protected by "witness" immunity below.

3.    *Law Enforcement Defendants*

Defendants argue that Defendants Sheriff Elder, Undersheriff Breister, and Kirkman ("Law Enforcement Defendants") are also entitled to absolute immunity from liability in this case "because they are alleged to have engaged in functions intimately associated with the judicial phase of the

criminal process and outside their normal investigatory roles." Mot. 16. Plaintiff alleges the following facts against these Law Enforcement Defendants:

1. In 2013, Defendant Elder announced that he was running for Sheriff of El Paso County. Plaintiff did not support Defendant Elder in his 2014 campaign. In the fall of 2014, Defendant Elder was elected El Paso County Sheriff. Am. Compl. ¶¶ 87, 91, 92.

2. When it became clear that Defendant Elder would win the election, Plaintiff decided to transition into the private sector as Defendant Elder had made statements that Plaintiff was going to be demoted and transferred out of the Investigation's Division. *Id.* ¶ 93.

3. In April of 2016, Defendant Undersheriff Joe Breister, openly stated that if Maketa, Presley, and Plaintiff "want to talk to the press just wait until this nuke drops on them." *Id.* ¶ 120.

4. On August 13, 2013, Ms. Trull was interviewed by Defendant Breister. Wendy Habert, Ms. Trull's immediate supervisor, was present during this interview. Ms. Trull admitted during that interview to being "equally responsible for initiating arguments and fights with Deputy Garreston […] which always occurred after their excessive consumption of alcohol." *Id.* ¶ 176.

5. Defendant Breister testified before the Grand Jury on May 11, 2016. Defendants Hurlbert and Fevurly intentionally did not ask him a single question about Ms. Trull's very first and unfiltered interview on August 13, 2013. Nor did Defendant Breister volunteer any such information. *Id.* ¶ 181.

6. At that time, within the 4th Judicial District the Brady List was compiled by the internal affairs unit, at the supervision and direction of Defendant Lisa Kirkman, an attorney and legal advisor to the sheriff's office, Defendant Elder, Undersheriff Breister and Defendant May. *Id.* ¶ 200.

7. Defendants May, Kirkman, Elder and Breister conspired to and purposely had Plaintiff's name placed on the list without any grounds to do so. *Id.* ¶ 203.

Defendants cite to no Tenth Circuit cases supporting the application of prosecutorial immunity to law enforcement officers.[3] *But see Buckley*, 509 U.S. at 276 ("When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same."). However, in following the Supreme Court's admonition to consider the nature of the function performed at the time of the alleged misconduct, *Buckley*, 509 U.S. at 271, the Tenth Circuit has determined that a court must consider the following factors in evaluating whether absolute immunity applies to pre-indictment acts: "(1) whether the action is closely associated with the judicial process, (2) whether it is a uniquely prosecutorial function, and (3) whether it requires the exercise of professional judgment." *Masters v. Gilmore*, 663 F. Supp. 2d 1027, 1039 (D. Colo. 2009) (quoting *Mink v. Suthers*, 482 F.3d 1244, 1261 (10th Cir. 2007)).

Even assuming that the Tenth Circuit would approve applying absolute prosecutorial immunity to a law enforcement officer and to the extent that Sheriff Elder's statement that Plaintiff "was going to be demoted and transferred out of the Investigation's Division" in or about 2014 states a plausible claim for relief, the Court finds the statement was made by Elder in his administrative role rather than any prosecutorial role and thus, it is not protected by prosecutorial immunity. Likewise, Undersheriff Breister's statement in April 2016 that if Plaintiff wanted "to talk to the press just wait until this nuke drops on" him is not protected by prosecutorial immunity. As discussed above, Breister's testimony before the grand jury is not protected by prosecutorial immunity, but may be protected by witness immunity; the Court will discuss this possibility below.

---

[3]The Tenth Circuit cases cited by Defendants – *Joseph v. Shepherd*, 211 F. App'x 692 (10th Cir. 2006) and *Roberts v. Kling*, 144 F.3d 710 (10th Cir. 1998) – involved "investigators" who worked for district attorneys.

With respect to the allegation that May, Kirkman, Elder, and Breister "conspired and purposely had Plaintiff's name placed on the [*Brady*] list," the Court notes that the parties vigorously dispute whether absolute immunity should attach, but the Amended Complaint raises only state tort claims based on the allegation. *See* Am. Compl. ¶¶ 297-304, 312-317. The Court perceives no Section 1983 claim against the individual Defendants based on the *Brady* list allegations.[4] *Mink*, 482 F.3d at 1258 ("Absolute prosecutorial immunity is a complete bar to a suit for damages ***under 42 U.S.C. § 1983***.") (citing *Imbler*, 424 U.S. at 419 n.13) (emphasis added).

Nevertheless, to the (unlikely) extent that the pleading may be construed as raising claims pursuant to 42 U.S.C. § 1983 based on the "*Brady* list" allegations, and to the extent that *Buckley* may be construed to permit the application of absolute prosecutorial immunity to law enforcement officers, the Court finds May and the Law Enforcement Defendants acted as prosecutors in this manner and such conduct is protected by absolute immunity. Although the Tenth Circuit has not opined on the issue, the Fourth Circuit determined that a district attorney was entitled to absolute prosecutorial immunity for accusing the plaintiff police officer of dishonesty, prohibiting the officer from testifying in any case he investigated, and disclosing this decision to city officials. *Savage v. Maryland*, 896 F.3d 260, 270-71 (4th Cir. 2018). The court likened the district attorney's conduct to placement on a *Brady* list. *Id.* at 271 (citing *Neri v. Cty. of Stanislaus Dist. Attorney's Office*, No. 1:10-CV-823-AWI-GSA, 2010 WL 3582575, at *8 (E.D. Cal. Sept. 9, 2010) (absolute immunity applies to prosecutor's decision to "Brady–list" officer, i.e., refuses to use him as trial witness based on credibility concerns)). Citing to opinions from the Ninth and First Circuits, the court reasoned

_____

[4]The Plaintiff admits as much in conceding that claims against Kirkman "relate[ ] solely to the Plaintiff's continuing inclusion in the 'Brady List' maintained by El Paso County (Claims 10 and 11)." Resp. 19.

that "the prosecutors' actions involved assessments of witness credibility and judgments about which cases to prosecute, directly connected to the judicial phase of the criminal process and [were] thus protected by absolute immunity." *Id.* (citing *Roe v. City & Cty. of San Francisco*, 109 F.3d 578, 584 (1997) ("a prosecutor's professional evaluation of a witness is entitled to absolute immunity even if that judgment is harsh, unfair or clouded by personal animus") and *Harrington v. Almy*, 977 F.2d 37, 42 (1st Cir. 1992) (absolute immunity applies to prosecutor's decision not to charge cases initiated by particular officer)); *see also Barnett v. Marquis*, 16 F. Supp. 3d 1218, 1222–23 (D. Or. 2014), *aff'd*, 662 F. App'x 537 (9th Cir. 2016) (absolute immunity applied to prosecutor's decision not to use police officer as a witness based on credibility concerns).

Here, the Court finds that Plaintiff's allegations, including that he had been both "placed" and "disclosed" on the Fourth Judicial District's *Brady* list; an attorney with whom he had often worked informed him that, as a result of the *Brady* list, "the attorney could no longer use him as an investigator or expert"; and, "[f]or law enforcement professionals and anyone who frequently testifies in court, having your name on the Brady List is commonly considered to be a 'career killer'" reflect conduct by May, Kirkman, Elder, and/or Breister in assessing a witness's credibility – here, the Plaintiff – whether accurate or not. Such assessment, as well as refusing to use Plaintiff as a trial witness based on credibility and disclosing or communicating the decision not to use Plaintiff, constitute conduct that is "directly connected to the judicial phase of the criminal process and thus protected by absolute immunity." *Savage*, 896 F.3d at 271 (citing *Harrington*, 977 F.2d at 40–41).

In sum, to the extent the Plaintiff alleges Section 1983 claims against the Law Enforcement Defendants based on the *Brady* list allegations, the Defendants are protected from liability. Other

allegations against these Defendants do not support a finding of absolute immunity; thus, the Court will proceed to determine whether the individual Defendants enjoy immunity as witnesses.

C.    Witness Immunity

As set forth above, DDA Gerhart and Undersheriff Breister testified at the grand jury proceedings leading to Plaintiff's indictment. In addition, Plaintiff alleges the following conduct by Defendant Sergeant Jaworski:

1.    On May 11, 2016, Defendant Jaworski also testified before the Grand Jury. Am. Compl. ¶ 135.

2.    Defendant Jaworski testified that there was no District Attorney to consult with about the decision to arrest Ms. Trull and he would have rather consulted with a District Attorney but did not do so; in complete contradiction of Detective Kaiser's and Defendant Gerhart['s] testimony. *Id.* ¶ 136.

3.    Defendants May, Hurlbert and Fevurly purposely failed to correct testimony they knew was untrue. In addition to the card reader information showing Plaintiff was not in the building, they had Defendant Jaworski's March 10, 2016 recorded interview with CBI Agent Shierkolk and Agent Martinez wherein Defendant Jaworski stated numerous times that he did not remember anything about the Trull Interview or the Trull Arrest Conference. Defendant Jaworski told CBI Agents Shierkolk and Martinez that it was too long ago, and he did not even remember being there, let alone who else was watching the interview. *Id.* ¶ 137.

4.    Defendant Jaworski testified that not only was he at the Trull Arrest Conference, he was there with Plaintiff, and Plaintiff gave the order to arrest. *Id.* ¶ 139.

Plaintiff also alleges the following conduct by Defendant CBI Agent Gagliardi:

5.    On May 25, 2016, Defendant Gagliardi falsely testified that the card key data showed Plaintiff was present during the Trull Arrest Conference in room 200b, despite the fact that the key card data unequivocally showed Plaintiff had left the building and parking structure about 19 minutes prior to the Trull Arrest Conference. Am. Compl. ¶ 160.

6. The Defendants purposely withheld the exculpatory key card data from the Grand Jury that definitively showed that Plaintiff was not present during the Trull Conference. *Id.* ¶ 161.

7. Defendant Gagliardi also lied to the Grand Jury about the location of the card reader panels on the second floor of EPCSO. Defendant Gagliardi falsely conveyed to the Grand Jury that there is a card reader panel outside of the conference room on the second floor, which proved that Plaintiff swiped his card to get into the conference room where the Trull Arrest Conference took place. *Id.* ¶ 162.

8. However, there is no card reader panel to get into the conference room. There is only a card reader panel to get access to the second floor but once on the second floor, there is no additional security required to gain access to the interview and conference rooms. *Id.* ¶¶ 163-64.

9. Defendants Brauchler, May, Hulbert, Fevurly, Gagliardi and Jaworski, manipulated and maneuvered the evidence presented to the Grand Jury relating to whom was present in the Trull Arrest Conference. Specifically, Brauchler, May, Hulbert, Fevurly, Gagliardi and Jaworski knew and presented evidence to the Grand Jury that the commanders' offices were on the fifth floor, including Terry Maketa, Paula Presley and Al Harmon. For any of the commanders to leave the fifth floor to go to the second floor would indicate that they were present during the Trull Interview and/or Arrest Conference. *Id.* ¶ 165.

10. However, during the May 25, 2016, Grand Jury when Defendant Gagliardi was asked who else was in room 200, he responded that "there's a few others that we have heard that we've been named or been talked about here, we asked for access logs on those folks. They show present in the building, that kind of thing." *Id.* ¶ 166.

11. When Defendant Gagliardi testified, he and the other Defendants had the actual card reader data which showed the precise floor within the building where people were located at specific times. Instead of presenting that evidence, the Defendants purposely elicited vague testimony about other people's whereabouts. *Id.* ¶ 167.

The Tenth Circuit has recognized that certain "trial 'functions ... are absolutely immune from liability for damages under § 1983'" and "[o]ne of these protected functions is 'the giving of testimony by witnesses at trial.'" *Montoya v. Vigil*, 898 F.3d 1056, 1068–69 (10th Cir. 2018) (quoting *Rehberg v. Paulk*, 566 U.S. 356, 363 (2012)). In fact, in *Rehberg*, the Supreme Court held

that "a grand jury witness," including a law-enforcement officer, "has absolute immunity from any § 1983 claim based on the witness' testimony." 566 U.S. at 369. The Supreme Court has defined this immunity broadly, explaining that a "witness has absolute immunity with respect to *any* claim based on the witness' testimony." *Id.* at 367 (emphasis in original). In so doing, however, the Court qualified the immunity's reach saying:

> Of course, we do not suggest that absolute immunity extends to *all* activity that a witness conducts outside of the grand jury room. For example, we have accorded only qualified immunity to law enforcement officials who falsify affidavits and fabricate evidence concerning an unsolved crime.

*Id.* at 370, n.1 (citations omitted) (emphasis in original).

Citing *Rehberg* and two circuit cases following it, the Tenth Circuit found that for absolute immunity to attach to a witness' testimony, a plaintiff "must use [the] testimony to prove any element of his or her claim." *Montoya*, 898 F.3d at 1069. Thus, when the act of testifying does not serve as the basis for the claim, immunity does not attach. *Id.* (citing *Vogt v. City of Hays*, 844 F.3d 1235, 1250 (10th Cir. 2017)). In *Montoya*, the court concluded that the plaintiff's claim was barred by absolute immunity because his claim "depend[ed] on showing [the defendant detective] *did* act unlawfully by testifying." *Id.* (emphasis in original).

In this case, Defendants Gerhart, Breister, Jaworski, and Gagliardi[5] assert they are protected by absolute immunity with respect to their grand jury testimony. The Court agrees. To prove his Section 1983 claims, Plaintiff must establish that each Defendant "caused [his] continued confinement or prosecution." *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008). To the extent that Plaintiff relies on any testimony before the grand jury (which issued an indictment against him)

---

[5]Plaintiff also lists Defendant Elder in this regard, but the allegations do not include any testimony by Sheriff Elder. *See* Resp. 18.

to prove his malicious prosecution claim, such claim would be "based on" the testimony and the testimony would be protected.[6] However, Plaintiff appears to argue that the challenged testimony is like that addressed by the Tenth Circuit in *Vogt*, in which the court distinguished between allegations that a defendant "acted unlawfully by testifying" and allegations where the "use of [testimony] would complete the alleged [ ] violation." 844 F.3d at 1250 n.11. In *Vogt*, the plaintiff alleged the defendant (plaintiff's employer) "unconstitutionally compelled him to incriminate himself" when it required that he provide a written statement concerning "a knife he obtained in the course of his work as a [ ] police officer"; the court concluded that, though the use of plaintiff's "statements in a probable cause hearing would complete the Fifth Amendment violation, the act of testifying [did] not serve as the basis of" the plaintiff's claim. *Id.*

In this case, Plaintiff summarizes his allegations as follows:

[T]here was an initial investigation in 2014 into the "Maketa/Trull" matter that led to no charges being pursued. A second investigation was ordered after Plaintiff spoke to the press about the investigation into Tom Clements' murder in March 2016 and after the plaintiff supported Defendant Elder's opponent in the election for Sheriff and supported District Attorney May's opponent (John Newsome) in the election for District Attorney. During those investigations none of the individuals interviewed inculpated the Plaintiff in any wrongdoing. The Grand Jury was convened, and Plaintiff was not named as a target. Plaintiff was subpoenaed to testify and when his attorney, John Newsome, contacted the DA Defendant Hurlbert, Mr. Newsome was told that the Plaintiff was not a target, rather they simply wanted to know whether he had information that would incriminate the "target" of the Grand Jury proceedings ("Terry Maketa"). When Defendants Hurlbert and Fevurly were informed that the Plaintiff would not testify that Maketa and Presley ordered the Trull arrest, as he did not believe that to be true, not only was he not called as a witness, he was added as a target of the Grand Jury and ultimately indicted. This is circumstantial evidence of

---

[6]To the extent that Plaintiff relies on case law distinguishing between an "ordinary" and "complaining" witness (Resp. 22), the Tenth Circuit confirmed that "[t]he distinction drawn in *Anthony* [*v. Baker*, 955 F.2d 1395 (10th Cir. 1992)] between officials who testify as ordinary witnesses cloaked with absolute immunity and those who testify as complaining witnesses exposed to § 1983 liability, was squarely rejected by the Supreme Court in *Rehberg v. Paulk*." *Handy v. City of Sheridan*, 636 F. App'x 728, 742 (10th Cir. 2016).

a conspiracy related to the investigation and other [sic] functions other than Grand Jury testimony.

The Court finds *Vogt* inapplicable here. In *Vogt*, the plaintiff alleged an unconstitutional act against the defendants–that they compelled him to write a statement, which was used to incriminate him in a probable cause hearing by way of the defendants' testimony. 844 F.3d at 1238. Similarly, in *Buckley*, 509 U.S. at 274, cited in *Rehberg* for the proposition that qualified, rather than absolute, immunity extends to a witness who "fabricates evidence," the grand jury testimony leading to the plaintiff's indictment involved an allegedly false identification by an expert of the plaintiff's boots matching a boot print left at the crime scene. In both cases, the alleged unconstitutional act constituted conduct *other* than witness testimony.

Here, with respect to the grand jury indictment, the Plaintiff identifies no act(s) on the part of the Defendants against him, other than their "fabricated" and/or "incomplete" testimony. In other words, the Plaintiff alleges that Defendants acted unlawfully by testifying before the grand jury, whether the testimony was untrue or incomplete. Thus, to prove his malicious prosecution claims against Gerhart,[7] Breister, Jaworski, or Gagliardi, Plaintiff must rely on their testimony to demonstrate that each Defendant "caused [his] continued confinement or prosecution." These Defendants enjoy absolute immunity from liability for the malicious prosecution claims.

Similarly, Plaintiff's conspiracy claim, to the extent Plaintiff alleges a conspiracy to maliciously prosecute him (Am. Compl. ¶ 242), relies on witness testimony and Defendants are

---

[7]Moreover, the Court finds that Gerhart, as a witness, is entitled to absolute immunity for another reason. Unlike the other Defendants who are alleged to have an animus toward Plaintiff or to have taken action against the Plaintiff, Gerhart is alleged simply to have testified that she did not order Trull's arrest. The allegations against Gerhart, taken as true, do not plausibly state that she conspired to harm Plaintiff; accordingly, Plaintiff would be unable to state a Section 1983 claim against Gerhart "without resorting to [her] grand jury testimony." *Montoya*, 898 F.3d at 1069 n.11 (quoting *Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015)).

absolutely immune. *See Leatherwood v. Rios*, 705 F. App'x 735, 739 (10th Cir. 2017) (plaintiff failed to state Section 1983 conspiracy claim where he failed to establish the existence of a constitutional violation). Finally, Plaintiff's substantive due process claim alleges that "Defendants deliberately withheld exculpatory evidence and purposely fabricated evidence, thereby misleading and misdirecting the jury. Absent this misconduct, the prosecution of Plaintiff could not and would not have occurred." Am. Compl. ¶ 237. Plaintiff's allegations reflect that evidence presented to (or omitted from) the grand jury came only in the form of witness testimony. The Court finds that the due process claim also relies on the Defendants' testimony before the grand jury and, thus, Defendants are immune from liability for the claim.

In sum, the Court has found no Section 1983 claims alleged against Defendant Kirkman. The Prosecutor Defendants, May, Brauchler, Fevurly, Hurlbert and Gerhart, are entitled to absolute prosecutorial and/or witness immunity from liability with respect to Plaintiff's allegations surrounding the 2016 grand jury and criminal proceedings and, therefore, Claims One (malicious prosecution), Two (due process), and Three (conspiracy) are dismissed against Defendants Kirkman, May, Brauchler, and Gerhart. As set forth above, Plaintiff's allegations that Hurlbert and Fevurly "traveled to El Paso County with CBI agents to interview Wendy Habert, the supervisor of Kelly Trull at the time when Ms. Trull initially made the report against Mr. Garretson" (Am. Compl. ¶ 108) and Hurlbert "made a public published statement that Plaintiff was guilty despite the dismissal of the charges" (*id.* ¶ 191) are not entitled to absolute immunity, but only qualified immunity, and will be discussed below.

In addition, to the extent that Plaintiff relies on the grand jury testimony of the Law Enforcement Defendants, Breister, Jaworski, and Gagliardi, to prove his first, second, and/or third claims, the Defendants are absolutely immune from liability for these claims. No absolute immunity

attaches, however, to any other conduct alleged against Elder, Breister, Jaworski, and Gagliardi with respect to Plaintiff's first and third claims,[8] including the following:

1.  In 2013, Defendant Elder announced that he was running for Sheriff of El Paso County. Plaintiff was assigned to investigate what had happened to Elder's missing internal affairs file. Plaintiff worked with two detectives to attempt to locate the file. Once they became sure the file was gone, they attempted to find out who had stolen and/or destroyed it but were unable to solve it. Plaintiff did not support Defendant Elder in his 2014 campaign. In the fall of 2014, Defendant Elder was elected El Paso County Sheriff. When it became clear that Defendant Elder would win the election, Plaintiff decided to transition into the private sector as Defendant Elder had made statements that Plaintiff was going to be demoted and transferred out of the Investigation's Division. Am. Compl. ¶¶ 87-93.

2.  Prior to publishing the [March 16, 2016] article, Kirk Mitchell contacted Defendant May and Defendant Elder for a comment regarding Plaintiff's and Terry Maketa's concerns that the Tom Clements investigation was being mishandled and not properly prosecuted. *Id.* ¶ 104.

3.  In or about April 2016, Defendant May, Brauchler, Hulbert and Fevurly caused a Grand Jury to be convened seeking indictments against Terry Maketa and Paula Presley which included allegations of wrongdoing surrounding the Kelly Trull Matter among others. *Id.* ¶ 117. Defendant Undersheriff Joe Breister, openly stated that if Maketa, Presley, and Plaintiff "want to talk to the press just wait until this nuke drops on them." *Id.* ¶ 120.

4.  On August 13, 2013, Ms. Trull was interviewed by Defendant Breister. Wendy Habert, Ms. Trull's immediate supervisor, was present during this interview. Ms. Trull admitted during that interview to being "equally responsible for initiating arguments and fights with Deputy Garreston [...] which always occurred after their excessive consumption of alcohol." *Id.* ¶ 176.

5.  As part of the renewed investigation, CBI agents interviewed Defendant [Deputy] Robert Jaworski regarding the Trull Matter. During his interviews with CBI, Defendant Jaworski said multiple times that he did not remember the Trull Arrest Conference or who was present. *Id.* ¶ 111.

---

[8]Plaintiff's second claim is specifically based on the grand jury proceeding (Am. Compl. 237); accordingly, because all individual Defendants enjoy prosecutorial or witness immunity with respect to the alleged unconstitutional acts before the grand jury, Claim 2 is dismissed.

6.    Defendant Jaworski, while employed at the EPCSO, also referred to Plaintiff as a "g--k." Jaworski was subsequently forced to retire from the EPCSO because of [ ] racist remarks against President Obama. *Id.* ¶¶ 114-115.

7.    During the pendency of Docket 2016-CR-2686 Plaintiff's defense attorneys analyzed the card reader data, which unequivocally showed Plaintiff had left the building and parking structure about 19 minutes prior to the Trull Arrest Conference, and filed motions to dismiss the indictment because the card reader data proved Plaintiff's innocence. Instead of conceding these motions, Defendants Brauchler, May, Hurlbert, and Fevurly, with the help of Defendant Gagliardi, continued to manipulate and fabricate evidence to keep the case against Plaintiff going. *Id.* ¶¶ 184-185.

Defendants contend they enjoy qualified immunity from liability for Plaintiff's remaining Section 1983 claims (Claim 1 and Claim 3) based on these allegations.

D.    Qualified Immunity

In their individual capacities, the Defendants base their request for dismissal of the remaining Section 1983 claims on the doctrine of qualified immunity, which protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Because qualified immunity is an immunity from suit, rather than a mere defense to liability, it is effectively lost if a case is erroneously permitted to go to trial. *Id.* at 231; *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) ("The privilege is an immunity from suit rather than a mere defense to liability."). The "driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery." *Pearson*, 555 U.S. at 231-232 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, n.2 (1987)).

Accordingly, qualified immunity questions must be resolved at the earliest possible stage in litigation." *Id*. at 232.

Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) (internal quotations and citations omitted). The privilege is immunity from suit rather than a mere defense to liability. *Id.* "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Gutierrez v. Cobos*, 841 F.3d 895, 899 (10th Cir. 2016) (citations and internal quotation marks omitted).

When a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to overcome the asserted immunity. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). Traditionally, there has been a two-step process for resolving qualified immunity questions: "First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right. . . . Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established[9] at the time of the defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194 (2001) (internal citations and quotation marks removed)). The Supreme Court affords courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

_____

[9]An official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

1.      Does Plaintiff Plausibly Allege Personal Participation?

For their first argument, Defendants contend that Plaintiff fails to allege their personal participation as required for a Section 1983 claim. Personal participation is an essential allegation in a civil rights action. *See Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976). "To establish ... liability, a plaintiff is required to bring forth evidence that an individual defendant directly and personally participated in the purported constitutional violation." *Persaud v. Doe*, 213 F. App'x 740, 743 (10th Cir. 2007) (citing *Steele v. Fed. Bureau of Prisons*, 355 F.3d 1204, 1214 (10th Cir. 2003), *cert. denied*, 543 U.S. 925 (2004), *overruled on other grounds by Jones v. Bock*, 549 U.S. 199, 127 S. Ct. 910, 921 (2007)). There must be an affirmative link between the alleged constitutional violation and each defendant's participation, control or direction, or failure to supervise. *See Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993). The Tenth Circuit has noted that in a civil rights case asserting claims against individual government actors, "it is particularly important ... that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations" against an entire group of defendants. *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011).

Defendants point to a few paragraphs in which the Plaintiff simply summarizes or concludes a number of allegations against them (Mot. 20); the Court finds that, while these paragraphs may, by themselves, be construed as insufficient to state the personal participation of each Defendant, they are, as stated, simply summaries of the allegations described in previous paragraphs. As set forth by the above-referenced allegations, to the extent they state Section 1983 claims, Plaintiff plausibly states the personal participation of Defendants Fevurly, Hurlbert, Elder, Breister, Jaworski, and Gagliardi.

2.    Does Plaintiff Plausibly Allege Claims for Malicious Prosecution (Claim 1) and Conspiracy (Claim 3)?

Plaintiff's first claim for relief alleges malicious prosecution in violation of the Fourth Amendment and of the Fourteenth Amendment's due process clause against "all individual Defendants" ("Claim 1"). In addition, Plaintiff's third claim for relief alleges conspiracy under 42 U.S.C. § 1983 against "all Defendants" ("Claim 3"). The individual Defendants argue they are entitled to qualified immunity from liability for these claims.

As set forth above, the Tenth Circuit has advised that dispositive motions based on qualified immunity are treated differently than other dispositive motions. *See Farrell v. Montoya*, 878 F.3d 933, 936–37 (10th Cir. 2017). "After a defendant asserts a qualified-immunity defense, the plaintiff must meet the 'heavy two-part burden' of showing that '(1) a reasonable jury could find facts supporting a violation of a constitutional right, [and] (2) [the constitutional right] was clearly established at the time of the defendant's conduct.'" *Id.* (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) and *Gutierrez*, 841 F.3d at 900-01). "In this circuit, to show that a right is clearly established, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Id.* (quoting *Gutierrez*, 841 F.3d at 900).

Defendants begin by arguing that the Supreme Court has "declin[ed] to address whether the Fourth Amendment permits a malicious prosecution claim" and "[t]he Tenth Circuit has rejected a Fourteenth Amendment claim for malicious prosecution"; thus, the law supporting Plaintiff's Claim 1 is not clearly established. Mot. 24, 31-33. Defendants next assert that under the Tenth Circuit's definition of a Fourth Amendment malicious prosecution claim, Plaintiff fails to state plausible

allegations supporting each element of the claim. Plaintiff counters that he states plausible claims pursuant to clearly established Tenth Circuit law.

This Court's first duty in determining whether the law supporting Plaintiff's claims is clearly established is to define the challenged constitutional right. *See Dist. of Columbia v. Wesby*, – U.S. –, 138 S. Ct. 577, 590 (2018) ("We start by defining 'the circumstances with which [the officers] w[ere] confronted.'") (citation omitted). As stated above, Plaintiff alleges that the Defendants Hurlbert, Fevurly, Elder, Breister, Jaworski, and Gagliardi prepared and presented false inculpatory evidence and withheld exculpatory evidence in seeking an indictment and prosecuting the criminal proceeding against the Plaintiff. *See City of Escondido v. Emmons*, – U.S. –, 139 S. Ct. 500, 503 (2019) ("Under our cases, the clearly established right must be defined with specificity.").

Defendants are correct that the Tenth Circuit has "rejected [a] Fourteenth Amendment malicious-prosecution claim under 42 U.S.C. § 1983 because Colorado law provides an adequate remedy." *Myers v. Koopman*, 738 F.3d 1190, 1193 (10th Cir. 2013). In *Myers*, the plaintiff alleged that defendant "conjured up facts to create the illusion of probable cause for an arrest warrant and subsequent prosecution." *Id.* The court found that "a post-deprivation malicious-prosecution claim serves as an effective antidote" to the plaintiff's allegations and "Colorado law provides that remedy." *Id.* (citing *Hewitt v. Rice*, 154 P.3d 408, 411 (Colo. 2007)). Even where the statute of limitations had run on the plaintiff's state law claim, the court concluded that he "*had* an adequate remedy. He let it wither. Due process has been fully satisfied." *Id.* at 1194. Notably, Plaintiff argues that the holding in *Myers* does not foreclose his Fourteenth Amendment malicious prosecution claim, but he fails to explain – and the Court cannot perceive – why it does not. Accordingly, the Plaintiff's Claim 1 alleging a violation of the Fourteenth Amendment is dismissed.

Next, for the Fourth Amendment portion of Claim 1, the Court must determine whether Plaintiff has pointed to "a controlling case or robust consensus of cases finding a Fourth Amendment violation 'under similar circumstances.'" *Wesby*, 138 S. Ct. at 591 (quoting *White v. Pauly*, 580 U.S. --, 137 S. Ct. 548, 552 (2017)). Although Defendants note a "recent suggestion that clearly established law can be created only by Supreme Court opinions," they concede that such is not the current state of the law and Plaintiff argues properly that "[t]his Court is bound by Tenth Circuit law." Resp. 31; *see Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) ("Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.") (citation omitted).

Plaintiff points to *Sanchez v. Hartley*, 810 F.3d 750 (10th Cir. 2016) for the proposition that the Tenth Circuit has "repeatedly recognized a cause of action under § 1983 for malicious prosecution under the Fourth Amendment." Resp. 29. In *Sanchez*, the court found the plaintiff plausibly pled a malicious prosecution claim in violation of the Fourth Amendment where he alleged the defendants (four detectives and an investigator) elicited and used a "false" confession to "institute legal process and cause continued pretrial detention." 810 F.3d at 753. The opinion was issued in January 2016, two months before the article and three months before the alleged "re-investigation," which led to the Plaintiff's indictment. To the extent that Plaintiff states a plausible Fourth Amendment malicious prosecution claim, the Court finds that Plaintiff's right against law enforcement officers' procurement and use of false evidence to seek an indictment and prosecute criminal charges was clearly established by *Sanchez* (and, possibly, prior opinions cited therein).[10]

---

[10]In support of his "clearly established" argument, Plaintiff also points to the Tenth Circuit's opinions in *Martinez v. Carr*, 479 F.3d 1292 (10th Cir. 2007) and *Becker v. Kroll*, 494

*See Doe v. Woodard*, 912 F.3d 1278, 1289 (10th Cir.), *cert. denied sub nom. I.B. v. Woodard*, 139 S. Ct. 2616 (2019)) ("A constitutional right is clearly established if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right.") (quoting *Mullenix v. Luna*, – U.S. –, 136 S. Ct. 305, 308 (2015)); *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) ("[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it....'").

Defendants also argue for dismissal of Plaintiff's Claim 1 asserting that Plaintiff fails to allege the elements necessary to establish a Fourth Amendment malicious prosecution claim. To state a § 1983 claim for malicious prosecution, a plaintiff must allege: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Montoya*, 898 F.3d at 1166 (quoting *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008)).

For the first element, the Court looks to whether Plaintiff's allegations concerning each Defendant support a plausible claim. Against Fevurly and Hurlbert, Plaintiff alleges they "traveled to El Paso County with CBI agents to interview Wendy Habert, the supervisor of Kelly Trull at the

---

F.3d 904 (10th Cir. 2007); however, although these cases may support other of Plaintiff's arguments, they do not support a finding that the law underlying Plaintiff's malicious prosecution claim is clearly established. First, unlike here, *Martinez* involves a Fourth Amendment "unreasonable seizure" claim. 479 F.3d at 1294. Second, both *Martinez* and *Becker* fail to support a "clearly established" finding for the simple reason that neither court found violations of either the Fourth or the Fourteenth Amendments. *See Wesby*, 138 S. Ct. at 590 ("we have stressed the need to 'identify a case where an officer acting under similar circumstances ... *was held to have violated the Fourth Amendment*.'") (quoting *Pauly*, 137 S. Ct. at 552) (emphasis added).

time when Ms. Trull initially made the report against Mr. Garretson" (Am. Compl. ¶ 108) and Hurlbert "made a public published statement that Plaintiff was guilty despite the dismissal of the charges" (*id.* ¶ 191). The Court finds these allegations insufficient to support a claim that Fevurly and Hurlbert "caused" the Plaintiff's "continued prosecution." Likewise, Elder's alleged statements in the fall 2014 that Plaintiff was going to be demoted and transferred out of the Investigation's Division (Am. Compl. ¶¶ 87-93) and his apparent decision to decline comment to the March 2016 article regarding Plaintiff's purported complaints about the Clements' murder investigation do not plausibly support a malicious prosecution claim. Further, Breister's "open" statement that "if Maketa, Presley, and Plaintiff 'want to talk to the press just wait until this nuke drops on them,'" apparently referring to the grand jury investigation, is insufficient to support a claim that Breister caused the Plaintiff's prosecution. Finally, Jaworski's interviews regarding the Trull arrest and his referring to the Plaintiff as a "g–k" do not plausibly support a claim that he caused Plaintiff's continued prosecution. Thus, the Court finds Plaintiff fails to state plausible claims for malicious prosecution in violation of the Fourth Amendment against Defendants Hurlbert, Fevurly, Elder, Breister, and Jaworski, and the Court will dismiss Claim 1 against these Defendants.

In addition, because Plaintiff fails "to establish the existence of a constitutional violation" against these Defendants, his claim for conspiracy to violate civil rights fails and the Court will dismiss Claim 3 against Defendants Hurlbert, Fevurly, Elder, Breister, and Jaworski. In light of this conclusion, the Court need not engage in an analysis of whether Plaintiff's rights against conspiracy under Section 1983 are clearly established.

At this point, the only remaining Defendant against whom Plaintiff alleges Section 1983 claims is CBI Agent Gagliardi. Plaintiff asserts that Gagliardi assisted the Prosecutor Defendants "to manipulate and fabricate evidence to keep the [criminal] case against Plaintiff going." Am.

Compl. ¶¶ 184-185. The evidence to which Plaintiff refers is the "key card data," which he asserts "unequivocally showed Plaintiff had left the building and parking structure about 19 minutes prior to the Trull Arrest Conference." Plaintiff alleges that "[d]uring the pendency of Docket 2016-CR-2686 Plaintiff's defense attorneys analyzed the card reader data and filed motions to dismiss the indictment because the card reader data proved Plaintiff's innocence." Plaintiff contends that, in addition to manipulating the data, "Gagliardi conspired [with the Prosecutor Defendants] to fabricate evidence again by stating that Plaintiff had engaged in 'ghosting' to get himself into the Trull Arrest Conference without his card reader being used and/or that Plaintiff had called in the order to have Kelly Trull arrested." *Id.* ¶ 187. Plaintiff asserts that his phone records, to which the Defendants had access, show that he did not make or receive a single telephone call to or from ... anyone involved in the Trull Arrest on September 12, 2013." *Id.* ¶ 188. The Court concludes that, taken as true, these allegations demonstrate Plaintiff alleges a plausible claim that Gagliardi "caused his continued confinement or prosecution."

However, Defendants contend that Plaintiff fails to allege he was "seized" as required by Tenth Circuit precedent for the first element. Mot. 26, 34 (citing *Nielander v. Bd. of Cty Comm'rs*, 582 F.3d 1155, 1164-65 (10th Cir. 2009)). Plaintiff counters that neither *Nielander* nor another case cited by Defendant, *Becker v. Kroll*, 494 F.3d 904, 914 (10th Cir. 2007), stand for the proposition that an arrest and requirement to defend criminal charges do not constitute a "seizure."

In *Nielander*, the plaintiff was served with a summons and criminal complaint charging him with felony criminal threat and disorderly conduct. 582 F.3d at 1162. He alleged that the summons had the effect of limiting his freedom by precluding him from commencing an out-of-state job. *Id.* at 1165. Citing *Becker*, the court concluded that the plaintiff failed to state a malicious prosecution

claim saying the Tenth Circuit has "declin[ed] to expand Fourth Amendment liability in cases where the plaintiff has not been arrested or incarcerated." *Id.* (quoting *Becker*, 494 F.3d at 915).

In *Becker*, the defendant filed an administrative criminal complaint against the plaintiff in state court; the complaint was withdrawn eight months later due to "irregularities in investigation." 494 F.3d at 911. The plaintiff "conceded she was never arrested, incarcerated, or otherwise placed under the direct physical control of the state." *Id.* at 915. In upholding the district court's finding that the plaintiff was not "seized" under the Fourth Amendment, the Tenth Circuit declined an "invitation" by Justice Ginsburg in *Albright v. Oliver*, 510 U.S. 266 (1994) to expand Fourth Amendment liability "in cases where the plaintiff has been neither arrested nor incarcerated." *Id.* The Plaintiff, in arguing that *Becker* "did not definitively decide what constitutes a seizure," cited the court's finding that "[a] groundless charging decision may abuse the criminal process, but it does not, in and of itself, violate the Fourth Amendment absent a significant restriction on liberty" and asked "what constitutes a 'significant restriction on liberty'"? Resp. 33. The Court finds that *Becker* sufficiently answers the question for purposes of this case – an arrest or incarceration – and finds that, for purposes of a Rule 12(b)(6) analysis, the Plaintiff plausibly alleges he was "seized" – in that he was arrested – for his Fourth Amendment malicious prosecution claim.

Defendants argue that Plaintiff fails to meet the second element, which requires that the Plaintiff allege the termination of criminal charges against him was "favorable." The Tenth Circuit has interpreted this element to require that "a plaintiff must allege facts which, if true, would allow a reasonable jury to find the proceedings terminated 'for reasons indicative of innocence.'" *Montoya*, 898 F.3d at 1066 (quoting *M.G. v. Young*, 826 F.3d 1259, 1263 (10th Cir. 2016)). When, as here, the disposition terminating the criminal proceeding does not say on its face anything about the plaintiff's guilt, courts "look to the stated reasons for the dismissal as well as to the

circumstances surrounding it in an attempt to determine whether the dismissal indicates the accused's innocence." *Id.* (quoting *Wilkins*, 528 F.3d at 803). If, under the circumstances, "the case was disposed of in a manner that leaves the question of the accused's innocence unresolved" or, in other words, "the termination of proceedings does not touch the merits," the criminal proceedings cannot be found to have terminated favorably. *Id.* (citations omitted).

In *Montoya*, the court found the plaintiff failed to allege a favorable termination where the allegations reflected that the prosecution agreed to vacate the plaintiff's conviction as a compromise after the plaintiff filed a "petition for relief due to ineffective assistance of counsel and actual innocence." *Id.* at 1067. The government stated that it compromised because it believed the ineffective assistance of counsel claim "had some chance of succeeding" and its discussions with persons involved in the proceeding that plaintiff should have taken the pre-trial plea deal led it to believe the deal was in the interest of justice. *Id.* The Tenth Circuit determined that these statements were neither an admission of the plaintiff's innocence nor a concession that the charges could not be proven beyond a reasonable doubt and, thus, "the question of Montoya's innocence was left unresolved." *Id.* In addition, the court found that the compromise fell "squarely within those categories of dispositions that typically fail to show innocence." *Id.*

In this case, Plaintiff alleges that Defendants filed a motion to dismiss the charges against him stating that "following the indictment of Plaintiff, information was uncovered that called into question the testimony of their main witnesses, namely that Defendant Jaworski made [a] racist statement about President Obama and that Detective Kaiser testified in another proceeding that Defendant Gerhart made the order to arrest Ms. Trull." Am. Compl. ¶ 190. Plaintiff alleges, "This was not true; Defendant Brauchler and Hurlbert knew this [information] before Plaintiff was indicted by them." *Id.* These allegations, taken as true, leave open the possibility that Plaintiff may have

49

enjoyed a favorable termination. However, Defendants attach to their motion a copy of the motion to dismiss criminal charges filed in state court[11] arguing that dismissal was "based largely on a subjective determination of the impact of impeachment evidence as to a key witness and the inability to serve another important witness a subpoena for testimony at trial." Mot. 34. The motion reads, in relevant part:

> 3. ... It is alleged [the Trull] arrest occurred without probable cause and was ordered by [Plaintiff], who was employed as an Inspector with the El Paso County Sheriff's Office.
>
> 4. After the Grand Jury returned a true bill, it was apparent that former Sergeant Robert Jaworski was going to be a key prosecution witness at trial. The prosecution anticipated that he would have testified that he heard the [Plaintiff] order the arrest of Ms. Trull. This, obviously, would have been a key piece of evidence. Shortly after the indictment, the People received information that Mr. Jaworski made racial comments towards then President Barak Obama, including calling him "n---r." Although the [Plaintiff] is not African American, he is a person of color and the People believe that evidence of this statement would have been admissible on cross-examination to show bias on the part of Mr. Jaworski, which the People believe would severely damage not only the credibility of this key witness, but the value of his testimony in general.
>
> 5. Even with the issues related to Mr. Jaworski, the People believed that they should continue with the prosecution of [the Plaintiff], because they anticipated that Detective Lisa Kaiser would be a key witness as well. The prosecution anticipated that this witness would have testified that she felt there was no probable cause for the arrest of Kelli Trull, thereby making the arrest illegal. She also would have testified that she was ordered to arrest Ms. Trull by her superiors, which most likely included the [Plaintiff] and then Chief Deputy District Attorney Shannon Gerhart. On June 14, 2017, in preparation of trial of co-defendant Terrance Maketa, Detective Kaiser said that it was definitely Chief Deputy District Attorney Gerhart who ordered Ms. Trull

---

[11]Plaintiff does not object to this Court's consideration of the motion to dismiss for its Rule 12(b)(6) analysis, which is proper if the motion is (1) "mentioned in the complaint," (2) "central to [the] claims," and (3) not challenged as inauthentic. *Genesis Capital Ventures, LLC v. Restore With Apex, Inc.*, 282 F. Supp. 3d 1225, 1230–31 (D. Colo. 2017) (quoting *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 521 (10th Cir. 2013)). Additionally, "facts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting a motion to dismiss into a motion for summary judgment." *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

to be arrested and not the defendant or any of her supervisors. Again, this called into question the testimony of a key witness.

6. Finally, in late June and early July co-defendant Terrance Maketa was tried to a jury of twelve. The prosecution desired to call another witness whom they thought could offer relevant testimony related not only [to] the co-defendant, but [the Plaintiff] as well. This witness was Travis Garretson. Notwithstanding tireless, and herculean efforts to serve Mr. Garretson by the Colorado Bureau of Investigation, they were unable to do so, and the People have no reason to believe that there will be a different result in the future.

7. Although several of the charges against co-defendant Maketa resulted in a hung jury, those charges related to offenses unrelated to the allegations against [the Plaintiff. In fact, the charges that relate to [the Plaintiff] resulted in a not guilty verdict in the co-defendant's trial.

8. In the weeks since trial, the People have attempted to shore up the case against the [Plaintiff], but without luck.

Mot. to Dismiss, ECF No. 51-3 (for ease of reference, the Court substituted the term "defendant," as it relates to Mr. San Agustin, with "Plaintiff"). The Court finds that these statements, rather than support Defendants' argument, "touch the merits" of the criminal proceeding against the Plaintiff, particularly in that the prosecution questioned both the credibility and value of the testimony of Deputy Jaworkski, who attested that Plaintiff ordered Trull's arrest, and in that one of the "key witnesses," Detective Kaiser, "said that it was definitely [ ] Gerhart who ordered Ms. Trull to be arrested and not [Plaintiff] or any of her supervisors."  The Court finds Plaintiff's allegations, coupled with statements made in the motion to dismiss, taken as true, plausibly state that Plaintiff's criminal proceeding terminated favorably.

The third element of a Fourth Amendment malicious prosecution claim requires a showing that no probable cause supported the arrest and/or prosecution.  Probable cause exists when the facts and circumstances show a "substantial probability that a crime has been committed and that a specific individual committed the crime." *St. John v. Justmann*, 771 F.2d 445, 448 (10th Cir. 1985).

Probable cause "must be evaluated as of the events in question." *Pierce v. Gilchrist*, 359 F.3d 1279, 1294 (10th Cir. 2004).

In *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996), the Tenth Circuit addressed a claim for malicious prosecution in violation of the Fourth Amendment brought by a plaintiff who was acquitted of forgery and embezzlement after a grand jury returned an indictment against her. The court affirmed the trial court's dismissal of the claim finding that "the *unchallenged* information presented to the grand jury was sufficient to demonstrate a substantial possibility that plaintiff committed the crimes." *Id.* (emphasis added). In so finding, the court applied principles related to the purported falsification of statements submitted in support of an arrest warrant:

> Where false statements have been included in an arrest warrant affidavit, the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit. In a case involving information omitted from an affidavit, the existence of probable cause is determined by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant.

*Id.* (quotation marks and citations omitted). Thus, the court determined that the purported false testimony provided "to the grand jury was not material to the grand jury's determination" but the remaining information demonstrated a "substantial possibility" that the plaintiff committed forgery and embezzlement. *Id.*

Applying these principles here, Plaintiff alleges that "unchallenged" information was presented to the grand jury in the form of the manipulated key card data. That is, taking Plaintiff's allegations as true, he alleges employee key card records show he was not present during the Trull interview or arrest, but "Defendant Gagliardi falsely testified that the card key data showed Plaintiff was present during the Trull Arrest Conference in room 200b, despite the fact that the key card data unequivocally showed Plaintiff had left the building and parking structure about 19 minutes prior

to the Trull Arrest Conference" and Gagliardi (and others) "manipulated and maneuvered the evidence presented to the Grand Jury relating to whom was present in the Trull Arrest Conference." *See* Am. Compl. ¶¶ 160-172. Although it is unclear exactly *how* Gagliardi purportedly "manipulated" the key card data, he apparently did so in a way that allowed him to present to the grand jury the key card data inculpating Plaintiff and/or withhold the data exculpating Plaintiff. *See id.* To the extent Gagliardi presented such evidence to the grand jury in a manner other than by testimony, the Court finds Plaintiff's allegations sufficient to demonstrate the indictment may have been procured through misconduct, such as fabricated evidence. *See Turner v. Delaney*, No. 10-2533-JWL, 2015 WL 4066637, at *5 (D. Kan. July 2, 2015) ("an indictment returned by a grand jury is generally held to be prima facie evidence of the existence of probable cause. ... To overcome the presumption of probable cause, [plaintiffs] must establish that the indictment was procured through some type of misconduct such as fabricated evidence or false testimony.") (citing *D'Addabbo v. United States*, 316 F. App'x 722, 726–27 (10th Cir. 2008) and *Moore v. Hartman*, 102 F. Supp. 3d 35 (D.D.C. 2015)). Whether the grand jury relied on such fabricated evidence or whether the testimony itself demonstrated a substantial possibility that Plaintiff committed the crimes charged against him are questions that cannot be resolved in a Rule 12(b)(6) analysis. *See Wolford*, 78 F.3d at 489 (resolving a malicious prosecution claim pursuant to Fed. R. Civ. P. 56); *cf. Turner*, 2015 WL 4066637 at *8 (dismissing malicious prosecution claim for plaintiffs' failure to "explain[ ] to the court how they might establish a lack of probable cause for the indictments without resorting to [defendant's] improper grand jury testimony.").

The fourth element requires Plaintiff to plausibly allege that Gagliardi acted with malice. "[M]alice, in the context of malicious prosecution, requires evidence of intent, not mere negligence."

*Chavez-Torres v. City of Greeley*, 660 F. App'x 627, 629 (10th Cir. 2016). The Tenth Circuit "use[s] the common law elements of malicious prosecution as the starting point for the analysis of a § 1983 malicious prosecution claim. ... [and] Colorado ... defines malice in state malicious prosecution claims as 'any motive other than a desire to bring an offender to justice.'" *Id.* (internal quotation marks and citations omitted).

Here, although Plaintiff does not lodge allegations against Gagliardi demonstrating he had a specific animus against Plaintiff (as Plaintiff does with other Defendants), the Court finds Plaintiff's allegations that Gagliardi manipulated evidence and presented it to the grand jury sufficient at this stage of the litigation to show Gagliardi acted with malice. *See Pierce*, 359 F.3d at 1292 ("officers who conceal and misrepresent material facts ... are not insulated from a § 1983 claim for malicious prosecution simply because the prosecutor, grand jury, trial court, and appellate court all act independently to facilitate erroneous convictions.").

Defendants do not challenge whether Plaintiff plausibly alleges the fifth element–that Plaintiff sustained damages–and the Court finds his allegations sufficient. *See* Am. Comp. ¶ 233.

With respect to Plaintiff's third claim for conspiracy, Defendants argue that Plaintiff fails to "plead any specific facts that show or permit an inference of agreement between any Defendant and another person." Mot. 36. The Court disagrees. Plaintiff alleges that he was charged with the kidnapping and false imprisonment of Kelly Trull and that the indictment was "based on the Defendants' fabricated theory that Plaintiff was present during the Trull Arrest Conference and ordered her arrest." Am. Compl. ¶ 183. He further asserts that Gagliardi "helped" the Prosecutor Defendants "manipulate and fabricate evidence to keep the [criminal] case going," including the key card data, and Gagliardi "conspired" with the Prosecutor Defendants "to fabricate evidence again by stating that Plaintiff had engaged in 'ghosting' to get himself into the Trull Arrest Conference

without his card reader being used." *Id.* ¶¶ 185-187. These allegations of Gagliardi assisting and working with the prosecutors to "fabricate evidence" and use it in the criminal proceeding are sufficient to state a plausible claim that Gagliardi conspired to maliciously prosecute the Plaintiff. *See Shimomura*, 811 F.3d at 360 (allegations that TSA officers together refused to provide information, threatened the plaintiff, and crowded plaintiff in a threatening manner were arguably sufficient to state concerted action).

In sum, the Plaintiff fails to state Claims 1 and 3 against Defendants Hurlbert, Fevurly, Elder, Breister, and Jaworski and those claims are dismissed. However, Plaintiff plausibly alleges Claim 1 for malicious prosecution and Claim 3 for conspiracy against Defendant Gagliardi.

E.      *Monell* Claim against El Paso County

For his Claim 4, Plaintiff alleges that "El Paso County . . . had, in effect, ... several interrelated de facto policies, practices and customs ... [that] were implemented with deliberate indifference, and were a direct and proximate cause of the Plaintiff's constitutional violations and injuries." Am. Compl. ¶¶ 248-249. Plaintiff further alleges that "Defendant Elder, as Sheriff of El Paso County, is the final decision-maker for El Paso County with regard to the investigative, arrest, custodial and administrative acts, omissions, and decisions he made or participated in." *Id.* ¶ 253.

A municipality can be directly sued under § 1983 when its officers commit constitutional violations in accordance with the municipality's official policy. *Ellis ex rel. Estate of Ellis v. Ogden City*, 589 F.3d 1099, 1104 (10th Cir. 2009) (citing *Monell*, 436 U.S. at 690). However, as the Tenth Circuit has acknowledged, "liability will not attach "where there was no underlying constitutional violation by any of [the municipality's] officers." *Id.* (quoting *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006)).

Here, the Court has determined that Plaintiff alleges no constitutional violations by the El Paso County Defendants: Elder, Breister, Kirkman, and Jaworski. Accordingly, the Court must conclude that Plaintiff's allegations fail to state a plausible claim pursuant to *Monell* against El Paso County. Claim 4 is dismissed.

## II. State Tort Claims

Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction if the claim raises a novel or complex issue of state law, it substantially predominates the claim(s) over which the district court has original jurisdiction, the district court has dismissed all claims over which it has original jurisdiction, or there are other compelling reasons for declining jurisdiction. *Nielander*, 582 F.3d at 1172. "[S]upplemental jurisdiction is not a matter of the litigants' right, but of judicial discretion." *Estate of Harshman v. Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1165 (10th Cir. 2004). Here, the Court will exercise supplemental jurisdiction and determine whether the Plaintiff plausibly states his tort claims against Defendants.

Plaintiff alleges various tort claims against the individual Defendants and "respondeat superior" against the entity Defendants (Claims 6-11). Defendants seek dismissal of these claims arguing they are barred by the applicable statute of limitations and/or the provisions of the Colorado Governmental Immunity Act ("CGIA"); the individual Defendants enjoy prosecutorial and/or witness immunity under Colorado law; and Plaintiff fails to state plausible claims for relief. As before, the Court will address each argument in turn.

### A. Statutes of Limitations

Although the statute of limitations is an affirmative defense, it "may be appropriately resolved on a [Rule] 12(b) motion when the dates given in the complaint make clear that the right sued upon has been extinguished." *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 671 (10th

Cir. 2016); *see also Billinger v. Weinhold*, 531 F. App'x 928, 929 (10th Cir. 2013) (quoting *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980)); *Bell v. Land Title Guarantee Co.*, 422 P.3d 613, 615 (Colo. App. 2018) ("A district court may grant a motion to dismiss based on the statute of limitations if the plaintiff's complaint shows on its face that the claim was not timely filed.").

Generally, "[a] claim for relief 'does not accrue until the plaintiff knows, or should know, in the exercise of reasonable diligence, all material facts essential to show the elements of that cause of action.'" *Sterenbuch v. Goss*, 266 P.3d 428, 433 (Colo. App. 2011) (quoting *Miller v. Armstrong World Indus., Inc.*, 817 P.2d 111, 113 (Colo. 1991)); *see also Hannon Law Firm, LLC v. Melat, Pressman & Higbie, LLP*, 293 P.3d 55, 58 (Colo. App. 2011), *aff'd sub nom. Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.*, 287 P.3d 842 (Colo. 2012) ("A cause of action generally accrues 'when a suit may be maintained thereon.'") (quoting *Jones v. Cox*, 828 P.2d 218, 224 (Colo. 1992)).

Defendants contend that certain of Plaintiff's claims are barred by the limitations provisions in two statutes: Colo. Rev. Stat. § 13-80-103(1)(c) and § 13-80-108(1). The first statute applies generally to claims brought against law enforcement officers and the second applies particularly to defamation claims.

### 1.    Law Enforcement

Under section 13–80–102(1)(h), a two-year statute of limitations applies to "[a]ll actions against any public or governmental entity or any employee of a public or governmental entity, except as otherwise provided in ... section 13–80–103." *Garcia v. Harms*, 410 P.3d 561, 565–66 (Colo. App. 2014). Under section 13–80–103(1)(c), a one-year statute of limitations applies to "[a]ll actions against sheriffs, coroners, police officers, firefighters, national guardsmen, or any other law

enforcement authority." *Id.* at 566. Thus, under the plain language of the statute, Plaintiff's state law claims against Defendants Sheriff Elder, Undersheriff Breister, Deputy Jaworski, and Agent Gagliardi are subject to the one-year limitations period in Colo. Rev. Stat. § 13–80–103(1)(c). *See Delta Sales Yard v. Patten*, 870 P.2d 554, 557 (Colo. App. 1993), *aff'd*, 892 P.2d 297 (Colo. 1995); *see also Bailey v. Clausen*, 557 P.2d 1207, 1211 (Colo. 1976) ("sheriff" in statute applied to deputy sheriffs appointed by the sheriff).

As applied to the remaining Defendants, the phrase "law enforcement authority" is not defined in section 13–80–103. *Id.* The *Garcia* court looked to the Colorado Supreme Court's analysis in *Delta Sales Yard v. Patten*, 892 P.2d 297, 300 (Colo. 1995) for instruction regarding a definition:

> [T]he Colorado Supreme Court turned to the definition of "peace officer" in section 18–1–901(3) to determine whether a state brand inspector was a law enforcement authority under section 13–80–103. A peace officer, as defined in section 16-2.5–101, C.R.S.2014, has "the authority to enforce all laws of the state of Colorado while acting within the scope of his or her authority and in the performance of his or her duties." Colorado statutes use the terms "peace officer" and "law enforcement officer" interchangeably. § 16–2.5–101(3). Because brand inspectors are peace officers endowed with the statutory power to arrest, the *Delta Sales Yard* court reasoned, they are law enforcement authorities under section 13–80–103. Id. at 300–01.

> We find *Delta Sales Yard* to be instructive. Because peace officers are granted the authority to enforce Colorado law, they are "law enforcement authorities" for purposes of section 13–80–103. Under section 16–2.5–135, C.R.S.2014, "[t]he executive director of the department of corrections, a warden, a corrections officer employed by the department of corrections, or other department of corrections employee assigned by the executive director, is a peace officer while engaged in the performance of his or her duties pursuant to title 17, C.R.S." Therefore, five of the named defendants in this case—the CDOC's executive director, the warden of Sterling, the hearing officer, and the two unnamed corrections officers—are "law enforcement authorities" for purposes of section 13–80–103(1)(c).

*Garcia*, 410 P.3d at 566. Following *Garcia*, the Court finds Defendants May, Gerhart, Brauchler, Hurlbert, and Fevurly, all alleged to be district attorneys or deputy district attorneys, are "peace

officers" pursuant to Colo. Rev. Stat.§ 16-2.5-132 ("a district attorney, an assistant district attorney, a chief deputy district attorney, a deputy district attorney, a special deputy district attorney, and a special prosecutor are peace officers whose authority shall include the enforcement of all laws of the state of Colorado"). Therefore, all state law claims brought in this case against the "Law Enforcement" and "Peace Officer" Defendants are subject to the one-year limitation.

Plaintiff makes no argument concerning this defense. He initiated this action on October 16, 2018; thus, his state law claims against the Law Enforcement/Peace Officer Defendants must have accrued no earlier than October 16, 2017. As set forth above, the grand jury proceedings occurred in April and May 2016 and, on May 25, 2016, Plaintiff was indicted for kidnapping and false arrest. Am. Compl. ¶¶ 117-172, 183. The charges were dismissed on October 16, 2017. *Id.* ¶ 189.

Based on these allegations, the Court finds that Plaintiff's Claim 7 for Intentional Infliction of Emotional Distress accrued earlier than October 16, 2017, the date on which he learned that the charges were dropped. Accordingly, this claim is dismissed against the Law Enforcement/Peace Officer Defendants, but will proceed against Defendant Kirkman unless otherwise dismissed. Claim 8 for Abuse of Process against the Law Enforcement/Peace Officer Defendants, which relies solely on allegations concerning the grand jury proceedings, accrued before October 16, 2017. Thus, Claim 8 is dismissed.

Claim 9 for Defamation against Hurlbert accrued after the dismissal of the charges and, thus, the claim will proceed unless otherwise dismissed. Claim 10 for Defamation against Defendants Kirkman, May, Elder, and Breister accrued "in late 2016" when Plaintiff was made aware that his name was placed on a *Brady* list. Plaintiff counters (in response to a related argument) that "once the charges against him were dismissed, there was no longer any possible basis for placing him on the *Brady* list and his name should have been removed." Resp. 52. While it may be true that

59

Plaintiff might recover for a defamation claim if he had alleged he suffered damages because his name was placed, or remained, on a *Brady* list on or after October 16, 2017, he made no such allegations in the Second Amended Complaint. Rather, the allegations specify that

> Defendants May, Kirkman, Elder and Breister purposely had Plaintiff's name placed on the Brady list without any grounds. There was no basis for Plaintiff to be placed on the Brady list. Placing Plaintiff's name on the Brady list is a statement that Plaintiff has been untruthful and/or committed other wrongs that would impede on his credibility. This was untrue, Plaintiff had done no such thing.

Am. Compl. ¶ 299. Plaintiff alleges that he learned about his placement on the list "in late 2016." *Id.* ¶ 199. Nothing in the pleading suggests that Plaintiff's name remained on (or was placed on) the list on or after October 16, 2017. Even if Plaintiff had alleged that his name remained on the list in late 2017, however, the Court finds the allegations taken as true reflect that he knew or should have known in late 2016 the facts necessary to support a claim for defamation. Therefore, the claim is dismissed against May, Elder, and Breister, but will proceed against Kirkman unless otherwise dismissed.

Finally, Claim 11 for Tortious Interference with Prospective Business Advantage relies on allegations concerning the grand jury proceedings, prosecution of criminal charges, and the *Brady* list. Notably, Plaintiff alleges that his "arrest, confinement, and continued prosecution tarnished Plaintiff's reputation and prevented past, current, and prospective customers and merchants from conducting business with Plaintiff." Am. Compl. ¶ 311. Plaintiff alleges nothing further allowing the Court to conclude that he suffered from economic interference once the criminal charges were dismissed. Accordingly, the Court finds Claim 11 accrued before October 16, 2017 and the claim is dismissed as against the Law Enforcement/Peace Officer Defendants pursuant to Colo. Rev. Stat. § 13-80-103(1)(c).

2.      Defamation Claims

Defendants also contend that Claims 10 and 11 are barred by the one-year limitation period attached to defamation claims.  Again, Claim 10 for Defamation alleges Defendant Kirkman, an attorney and legal advisor to El Paso County, supervised and directed the compilation of the county's *Brady* list and she "conspired to and purposely had Plaintiff's name placed on the list without any grounds for doing so."  Am. Compl. ¶ 203.  For the reasons set forth above, the Court finds Plaintiff's allegations, taken as true, reflect that Claim 10 accrued at the time Plaintiff became aware of his placement on the list in late 2016.  Accordingly, Claim 10 is dismissed as untimely.

Defendants also argue that Claim 11 for Tortious Interference, to the extent it is based on the alleged "defamatory statement" regarding the *Brady* list, is subject to the one-year statutory period.  Plaintiff does not respond to this argument.  Nevertheless, the Court is not persuaded by the case law on which Defendants rely for their argument.  Defendants cite a 1998 opinion from the Kansas Court of Appeals, which addressed whether a defamation action was improperly "disguised" as one for tortious interference to avoid the limitations bar.  *Taylor v. Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers*, 968 P.2d 685, 691 (Kan. App. 1998) ("The issue here is whether a plaintiff may plead a defamation action as a tortious interference action and thereby escape the bar of the statute of limitations.").  In commenting that "[t]he law is clear in Kansas that the courts will look through form to substance in determining the true nature of a cause of action," the *Taylor* court found that "virtually all" of the plaintiff's claims were based on one letter and the alleged defamatory statements therein.  *Id.* at 678.  The court cited to other opinions finding that "identical allegations" were "duplicative" of claims otherwise time-barred and, thus, these claims were untimely.  *See id.* at 679-80.

Defendants cite to no Colorado cases addressing whether a time-barred claim is actually disguised as a timely claim, and the Court has found none. Given the lack of binding or persuasive authority and at this early stage of the litigation taking the Plaintiff's allegations as true for purposes of the present motion, the Court finds that Plaintiff's Claim 11 is not disguised as a time-barred defamation claim, particularly in that the claim is asserted against *all* Defendants and contains allegations that are different from and additional to those allegations contained in Plaintiff's defamation claims. *See id.* at 680 (citing *Eddy's Toyota of Wichita, Inc. v. Kmart Corp.*, 945 F. Supp. 220, 225 (D. Kan.1996) for the proposition that "a tortious interference with contract cause of action was determined, under Kansas law, to actually be a malicious prosecution cause of action, *because the action was based solely on the allegations* of a malicious lawsuit" (emphasis added)). The Court will not dismiss Claim 11 on this basis.

B.    Colorado Governmental Immunity Act ("CGIA")

At this point, Claim 6 for respondeat superior remains against the entity Defendants, Claims 7 for outrageous conduct and 10 for defamation remain against Defendant Kirkman, Claim 9 for defamation remains against Defendant Hurlbert, and Claim 11 for tortious interference remains against the entity Defendants and Defendant Kirkman. Defendants contend that Plaintiff failed to "substantially comply" with the CGIA's notice requirement by failing to "set forth a factual description sufficient to apprise the defendants of the basis for which the plaintiff would hold them liable." Mot. 50. Defendants also contend that Plaintiff failed to identify Kirkman in his notice.

Under the CGIA, an injured person seeking damages from a public entity or employee must provide written notice of the claim within 182 days after the date of the discovery of the injury, regardless of whether the person then knew all of the elements of a claim or of a cause of action for such injury. Colo. Rev. Stat. § 24–10–109(1); *Finnie v. Jefferson Cty. Sch. Dist. R-1*, 79 P.3d 1253,

1255 (Colo. 2003). The statute sets forth the following information that must be contained in a notice:

(a) The name and address of the claimant and the name and address of his attorney, if any;

(b) A concise statement of the factual basis of the claim, including the date, time, place, and circumstances of the act, omission, or event complained of;

(c) The name and address of any public employee involved, if known;

(d) A concise statement of the nature and the extent of the injury claimed to have been suffered;

(e) A statement of the amount of monetary damages that is being requested.

Colo. Rev. Stat. Ann. § 24-10-109(2). While the requirement to file within the statutory period is jurisdictional, "the adequacy of the notice's contents is subject to a substantial compliance standard under section 24–10–109(2)." *City & Cty. of Denver v. Crandall*, 161 P.3d 627, 632 n.5 (Colo. 2007). "Substantial compliance requires a good faith effort to include, as far as is reasonably possible, the listed information." *Awad v. Breeze*, 129 P.3d 1039, 1041 (Colo. App. 2005), *as modified on denial of reh'g* (June 9, 2005), *cert. denied* (Colo. Feb. 27, 2006); *see also Cassidy v. Reider*, 851 P.2d 286, 288 (Colo. App. 1993) (quoting *Woodsmall v. Reg'l Transp. Dist.*, 800 P.2d 63, 68 (Colo.1990)) ("'substantial' compliance [is] a degree of compliance 'considerably more than minimal, but less than absolute.'").

Defendants do not challenge the timeliness of Plaintiff's November 18, 2016 CGIA Notice but, rather, its contents. Plaintiff does not object to this Court's consideration of the Notice for its Rule 12(b)(6) analysis (Resp. 52-53); the Court finds the Notice is "mentioned in the complaint," "central to [the] claims," and not challenged as inauthentic. *See Genesis Capital Ventures, LLC*, 282 F. Supp. 3d at 1230–31. A review of the Notice reflects that Defendant Kirkman is not, in fact,

mentioned. Plaintiff does not argue that he did not know Kirkman's name at the time he sent the Notice or that he made a good faith effort to include her name but failed; rather, Plaintiff contends that "some details" were omitted due to a court order limiting their disclosure. However, he does not assert that Kirkman's name was among those details. Therefore, the Court finds Plaintiff failed to substantially comply with the CGIA by failing to list Defendant Kirkman among the "public employee[s] involved" in the circumstances underlying his claims. For this reason, Claims 7 and 10, as well as Claim 11 against Kirkman are dismissed.

Defendants also assert that Claim 9 should be dismissed because the alleged defamatory statement occurred after the Notice was issued. For Claim 9, Plaintiff alleges, "After the charges against Plaintiff were dismissed, Defendant Mark Hurlbert made a public published statement that Plaintiff was guilty despite the dismissal of the charges. This statement was false." Am. Compl. ¶ 291. The charges against Plaintiff were dismissed on October 16, 2017. Thus, Defendants are correct that the alleged defamation occurred after the issuance of the November 2016 Notice.

Plaintiff does not respond to this argument and there is no indication that he issued a subsequent Notice describing Hurlbert's alleged defamatory statement. The Court finds that Plaintiff failed to substantially comply with the CGIA by failing to notify the Defendants of his injuries from Hurlbert's alleged statement. Accordingly, Claim 9 is dismissed.

C. Claims against Entity Defendants

Plaintiff alleges a "claim" (Claim 6) for respondeat superior; however, in Colorado, respondeat superior is a theory of liability. *See Stokes v. Denver Newspaper Agency, LLP*, 159 P.3d 691, 694 (Colo. App. 2006) (recognizing respondeat superior as a theory of liability). "Under the respondeat superior doctrine, an employer is liable for torts of an employee acting within the scope of employment." *Id.* at 693. Thus, "under a theory of respondeat superior the liability of an

employer is derivative of the liability of its employee," *Gallegos v. City of Monte Vista*, 976 P.2d 299, 301 (Colo. App. 1998) and if the employee is not liable, the employer cannot be liable. The Court concludes that, since no individual Defendant is liable for any state tort in this case, Plaintiff's respondeat superior theory cannot stand. Claim 6, to the extent it may be construed as a "claim," is dismissed.

With respect to Claim 11 for tortious interference against the state entities (Fourth and Eighteenth Judicial Districts and CBI), Defendants assert that Plaintiff fails to allege any waivers of the State's immunity under the CGIA. Specifically, the statute provides that "[a] public entity shall be immune from liability in all claims for injury which lie in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by the claimant except as provided otherwise in this section." Colo. Rev. Stat. § 24-10-106(1). The CGIA lists a number of circumstances under which the State has waived its sovereign immunity (§§ 24-10-106(1)(a)-(i)); Defendants contend that "none of [Plaintiff's] state law claims for relief falls within a waived area." Mot. 54. Plaintiff does not respond to this argument.

A review of the waived areas listed in the statute reflects that the State has not waived its immunity from suit for damages caused by the State's alleged interference with a plaintiff's prospective business advantage by initiating grand jury proceedings and pursuing criminal charges based on false or omitted information, and/or by publishing the plaintiff's name on a *Brady* list. Thus, the Court must find that the entity Defendants are immune from liability for Plaintiff's tortious interference claim, and Claim 11 is dismissed.

## CONCLUSION

The Court concludes that Defendants enjoy prosecutorial and/or witness immunities from liability for Plaintiff's Section 1983 claims, except Claims 1 and 3 against Defendant Gagliardi.

Furthermore, the Court finds that Plaintiff's state tort claims are barred by the applicable statutes of limitations or by the CGIA.  Accordingly, the Defendants' Combined Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) [filed January 8, 2019; ECF 51] is **granted in part and denied in part** as set forth herein.

The stay imposed on January 2, 2019 is lifted.  The Court will hold a Status Conference in this case on September 17, 2019 at 1:30 p.m. in Courtroom A-501, on the fifth floor of the Alfred A. Arraj United States Courthouse located at 901 19th Street, Denver, Colorado.

SO ORDERED.

Dated this the 28th day of August, 2019, in Denver, Colorado.

BY THE COURT:

Michael E. Hegarty

Michael E. Hegarty
United States Magistrate Judge