IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-02646-MEH

JUAN SAN AGUSTIN, JR.,

      Plaintiff,

v.

RALPH GAGLIARDI, Colorado Bureau of Investigations Agent, and
TIMOTHY J. MARTINEZ, Colorado Bureau of Investigations Agent,

      Defendants.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge.**

      Before the Court is Defendants' Combined Motion to Dismiss and Motion for Summary Judgment. ECF 142. The Motion is fully briefed, and oral argument would not materially assist in its resolution. Based upon the record herein and for the reasons that follow, the Motion is granted.

## <u>BACKGROUND</u>

**I.    Plaintiff's Allegations**

      At issue is Plaintiff's Third Amended Complaint ("TAC"). The Court begins with the underlying events as Plaintiff pleads them in his TAC. ECF 136. The Court does so because the pleading relates to Defendants' Motion to Dismiss and the nature of Plaintiff's claims. The Court also does so for context for the later Statement of Undisputed Material Facts.

      There was an investigation into the 2013 murder of Tom Clements, the head of the Colorado Department of Corrections. Plaintiff, who worked for the El Paso County Sheriff's Office ("EPSO") as an investigator, was a member of the team who investigated it. Defendants,

agents with the Colorado Bureau of Investigations ("CBI"), had at least some degree of involvement with that investigation (although Defendants say it was limited in scope and with no direct interaction with Plaintiff). In March 2016, Plaintiff expressed strong views publicly to the press critiquing the murder investigation. *Id*. at ¶¶ 92, 94.

There was an unrelated investigation of Ms. Trull, a nurse who worked for the El Paso County Jail. Ms. Trull initially had accused her boyfriend, an EPSO deputy sheriff, of domestic violence, an accusation which caused the boyfriend to lose his job. Ms. Trull later recanted. In her retelling, she also revealed that she had driven under the influence of alcohol. That prompted the EPSO to investigate *her*. She was asked to return for a second interview. It took place on the morning of September 12, 2013. Det. Lisa Kaiser was assigned to the case and conducted the second interview.

Others were there to observe, although the evidence leaves unclear exactly who was there and what advice or orders they gave. Observing the interview from a nearby conference room— as Plaintiff pleads in his TAC—were Sgt. Robert Jaworski (Det. Kaiser's supervisor), other EPSO employees and supervisors, and Deputy District Attorney Shannon Gerhart. Also present was Commander Mitch Lincoln. *Id*. at ¶ 106. After the interview, in what Plaintiff calls the "Trull Arrest Conference," Det. Kaiser conferred with DDA Gerhart and "EPSO command staff" "to determine whether there was probable cause to arrest Ms. Trull." *Id*. at ¶ 71. DDA Gerhart opined that probable cause existed to arrest her for harassment and driving under the influence. *Id*. at ¶ 72. Ms. Trull was arrested and prosecuted on those charges. *Id*. at ¶ 73. Det. Kaiser is the officer who actually arrested her (*id*. at ¶ 101), which, Plaintiff alleges, she did at the direction of DDA Gerhart (*id*. at ¶¶ 121, 123-124, 127).

In a later conversation with Defendant Martinez during Plaintiff's criminal case, Commander Lincoln denied making the decision to arrest Ms. Trull and opined that it would have been Plaintiff and/or Undersheriff Presley who did. *Id*. at ¶ 199.

Plaintiff denies that he "was present for the Trull Arrest Conference" or that "he was . . . even in the building." *Id*. at ¶ 74. He relies on employee key card data showing he left the second floor of the EPSO building at 9:30 a.m. that morning and drove out the parking garage two minutes later. *Id*. at ¶ 75. Plaintiff denies returning that day. *Id*. In addition, Det. "Kaiser never mentioned Plaintiff as being involved in the investigation and/or arrests of Trull." *Id*. at ¶ 103. Even if he had been present, Commander Lincoln, who was present and outranked Plaintiff, could have overridden any instruction of his. *Id*. at ¶¶ 106, 107.

In 2014, the CBI began to investigate Terry Maketa, the then-sheriff of El Paso County, an investigation which included within its scope Trull's arrest. "Plaintiff was interviewed numerous times concerning various allegations of wrongdoing by [Sheriff] Maketa" (*id*. at ¶ 88), although Plaintiff himself was never a target of that investigation, (*id*. at ¶ 88). The investigation concluded in September 2014 with no finding of wrongdoing by anyone.

The Maketa investigation was reopened in 2016, at which time Defendants joined the reconstituted investigating team. In his TAC, Plaintiff questions aspects of the renewed investigation. "CBI agents specifically asked . . . two sheriff's deputies why Plaintiff had given negative statements to the press in early March 2016 regarding the Clements [murder] investigation." *Id*. at ¶ 99. Det. Kaiser had told Defendant Martinez that Sgt. Jaworski and DDA Gerhart had instructed her to arrest Ms. Trull. Despite knowing that the arrest decision came from them, Plaintiff alleges that "Defendant Martinez purposefully failed to ask Jaworski any questions about Gerhart's involvement in the decision to arrest Trull when he [interviewed] Jaworski." *Id*.

at ¶ 101. (However, Plaintiff also says that when Defendant Martinez interviewed him, Sgt. Jaworski denied "remember[ing] the Trull Arrest Conference or who was present," (*id*. at ¶¶ 100, 133), thereby calling into doubt the value of any further questioning.) Plaintiff also complains that Defendant Martinez "suggested to Jaworski" that the instruction to arrest Trull may have come from him. *Id*. at ¶¶ 102, 103.

In April 2016, District Attorney George Brauchler and Deputy District Attorneys Mark Hurlbert and Grant Fevurly of the Eighteenth Judicial District asked a grand jury to indict Sheriff Maketa and Undersheriff Paula Presley for wrongdoings that included Trull's arrest. *Id*. at ¶ 113. That same month, Undersheriff Joe Breister "openly stated that if Maketa, Presley, and Plaintiff 'want to talk to the press just wait until this nuke drops on them.'" *Id*. at ¶ 117.

The grand jury met five times between April 27 and May 25, 2016. *Id*. at ¶ 118. Initially, Plaintiff was not a target of the grand jury investigation. *Id*. at ¶ 114.

As she earlier had told Defendants, Det. Kaiser explained to the grand jury that "the decision to arrest Trull came from her chain of command to include Chief District Attorney Shannon Gerhart from the 4th Judicial District Attorney's Office who was present and observed the interview from the conference room." *Id*. at ¶ 209. Then, for the first time up to this point, Det. Kaiser indicated that *Plaintiff* may have been present at the Trull Arrest Conference. She assumed he was there given the "heavy interest in the case" generally (*id*. at ¶ 122), but she "said absolutely nothing about Plaintiff participating in the decision to arrest Ms. Trull" (*id*. at ¶ 126).

DDA Gerhart told the grand jury that she was present at the Trull Arrest Conference, but she *denied* being the one who gave the instruction to charge Ms. Trull. *Id*. at ¶ 128. Her denial was inconsistent with what she earlier had told Defendant Martinez and what Det. Kaiser had recalled. *Id*. at ¶¶ 128, 129.

4

Sgt. Jaworski testified, and despite earlier remembering nothing from the Trull Arrest Conference, he then gave details. He denied having the benefit of any district attorney's advice when the decision whether to arrest Trull was being made. *Id*. at ¶ 132. He stated that he was present at the Trull Arrest Conference as was Plaintiff, the person Sgt. Jaworski accused of giving the arrest order. *Id*. at ¶ 135. Plaintiff emphasizes Sgt. Jaworski's personal dislike of him, and by this point, Sgt. Jaworski had become subject of an internal investigation on an unrelated matter. *Id*. at ¶¶ 135, 137, 140.

Based on the evidence presented thus far, it was the grand jury's understanding that DDA Gerhart, Sgt. Jaworski, and Plaintiff were the people who had agreed to arrest Ms. Trull. *Id*. at ¶ 153.

Al Harmon is the Bureau Chief of EPSO and Plaintiff's commanding officer. *Id*. at ¶ 152. Chief Harmon did not recall being present. He opined that Det. Kaiser had consulted with Sgt. Jaworski who in turn had consulted with Plaintiff about whether to arrest Ms. Trull. *Id*. at ¶ 153.

When Ms. Trull first made the domestic assault accusation, she had gone to her immediate supervisor, Ms. Habert, and Undersheriff Breister. *Id*. at ¶ 64. Breister referred the matter for investigation. *Id*. On August 13, 2013, Undersheriff Breister interviewed Ms. Trull (her first interview). Plaintiff complains that the grand jury never learned about Ms. Trull's first interview with him in which she admitted criminal culpability. *Id*. at ¶ 184. During his grand jury testimony, the prosecutors neither asked him about his first interview of Ms. Trull, nor did Undersheriff Breister volunteer that information on his own. Plaintiff notes that DDA Hurlbert and Fevurly as well as Defendant Gagliardi were present at that grand jury proceeding and allowed Undersheriff Breister's telling to remain incomplete despite themselves knowing that Ms. Trull had provided the probable cause to arrest her at her first interview. *Id*. at ¶ 186.

5

CBI did not interview Plaintiff before the grand jury proceeding. However, Defendant Martinez did serve a subpoena for him to testify at the grand jury. *Id*. at ¶ 142. In response to the subpoena, Plaintiff retained an attorney who in turn communicated to DDA Hurlbert that Plaintiff "had never ordered an arrest [of Trull]" and "was not a participant in any conference where it was determined that a deputy's girlfriend would be arrested." In other words, "Plaintiff was not involved in the Trull Matter in any way." *Id*. at ¶¶ 148, 150. Although Plaintiff made himself available to testify and was under the subpoena, DDA Hurlbert did not actually call him (although DDA Hurlbert gave him the option to testify if he would admit to being the person who had ordered the arrest). *Id*. at ¶¶ 147, 149.

The grand jury asked for key card data to show who was present at the Trull Arrest Conference. Defendants obtained the information, which Plaintiff contends "unequivocally showed that [he] had left the building before the Trull Arrest Conference took place." *Id*. at ¶ 155. Plaintiff claims that Defendants knew the key card data contained exculpatory information (that he was not physically present when the arrest decision was made) and intentionally withheld it from the prosecutors and/or gave them false information about what it contained. *Id*. at ¶¶ 76, 155-157.

However, Plaintiff does not go so far as to allege no communication between the Defendants and the prosecutors on the matter. On May 24, 2021, Defendant Martinez emailed DDA Fevurly to ask if they should put the information into exhibit form for presentation to the grand jury; or, conversely, whether it would be "good enough for [Defendant] Gagliardi to generally describe what [they had] found" in testimonial form (which was Defendants' preference). *Id*. at ¶ 158. No exhibit was made, and that next day, on May 25, 2021, Defendant Gagliardi testified before the grand jury about the key card data. Plaintiff alleges that Defendant

6

Gagliardi falsely told the grand jury that the data placed Plaintiff in the room where the Trull Arrest Conference was taking place. *Id*. at ¶ 159.  That assertion was incorrect in two ways. First, the data showed Plaintiff's departure beforehand, and second, the data could not show entry into the room, just the floor. *Id*. at ¶¶ 160, 162-164. "Had the key card data been given to the prosecutors it would have vitiated any probable cause that may have existed against Plaintiff." *Id*. at ¶ 175.

Plaintiff contends that Defendants wrongfully influenced the grand jury evidentiary record in other ways. Plaintiff accuses Defendants of presenting incorrect information about what the key card data showed concerning the presence of others at the Trull Arrest Conference. *Id*. at ¶¶ 165-173. He furthers that Sgt. Jaworski later "adopted" Defendant Martinez' suggestion and told the grand jury that Plaintiff was the one "involved in the investigations and arrest of Trull." *Id*. at ¶ 104. Defendant Gagliardi knew that Commander Lincoln was present at the Trull Arrest Conference and outranked Plaintiff (and thus could have overridden any instruction from him). *Id*. at ¶¶ 106-108. Plaintiff accuses Defendants of purposefully withholding from the grand jury Sgt. Jaworski's personal dislike of him. *Id*. at ¶ 140. Plaintiff also questions whether Defendants gave their earlier interviews of key witnesses (Det. Kasier, DDA Gerhart, and Sgt. Jaworski) to DDA Hurlbert and DDA Fevurly for use in the grand jury presentation or flagged inconsistencies between the witnesses' interview statements and grand jury testimony.  *Id*. at ¶¶ 130, 133, 134. Plaintiff accuses Defendants of withholding from the prosecutors the earlier interviews of Ms. Trull that Det. Kaiser had conducted and other evidence that would have shown the existence of probable cause to arrest Ms. Trull. Id. at ¶¶ 177-186. If there was probable cause to arrest Ms. Trull, then Plaintiff was innocence of the charges.

Plaintiff accuses Defendants of purposely withholding exculpatory information from the prosecutors in order to obtain the indictment. *Id*. at ¶ 184. He says they "intentionally conspired to

7

cause the Grand Jury to believe that [he] was physically present at the Trull Arrest Conference and that he gave the order to arrest her, when they all knew this to be completely untrue." *Id*. at ¶ 207. In addition to withholding evidence, Plaintiff accuses Defendants of presenting both false and incomplete evidence to the grand jury. As such, Defendants "usurp[ed] the independent of the Grand Jury." *Id*. at ¶ 208.

On May 25, 2016, the grand jury indicated Plaintiff for kidnapping and false imprisonment of Ms. Trull (in other words, for causing her false arrest). *Id*. at ¶ 187. Plaintiff's defense attorney, Iris Eytan, conferred with DDA Fevurly to negotiate the criminal case's dismissal. The defense attorney illustrated how the key card data appeared to show Plaintiff's departure during the middle of Ms. Trull's second interview. *Id*. at 190. The prosecutors responded to the defense attorney's inquiry by characterizing the card reader data as being of "extremely limited utility." Plaintiff cites to it as further manipulation of the facts to perpetuate the fraudulent charges against him. *Id*. at ¶ 202.

After that meeting, DDA Fevurly asked Defendants to gather evidence from which to create a timeline of Plaintiff's presence and/or departure during the second Trull interview. *Id*. at 190. At the prosecutor's request, Defendants examined the key card data further and also pulled telephone records to see if Plaintiff may have called someone at the Trull Arrest Conference after leaving. *Id*. at ¶ 191-195. Plaintiff blames Defendants for creating a false impression that evidence could be found to implicate Plaintiff's involvement. *Id*. at ¶ 196. Plaintiff also questions why Defendant Martinez did not record a conversation with Commander Lincoln (*id*. at ¶ 200) that occurred as part of this inquiry—although this Court notes his explanation that he "didn't have a recorder immediately available" at that time (*id*. at ¶ 199). The prosecutors and Defendants together conspired to fabricate evidence to present an argument "that Plaintiff had engaged in

'ghosting' to get himself into the Trull Arrest Conference without his card reader being used and/or that Plaintiff had called in the [arrest] order" from another location *Id*. at ¶ 203. Ultimately, Defendant Martinez found no calls from Plaintiff to anyone related to the Trull arrest during the relevant timeframe. *Id*. at ¶¶ 198, 201.

The prosecutors moved to dismiss all charges against Plaintiff, which was granted on October 16, 2017. *Id*. at ¶ 205. The reason they gave for dismissing the charges was problems with the testimony of their two main witnesses, Sgt. Jaworski (who was subject of an internal investigation) and Det. Kaiser (who said DDA Gerhart had ordered her to arrest Ms. Trull). Plaintiff rejects the prosecutors' statement that they recently had learned of those problems with their testimony, arguing that they knew of thew of them before his indictment. *Id*. at ¶ 206.

In total, "Defendants were instrumental in securing false and fraudulent charges against the Plaintiff and his continued prosecution." *Id*. at ¶ 176. However, Plaintiff does not limit his accusation of wrongdoing to just them. He alleges that multiple district attorneys as well as EPSO leadership—(newly elected) Sheriff Elder (whose election Plaintiff opposed), Undersheriff Breister, and Sgt. Jaworski—joined in the conspiracy to bring about his indictment and continued prosecution. *Id*. at ¶¶ 77-82, 220-223.

In late 2016, Plaintiff learned that his name had been added to a list of deputy sheriffs who had committed acts of dishonesty or other wrongdoings. Being on that list would harm his new career as a private investigator and expert witness. Plaintiff blames EPSO leaders for placing him on that list. *Id*. at ¶¶ 213-219.

## II.   Claims for Relief

Plaintiff accuses Defendants of violating his "Fourth Amendment rights to be free from malicious prosecution without probable cause and without due process." *Id*. at ¶ 233. He alleges

9

that they acted with intent and malice to fabricate evidence, manipulate witness testimony, and suppress and withhold exculpatory evidence as well as to assist in the falsification of charges. *Id*. Plaintiff furthers that "Defendants together, and with others," formed a conspiracy to maliciously prosecute him. *Id*. at ¶ 240.

## III.    Procedural History

Plaintiff initially sued many of the above-mentioned EPSO employees and Fourth Judicial District prosecutors. Following the Court's dismissal order, *San Agustin v. El Paso County*, No. 18-cv-02646-MEH, 2019 WL 4059167 (D. Colo. Aug. 28, 2019), only Agent Gagliardi remained as a Defendant. Thereafter, the Court permitted Plaintiff to add Agent Martinez as a Co-Defendant (ECF 134) which resulted in the TAC at issue now. Although Defendant Gagliardi argued against the futility of adding Agent Martinez, the Court declined to consider at that time the plausibility of Plaintiff's new pleading, leaving it for a later Rule 12(b)(6) motion. *Id*. at 7-8.

Defendants submit the Combined Motion to Dismiss and Motion for Summary Judgment as their Rule 11 response to the TAC, which the Court permitted in its Order granting leave to amend. ECF 142 at 1, n.1; ECF 134 at 8.

## IV.    Statement of Undisputed Material Facts

Discovery was completed after the Court's Order on the prior Motion to Dismiss on August 28, 2019. For their respective statements of fact, the parties cite to both the TAC and the underlying fact record. Because the Court already recounts the TAC allegations above, the Court will limit this section to the evidentiary record (citing to the TAC only where needed for context). The Court also considered the "Additional Disputed Facts" in Plaintiff's Response (ECF 145 at 9-16), but it excludes those matters for which Plaintiff cites only to the TAC in support. As for his statements

that do not concern facts in direct dispute but rather a matters that he highlights as dispositive to the legal issues, the Court considers them for the later legal analysis.

The Clement Investigation

1.      Plaintiff was part of a team investigating the Clement murder. He disagreed with the Fourth Judicial District Attorney about how to handle the investigation. TAC, ECF 136 at ¶¶ 39-53.

2.      The CBI also investigated matters related to the Clement murder. ECF 142-2 at 6; ECF 142-3 at 13. However, Defendant Martinez and Defendant Gagliardi had limited involvement in it. ECF 142-2 at 6; ECF 142-3 at 13.

3.      Defendant Martinez "very briefly" worked on it by attempting to locate witnesses (ECF 142-2 at 6), although DDA Hurlbert recalled the two having a negative interaction with Plaintiff at a meeting (ECF 142-4 at 6).

4.      Defendant Gagliardi "minorly" investigated the associated death of a pizza delivery person.  ECF 142-3 at 13.

The Maketa Investigation

5.      In January 2016, the CBI assigned Defendant Martinez to take over the ongoing Maketa investigation, which had stalled after the officers handling it left CBI. ECF 142-2 at 5.

6.      Defendant Gagliardi was assigned to the CBI team handling the investigation in March 2016. ECF 142-3 at 4.

7.      Two other CBI agents also were assigned to the investigation at the same time. ECF 142-2 at 7.

8.      Neither Defendant Martinez nor Defendant Gagliardi had been involved in the Maketa investigation before 2016. *Id*. at 5.

9. Included within the scope of the Maketa investigation was alleged wrongdoing surrounding Trull's arrest. TAC, ECF 136 at ¶¶ 87, 97, 113, 145.

The Trull Arrest

10. EPSO was investigating Trull following her accusation of domestic violence against a deputy sheriff. *Id*. at ¶¶ 61-67.

11. On September 12, 2013, Trull returned to the sheriff's office building for a second interview. *Id*. at ¶ 67. That interview began at 9:22 a.m. ECF 142-11 at 3.

12. Det. Kaiser interviewed her. Trull stated that the accusation was a lie. Instead, it was she who had assaulted the deputy sheriff. Then, after the incident, she drove away despite being intoxicated. TAC, ECF 136 at ¶¶ 67, 70.

13. Det. Kaiser believed that Trull had changed her story to save the deputy sheriff's job. ECF 142-7 at 5. Nonetheless, Det. Kaiser placed Trull under arrest for DUI and domestic violence harassment. TAC, ECF 136 at ¶¶ 72-73.

14. Plaintiff submits the affidavit of Det. Kaiser dated January 5, 2021 (and thus prepared for purposes of this civil lawsuit). In it, Det. Kaiser recalls that DDA Gerhart, Sgt. Jaworski, and "other members of the command staff . . . including [Commander] Lincoln" were present during the second Trull interview. She says that Sgt. Jaworski was the person who told her to arrest Trull. (However, as Plaintiff also notes, Det. Kaiser told the grand jury that DDA Gerhart (not Sgt. Jaworski) had ordered it.) As for Plaintiff, she has "no memory of [him] being in the conference room that day" and "no knowledge that [Plaintiff] was involved in the Kelly Trull arrest in any way." To her knowledge, Plaintiff "had no involvement in the investigation and/or decisions to arrest Trull." ECF 145-4.

15.     At the time of Trull's arrest, Plaintiff worked as an Inspector for EPSO. ECF 142-6 at 3. Above him in rank were Chief Al Harmon and Commander Lincoln, *id*., and therefore, Plaintiff adds, either could have overruled any order by him. Below Plaintiff in rank were Sgt. Jaworski and Det. Kaiser. *Id*.

16.     Present at the second Trull interview was DDA Gerhart, who was there in her role as a liaison. DA liaisons advise EPSO staff on probable cause and charging decisions. They are outside the EPSO chain of command, but according to DA Newsome, the person who created the liaison program, EPSO always relied on and followed their advice. He was unaware of any instance when EPSO had ignored a DDA liaison's legal advice about probable cause or charges. ECF 145-3.

17.     At her deposition on May 4, 2021, DDA Gerhart recalled that Sgt. Jaworski and Det. Kaiser was present when the decision whether to arrest Plaintiff was made. She has "no actual memory of [Plaintiff] being there," although "it wouldn't have stuck out to [her] either way." ECF 147-5 at 22.

18.     DDA Gerhart took notes during the Trull interview as an aid should charges later be brought against Trull. ECF 145-7 at 38. Her notes are in the record at ECF 145-5.

### Defendants' Investigation and the Grand Jury Proceeding

19.     After taking over the investigation, Defendant Martinez and his team interviewed potential witnesses. The interviews were recorded and then memorialized in reports. ECF 142-2 at 8.

20.     Defendant Martinez interviewed DDA Gerhart, the transcript of which is in the record at ECF 145-2. At one point, DDA Gerhart described the whole Trull investigation as "odd." At the time she was "sure I said something like Gosh, your best charge is a DUI. Like—and

knowing me I was probably laughing when I said it." *Id.* at 21. After she finished speaking, Defendant Martinez asked: "Is it safe to say—I don't want to put words in your mouth, but you're kind of talking about this in jest, this DUI? Like this is—you know, this is kind of a piece of crap case." *Id.* at 22. DDA Gerhart answered, "Yeah." The exchange continued:

| | |
|---|---|
| Defendant Martinez: | The best thing you probably have is a DUI. |
| DDA Gerhart: | Yeah. |
| Defendant Martinez: | Just mentioning it in jest? |
| DDA Gerhart: | Right. |
| Defendant Martinez: | Do you remember specifically doing that? |
| DDA Gerhart: | I do. |

*Id.*

21.    The record does not contain a transcript of the CBI interview of Sgt. Jaworski that Defendant Martinez conducted. However, the audio recording was discussed at Sgt. Jaworski's later deposition conducted for this civil lawsuit. At the deposition, Plaintiff's counsel asked Sgt. Jaworski, "you could hear the agents—the CBI agents suggesting to you that maybe the order for Kaiser [not to search the cell phone of Trull's deputy sheriff boyfriend] had come from [Plaintiff] or above, right?" Sgt. Jaworski confirmed, "That's what the tape says, yes." Plaintiff's counsel asked, "again, even with that suggestion that maybe that order had come from [Plaintiff] or someone above, you said you still couldn't recall that, correct?" Sgt. Jaworski answered, "Correct." ECF 145-6 at 14. Defendants concede that Defendant Martinez asked Sgt. Jaworski during his interview whether certain decisions could have come down from Plaintiff or others in the chain of command." ECF 146 at ¶ 37.

22.    Further, at his deposition on December 2, 2020, could Sgt. Jaworski explain why during the CBI investigation he could remember nothing about the second Trull interview but two months later at the grand jury proceeding he could. ECF 145-6 at 20.

14

23.     In late March or early April 2016, the Eighteenth Judicial District Attorney initiated a grand jury inquiry into the allegations surrounding the Trull arrest. TAC, ECF 136 at ¶¶ 95-96. DDA Hurlbert was the lead prosecutor on the case, assisted by DA Fevury. ECF 142-4 at 6; ECF 142-5 at 7.

24.     The CBI agents shared all interview recordings, evidence, and reports with the Eighteenth Judicial District prosecutors as soon as practicable after they were completed. ECF 142-2 at 18; ECF 142-3 at 9. During the early stage, the prosecutors relied heavily on Defendants' knowledge of all the evidence in the case. ECF 142-4 at 16. Defendants collaborated with the prosecutors by providing them with interviews, evidence, and investigative reports. ECF 142-2 at 7-8.

25.     The prosecutors decided what to do with the information the investigators provided. ECF 142-2 at 16. DDA Fevurly stated that he and DDA Hurlbert decided what witnesses to call and how to question them at the grand jury proceedings. Possibly they could have asked Defendants for their input, but DDA Fevurly remembers nothing specific. ECF 142-5 at 49. DDA Hurlbert similarly testified that the prosecutors generally are the ones responsible for the presentation of evidence, but he could not remember whether they involved Defendants in any of those decisions. ECF 142-6 at 7. Plaintiff emphasizes how both Defendants recalled "[meeting] with prosecutors on a regular basis about the case and helped make these decisions," ECF 145 at ¶ 30, but he does not cite to where in their deposition transcripts the Defendants stated that.

26.     The prosecution team, according to DDA Fevurly, received all witness interview reports and related evidence from the CBI agents before conclusion of the grand jury. ECF 142-5 at 10-11, 21. The exception, Plaintiff points out, is the evidence that was collected after the grand

jury proceeding during the course of the criminal case such as his phone records and an interview of Commander Lincoln. ECF 142-3 at 9.

27. DDA Hurlbert presented Det. Kaiser to the grand jury on May 4, 2016. She testified as follows: Plaintiff was in her chain of command. She did not believe she had sufficient evidence to arrest Trull for either DUI or domestic violence, and she would not have arrested her on any charge if the decision had been left to her. The order to arrest Trull came from her chain of command and DDA Gerhart. Det. Kaiser believed that Plaintiff was in the monitoring room at the time of Trull's interview given the "heavy interest in the case" generally. ECF 142-7 at 1-2, 4, 6-8.

28. DDA Hurlbert presented DDA Gerhart to testify to the grand jury on May 11, 2016. She recalled Sgt. Jaworski's request for her to come to the sheriff's office to listen to Trull's second interview. She remembers Sgt. Jaworski being present in the monitoring room, but she is unsure if Plaintiff was there. She denied ordering the Trull arrest and was skeptical about bringing any charges. ECF 142-8 at 1-2, 4-6.

29. Sgt. Jaworski appeared before the grand jury on May 11, 2016. He testified that he had attended the meeting where it was decided to arrest Trull; Plaintiff also was there; and Plaintiff is the one who gave the arrest order. ECF 142-8 at 1-2, 8. DDA Hurlbert was aware that CBI had interviewed Sgt. Jaworski in March 2016 at which time he denied remembering who had ordered Trull's arrest. ECF 142-4 at 14. However, the change in Sgt. Jaworski's testimony did not surprise the prosecutors because, in their opinion, witnesses commonly are more forthcoming when under oath. ECF 142-4 at 8; ECF 142-4 at 23.

30. Plaintiff objects (without citing legal authority) that the prosecutors' opinion about witnesses being more forthcoming under oath "would most likely be inadmissible at trial." ECF

145 at ¶ 46. According to Defendants, Sgt. Jaworski himself had told them at the prior CBI interview that he might be more forthcoming under a grand jury subpoena. ECF 142-2 at 9; ECF 142-3 at 11. Plaintiff notes how the CBI record does not document Sgt. Jaworski making that particular assertion, which presumably occurred after the interview. ECF 145 at ¶ 47. Defendant Martinez adds that he informed the prosecutors of this. ECF 142-2 at 22.

31.     The prosecutors did not believe Sgt. Jaworski. Because the Trull matter "was a big deal," DDA Hurlbert expected him to remember. ECF 142-4 at 8. DDA Fevurly added how Sgt. Jaworski had been able "to discuss other cases in quite some detail." ECF 142-5 at 23.

32.     It was not until after the grand jury proceeding when Defendants learned of additional unrelated issues that affected the credibility and usefulness of Sgt. Jaworski's testimony. ECF 142-2 at 21-22; ECF 142-3 at 12-13. However, Plaintiff points out that Sgt. Jaworski already was subject of an internal investigation before his grand jury testimony. ECF 145-6 at 30.

33.     DDA Hurlbert presented Ms. Trull to the grand jury on May 18, 2016. She recalled Sheriff Maketa and Undersheriff Presley asking her to attend a second interview at which she would take responsibility for the domestic violence incident and thereby enable her boyfriend deputy sheriff to return to his job. ECF 142-9 at 1-2, 5-6.

34.     Bureau Chief Harmon testified to the grand jury on May 18, 2016, presented by DDA Hurlbert. He explained that Plaintiff was close with Sheriff Maketa and Undersheriff Presley, and occasionally they would use Plaintiff to bypass him to implement orders. Bureau Chief Harmon did not recall being at the Trull interview or arrest meeting, but he opined that Plaintiff was there. ECF 142-9 at 1-2, 11, 13-14, 17, 23.

35.     The prosecutors believed that Sheriff Maketa and Undersheriff Presley had orchestrated Trull's arrest before her second interview. They also suspected Plaintiff's

involvement because of his close relationship with them and given the testimony of Det. Kaiser, Sgt. Jaworski, and Bureau Chief Harmon. ECF 142-5 at 59; ECF 142-4 at 10-13.

The Key Card Data

36.     The prosecutors asked Defendants to retrieve key card data at the request of a grand jury member. ECF 142-5 at 28.

37.     EPSO employees used key cards to access floors (but not individual rooms) in the sheriff's office building. ECF 142-6 at 4.

38.     The interview room where the second Trull interview took place and the conference room where others monitored the interview by video both were located in the investigation division on the second floor of the sheriff's office building. Access to the second floor is through Card Reader 200B. *Id.* at 5.

39.     Plaintiff had an office in the investigation division on the same floor of the building where the second Trull interview occurred. *Id.*

40.     On May 24, 2016, Defendant Martinez obtained the key card data from the EPSO building and gave it to Defendant Gagliardi. ECF 142-2 at 17; ECF 142-3 at 5.

41.     On that same day, Defendant Gagliardi reviewed the key card data, converted the print-out to digital format, and separated the pages into different sections. ECF 142-3 at 5-6. The packet that Defendant Gagliardi gave the prosecutors was 300 pages long, in stack four to five inches high. ECF 142-3 at 5, 10-11.

42.     The raw key card data does not indicate the locations of specific card readers, but an accompanying map of the office building did. ECF 142-3 at 10; ECF 142-5 at 58.

43.     At noon on May 24, 2016, Defendant Martinez emailed DDA Fevurly to ask whether the prosecutors wanted the information in exhibit form or alternatively whether it would

18

be "good enough for Gagliardi to generally describe what [they] found" to the grand jury personally. Defendant Martinez indicated their preference for the latter option. ECF 142-2 at 15; ECF 145-1 at 3.

44.     The prosecutors did not ask Defendants to prepare an exhibit of the key card data, nor did they present one to the grand jury. ECF 142-5 at 29-30; ECF 142-3 at 9.

45.     Defendants obtained the key card data on May 24, 2016. Defendant Gagliardi gave the information to the prosecutors on the morning of May 25, 2016, an hour to an hour-and-a-half before the start of that day's (final) grand jury session. ECF 142-2 at 15; ECF 142-3 at 6-7; ECF 142-5 at 29.

46.     DDA Fevurly reviewed the key card data before he questioned Defendant Gagliardi at the grand jury proceeding. ECF 142-5 at 26, 32, 57.

47.     Before taking the stand, Defendant Gagliardi walked DDA Fevurly through the data, and pointed out the various card reader time entries—but not, Plaintiff emphasizes, the specific fact that he had left the building before Trull's arrest. ECF 142-3 at 6. Defendant Gagliardi recalled giving the prosecutors the key card data print-outs and showing them the relevant time stamps and key card areas for Sheriff Maketa, Undersheriff Presley, and Plaintiff generally. However, he did not go so far as to highlight separately the specific time stamp when Plaintiff left the building and how it indicated his departure before Trull's arrest. *Id.*

48.     When he testified to the grand jury, Defendant Gagliardi was aware that the key card data showed the use of Plaintiff's card to exit the sheriff's office building at 9:30 a.m. on September 12, 2013. ECF 145 at ¶ 16; ECF 146 at ¶ 16.

49.     DDA Fevurly does not remember if his review of the information provided was in depth enough to realize that it showed Plaintiff's departure before Trull's arrest. In any event, he

19

did not ask Defendant Gagliardi "any questions about timestamps on the keycard data" during his grand jury testimony. He presented the information at a more general level. He perceived the grand jury as wanting "to know whether there was keycard access to the rooms." DDA Fevurly introduced no evidence that the time stamp data showed the use of Plaintiff's key card to leave the building during the Trull interview because he did not regard the evidence as valuable. ECF 142-5 at 28-29.

50.     Defendant Gagliardi did not tell the grand jury that Plaintiff's key card data showed his departure before Trull was arrested, although, as Defendants point out, neither did the prosecutor ask him about it. ECF 145 at ¶ 17; ECF 146 at ¶ 17.

51.     DDA Fevurly does not remember actually receiving the information, but he expresses no reason for believing that Defendants did not provide him the relevant key card data during the grand jury. In other words, he has no reason to believe that Defendants withheld any key card data. ECF 142-5 at 28, 58.

52.     Although he was not responsible for presenting the data to the grand jury, DDA Hurlbert specifically recalls reviewing it while the grand jury was in session. However, he does not remember Defendant Gagliardi going through it in detail. ECF 142-4 at 16, 24, 26.

53.     The record contains the transcript of DDA Fevurly's questioning of Detective Gagliardi at the May 25, 2016 grand jury session. ECF 142-10 at 5-9. Defendants summarize it as "general testimony about the key card data," (ECF 142 at ¶ 73), a characterization with which Plaintiff agrees (ECF 145 at ¶ 73).

54.     The Court quotes their actual exchange: Defendant Gagliardi explained that the key card data shows access to rooms (not just floors), and specifically, "the conference room where individuals could observe ongoing interviews." ECF 142-10 at 6. Next, Defendant Gagliardi

explained who the key card data indicated was present for both of Trull's two interviews. At the first one, Defendant Gagliardi said the data placed Undersheriff Presley "on the floor 200" (that is, the second floor), "down on that floor in that room." *Id*. at 7. He repeated that Undersheriff Presley "was on the second floor, the conference room floor during the first interview." *Id*. at 8. At the second Trull interview, the data showed both Sheriff Maketa and Undersheriff Presley "present at the office, floor 500 but as far as the room 200B that card, the access card there I have [Plaintiff's] card reader *in that room*" (emphasis added[1]). *Id*. He repeated that the sheriff and undersheriff "were present in the building" and Plaintiff "was *on the conference room floor*" (emphasis added[2]). *Id*. at 8. As for others, such as Det. Kaiser and Sgt. Jaworski, the data showed "their key cards being used in room 200, that area as well." *Id*. at 8. Lastly, Defendant Gagliardi mentioned one limitation of the key card data. To paraphrase, if Person A used his key card to access a space and Person B followed him in, the key card reader would not record Person B's presence. He referred to that as "ghosting in" or "coming in with somebody through a doorway." *Id*. at 6.

55.     At his deposition, Defendant Gagliardi explained that he "was not asked about times of card use, just location." ECF 142-3 at 8. When asked whether he regarded the specific key card data point that showed Plaintiff's departure before Trull's arrest as a "salient" fact "of some importance," Defendant Gagliardi answered that he does now with the benefit of hindsight

---

[1] Plaintiff emphasizes this part of Defendant Gagliardi as factually incorrect; the key card data is not room-specific. He argues that Defendant Gagliardi "did not in any way correct or take back his testimony." ECF 145 at ¶¶ 26-27.

[2] Defendants argue that this statement was Defendant Gagliardi's correction of his earlier misstatement. ECF 146 at ¶ 27.

"[b]ut not then." He explained, "[i]t wasn't a focus brought to me or from me, about what we had been—we understood or the totality of the facts." ECF 142-3 at 8.

56.     Referring to the above testimony, Defendant Gagliardi says he neither was asked nor on his own did he testify specifically about whether Plaintiff was in the conference room where individuals were monitoring the second Trull interview when the decision was made to arrest her. Nor was he asked or testify about or offer any other evidence indicating that Plaintiff was the person who ordered the Trull arrest. ECF 142 at ¶¶ 76-77. Plaintiff agrees with that reading of the transcript. ECF 145 at ¶¶ 76-77.

57.     Had Defendants prepared the key card data in exhibit form—and had the prosecutor decided to publish it to the grand jury—then it would have showed the grand jury that Plaintiff had left and when. ECF 142-3 at 9.

58.     Plaintiff agrees that the underlying data shows the use of his key card on the second floor of the building from 8:11 a.m. until 9:30 a.m. on September 12, 2012. ECF 142-6 at 4. He concedes that he "probably [was] on the second floor" during that time frame. *Id*. at 5.

59.     As for whether the fact of Plaintiff's departure before Trull's arrest as indicated by the key card data was evidence that exculpated him, the prosecutors disagreed. There was other evidence to indicate Plaintiff's involvement. ECF 142-4 at 26; ECF 142-5 at 37, 57. While that is the prosecutors' expression of their personal opinion, Plaintiff contends that it is a question of fact for the jury. ECF 145 at ¶ 81.

60.     After the grand jury issued its indictment, Defendant Gagliardi wrote a report about the key card data to document the investigation file. ECF 142-3 at 9.

Indictment and Criminal Prosecution

61.     The prosecutors met with Defendants to "go through everything" and "to discuss the proposed indictment" before submitting it to the grand jury. ECF 145-1 at 1. The prosecutors advised Defendants of the potential charges they planned to present. Defendants offered no input. ECF 142-5 at 52-53. Although they conferred with Defendants to some extent, the prosecutors assert that they were the ones who wrote the draft indictment and ultimately decided what charges to present to the grand jury for its consideration. ECF 142-2 at 7-8; ECF 142-5 at 43, 45.

62.     The draft indictment given to the grand jury for its review sought charges against Sheriff Maketa, Undersheriff Presley, and Plaintiff for arresting Trull without probable cause. Because the arrest was without lawful authority, the crimes of kidnapping and false imprisonment were implicated. The prosecutors chose not to seek the same charge against Det. Kaiser (even though she was the one who physically arrested Ms. Trull) because she was acting on orders. Nor did the prosecutors choose to include Sgt. Jaworski, Commander Lincoln, or Bureau Chief Harmon in the indictment (who were all potential sources of that order or who had authority to override an arrest order). ECF 142-5 at 43-44.

63.     DDA Hurlbert explained that the focus of the criminal inquiry was on Sheriff Maketa. The prosecutors' interpretation of the evidence showed the arrest decision to have come from the top. Consequently, they "were looking to, as you do in investigations, roll people and get people—to give [them] the next level, next level, next level, next level, next level." For the same reason, the prosecutors wanted Plaintiff to testify at the grand jury to provide evidence that the arrest decision was made by Sheriff Maketa or Undersheriff Presley. ECF 142-4 at 10-11.

64.     Ultimately the grand jury chose to indict Sheriff Maketa, Undersheriff Presley, and Plaintiff for the arrest of Ms. Trull. The record contains the indictment at ECF 142-13. The

majority of the counts were against Sheriff Maketa and Undersheriff Presley for other aspects of the Trull matter as well as an unrelated matter involving Ms. Trull's supervisor. Two counts—one for second degree kidnapping and the other for false imprisonment—included Plaintiff as a third defendant. The factual predicate underlying the kidnapping and false imprisonment (which concerned Trull's arrest) asserted that Sheriff Maketa had a relationship with the deputy sheriff whom Trull had accused of domestic assault, and he and Undersheriff Presley endeavored to restore the deputy sheriff's job by encouraging Ms. Trull to change her story. Her second interview, at which she recanted her accusations and implicated herself as the wrongdoer, "was recorded and observed by various [EPSO] commanders." After her boyfriend deputy sheriff learned of her arrest, he contacted Sheriff Maketa and Undersheriff Presley. As for the decision whether to arrest Trull, the narrative says that neither Det. Kaiser, Sgt. Jaworski, nor Bureau Chief Harmon believed there was probable cause. However, they all felt pressure from superiors to carry out the arrest. Plaintiff's role was that of a conduit between Sheriff Maketa and Undersheriff Presley and the decisionmakers. Sheriff Maketa and Undersheriff Presley used Plaintiff to bypass the chain of command, and Plaintiff (along with Bureau Chief Harmon) ordered Trull's arrest. Bureau Chief Harmon denied giving any such order—but also feared losing his job if he did not follow orders.

65.     The indictment makes no mention of the key card data or that Plaintiff was in the monitoring room at the time of Trull's arrest. ECF 142-13.

66.     Although there is no direct evidence of it, Plaintiff himself pleads (TAC, ECF 136 at ¶ 188) and the record otherwise indicates (*see e.g.*, ECF 142-14 at 3, ¶ 9), that his defense attorney received the card reader data.

67.     On August 11, 2016, DDA Fevurly emailed Defendants regarding a timeline that Plaintiff's defense attorney had created from the key card data. "[O]ne thing that caught [his] eye,"

24

DDA Fevurly noted, was how the data "appears to show [Plaintiff] leaving the building in the middle of the [second Trull] interview." The defense attorney had emphasized the point along with the fact that Plaintiff had left that day to teach a class. DDA Fevurly was not convinced the defense attorney's point was dispositive because Plaintiff could have communicated remotely even if he no longer was in the building. "So, shot in the dark here," the prosecutors asked Defendants "to track down info about this." They asked Defendants to pull Plaintiff's telephone records from that day, verify that he actually did leave to teach that day and when, "etc." ECF 145-1 at 5.

68.     Defendant Martinez wrote a report about his findings. ECF 145-1 at 10-16. He began by noting the reason for the inquiry. The defense attorney told DDA Fevurly that Plaintiff was not present when the decision to arrest Trull was made as shown by the card key reader logs and his teaching schedule. In addition, DDA Fevurly wanted Plaintiff's telephone records from that day. Defendant Martinez therefore began his inquiry by reviewing the record "to get a better understanding of the timeline for that day." He listed out the relevant key card reader logs, and stated:

> From this review, I knew [Plaintiff's] card reader information indicates his card was swiped at the EPSO office on the day [Trull] was arrested. His card was swiped on his way out of the building at 9:30 AM (9:32 AM as he exited the parking structure). I know Trull sent a text saying she was arrested (to her boyfriend, [the deputy sheriff] who was waiting outside for her) at 9:59 AM.

Defendant Martinez incorporated Defendant Gagliardi's earlier report. Next, he listed the telephone calls that Plaintiff had made that day, beginning at 9:34 a.m. At 3:45 p.m. that day, Plaintiff called Commander Lincoln. Defendant Martinez asked Commander Lincoln about the substance of their conversation. Defendant Martinez did not record the questioning (he did not have a device immediately available), but memorialized it in his report. Commander Lincoln believes he was present during the second Trull interview, and he definitely did not make the arrest

25

decision. Instead, he opined that Plaintiff or Undersheriff Presley did. Commander Lincoln did not remember why Plaintiff had called him that day. Defendant Martinez' report addressed other matters as well.

69.     Plaintiff—as the defendant to the indictment—sought production of the grand jury colloquies and moved to dismissed the charges for prosecutorial misconduct related to the presentation of the key card data. ECF 142-11. He also moved to dismiss the charges for lack of probable cause.

70.     The state criminal court denied Plaintiff's motions because in its determination there was probable cause to support the charges. The state criminal court reviewed the grand jury record which consisted of 750 pages of testimony recorded over five separate days of testimony although evidently not the colloquy exchange between the grand jury and the prosecutors which was not transcribed. The court "conclude[d] that the prosecution has met the probable cause burden of proof as to each of the charges against each of the three defendants" and furthered "that the narrative following each charge of the indictments accurately reflects the testimony before the grand jury." ECF 142-15.

71.     The state criminal court also considered Plaintiff's prosecutorial misconduct argument. Plaintiff complained about the evidence that the grand jury heard about his involvement. Plaintiff contended that Defendant Gagliardi and Sgt. Jaworski had "lied numerous times in indicating that [he] was present at the second Trull interrogation" and that Defendant Gagliardi "cannot be believed." The state criminal court declined to resolve that particular issue as part of a probable cause determination and left it "for a jury to determine." ECF 142-15 at 3.

72.     Ultimately the charges against Plaintiff were dismissed, but on the *prosecution's* motion.  Several reasons were given. First, there were matters that decreased the value of Sgt.

Jaworski's testimony, and Sgt. Jaworski was a key witness. He says that Plaintiff was the one who ordered Ms. Trull's arrest. Second, there was an issue concerning another key witness, Det. Kaiser. The prosecution anticipated her to testify that "she was ordered to arrest Ms. Trull by her superiors, which most likely included [Plaintiff] and then [DDA Gerhart]." Then on June 14, 2017, as they prepared for Sheriff Maketa's trial, Det. Kaiser clarified "that it was definitely [DDA Gerhart] who ordered Ms. Trull to be arrested and not [Plaintiff] or any of her supervisors." Third, they doubted the ability to secure Ms. Trull's boyfriend as a witness "whom they thought could offer relevant testimony related" to Plaintiff (although without explaining what information the boyfriend knew). Fourth, a jury had found Sheriff Maketa not guilty of the same charges brought against Plaintiff. After that jury verdict, the prosecutors "attempted to shore up the case against [Plaintiff], but without luck." Fifth, Ms. Trull did not respond to the prosecutors' efforts to confer with her about dismissing the indictment against Plaintiff. In sum, the evidence had changed in a way that caused the prosecutors to lose confidence that they still could prove the charges beyond a reasonable doubt. Their motion emphasized that the voluntarily dismissal was no "comment on the guilt or innocence of [Plaintiff] but rather a statement as to [the state's] ability to prove a case beyond a reasonable doubt." ECF 142-16.

## **LEGAL STANDARDS**

### I.  **Rule 12(b)(6)**

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of

a motion to dismiss, means that the plaintiff pleads facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. *Twombly* requires a two-prong analysis. First, a court must exclude "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Iqbal*, 556 U.S. at 679–80. Second, a court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the well-pleaded averments state a plausible claim for relief, then it survives a motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)). "The plausibility standard does not require a showing of probability that 'a defendant has acted unlawfully,' but requires more than 'a sheer possibility.'" *Parshall v. Health Food Assocs., Inc.*, No. 14-4005-JAR, 2014 WL 2547761, at *1 (D. Kan. June 5, 2014). While the Rule 12(b)(6) standard does not require that a plaintiff establish a *prima facie* case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more

than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action,"

so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"

*Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining

whether a complaint states a plausible claim for relief will . . . be a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556

U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct," the complaint has made an allegation, "but it has not shown that the

pleader is entitled to relief." *Id*.

## II.     Fed. R. Civ. P. 56(c)

A motion for summary judgment serves the purpose of testing whether a trial is required.

*Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). "Summary judgment is not

a disfavored procedural shortcut. Instead, it is an important procedure designed to secure the just,

speedy and inexpensive determination of every action." *Evans v. Cawthorn*, No. 16-3095-DDC-

ADM, 2019 WL 5787952, at *3 (D. Kan. Sept. 6, 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S.

317, 327 (1986)).

A court shall grant summary judgment if the pleadings, depositions, answers to

interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if

it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis

for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry

its initial burden either by producing affirmative evidence negating an essential element of the

nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party must assert a set of facts, that if could be found to be true, would enable it to prevail on the claim. To meet that burden, the opposing party may not rest on the allegations contained in the complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247–48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324).  In other words, the opposing party must do more than make a conclusory denial of an asserted material fact but explain the reason for the denial with an accompanying specific reference to the evidentiary record. *Am. Auto. Ins. Co. v. Marlow*, 666 F. Supp. 2d 1209, 1212 (D. Colo. 2009); Section III(F) of the undersigned's Practice Standards---Civil Actions. If the parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, the court should not adopt that version. *Pierson v. Bassett*, 534 Fed.Appx. 768, 771 (10th Cir. 2013).

"[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v.*

30

*Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## III.   Qualified Immunity

Qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly violative at the time of the official's actions. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It "protects all but the plainly incompetent or those who knowingly violate the law." *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). The privilege is an entitlement not to stand trial or face the other burdens of litigation, and thus, it is immunity from being sued rather than a defense to liability. *Ahmed v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006). Qualified immunity exists if (1) the law enforcement officer's actions violated a constitutional or statutory right and (2) the right was clearly established at the time of the officer's conduct. *Harris*, 838 F. App'x at 342.

When a defendant asserts qualified immunity at the summary judgment stage, it is the plaintiff who bears the burden of showing both (1) the defendant violated a constitutional right and (2) that constitutional right—or stated differently, the unlawfulness of the defendant's conduct— was clearly established at the time. *Smith v. City of Hobbs*, No. 19-cv-00796-JCH-SMV, 2020 WL 7056102, at *4 (D.N.M. Dec. 2, 2020) (citing case law). In determining whether a plaintiff meets this burden, the court accepts the plaintiff's version of the facts as true, unless blatantly contradicted by the record so that no reasonable jury could believe it. If the plaintiff meets the two-part test, then the defendant bears the traditional burden of the movant for summary judgment. *Halley*, 902 F.3d at 1144.

31

For a right to be "clearly established," its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016). A plaintiff "typically must identify 'an on-point Supreme Court or published Tenth Circuit decision,' but also may look to the 'weight of authority' from other courts." *Harris*, 838 F. App'x at 342. The clearly established right must be "particularized to the facts of the case" and should not be defined "at a high level of generality," *id.*, especially in the excessive force context, *City of Escondido v. Emmons*, 139 S.Ct. 500, 503 (2019). However, a case directly on point is not required so long as existing precedent has placed the statutory or constitutional question beyond debate. *A.N. v. Syling*, 928 F.3d 1191, 1197 (10th Cir. 2019). A general statement of the law can establish a right for qualified immunity purposes if it applies with obvious clarity to the specific conduct in question. *Ramirez v. Reddish*, No. 18-cv-00176-DME, 2020 WL 1955366, at *4 (D. Utah April 23, 2020). "A general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Courts have the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

## ANALYSIS

The Court discusses Plaintiff's two claims for relief in turn below. The Court first evaluates them under the Rule 12(b)(6) pleading standard. If plausibly stated, then the Court next considers whether the fact record warrants sending them to the factfinder for resolution.

## I.     Malicious Prosecution

To state a Section 1983 claim for malicious prosecution, Plaintiff must allege: (1) Defendants caused his underlying criminal prosecution, (2) the underlying criminal action terminated in his favor, (3) no probable cause supported the criminal prosecution, (4) Defendants acted with malice, and (5) damages. *San Agustin*, 2019 WL 4059167 at *24. For purposes of this ruling, this Court assumes that Plaintiff could prove damages were he otherwise to prevail on the claim.

Plaintiff alleges that Defendants fabricated evidence, manipulated witness testimony, and withheld exculpatory evidence for the purpose of influencing the outcome of the grand jury proceeding to secure the indictment. The Court notes that he only may sue Defendants for actions they took in producing evidence and not for their testimony to the grand jury. *Id*. at *29. Defendants have absolute immunity for any claim of wrongdoing based on testimony to the grand jury that they may have given as witnesses. *Id*. at *18-20 (finding Defendant Gagliardi immune on that basis). That bars Plaintiff from including in the malicious prosecution claim any allegation that Defendant Gagliardi falsely testified to the grand jury about the key card data. What remains are claims for conduct other than testifying as a witness, and thus conduct that occurred outside the grand jury room. While Defendants may not be absolutely immune for such non-testimonial conduct, they still may seek qualified immunity protection. *Id*. at *18-19.

33

(1)    Defendants Caused Plaintiff's Criminal Prosecution

For present purposes, the Court repeats its early determination that this element is plausibly pleaded, *id*. at *25, 28, a finding which the Court now extends to Defendant Martinez. The evidence confirms that both Defendants were active in the criminal investigation that preceded the grand jury proceeding and continued to be active in it during the criminal case. The evidence confirms that at least in that narrow sense, their conduct "caused" or at least contributed to the indictment. Whether it can be said that Defendants *initiated* the criminal action, as *Zamora v. City of Belen*, 383 F.Supp.2d 1315, 1331 (D.N.M. 2005) discussed, is less clear. Nevertheless, the Court construes this element in Plaintiff's favor. The Court leaves for its discussion of the other elements the question of whether Defendants acted *wrongly* to achieve that result.

(2)    Favorable Termination

Plaintiff must establish the termination of his criminal prosecution "for reasons indicative of innocence." *San Agustin*, 2019 WL 4059167 at *26. In the prior dismissal order, the Court quoted the prosecution's motion to dismiss in full. After reviewing Tenth Circuit's definition of this element, the Court found the grounds for the voluntarily dismissal to "'touch the merits' of the criminal proceeding." *Id*. at *27. Consequently, Plaintiff successfully had pleaded this element. Defendants argue that the reasons the prosecutors gave for withdrawing the charges (as expressed in the motion to dismiss itself and at their depositions) make clear that it was not because they believed Plaintiff to be actually innocent. Nevertheless, for purposes of the present analysis, the Court resolves this element in his favor.

Even if Plaintiff could establish the first two elements, there is insufficient evidence by which he could prevail on the next two.

34

(3)    <u>Probable Cause</u>

The existence of probable cause to support the criminal charges would defeat Plaintiff's malicious prosecution claim. There was probable cause if the facts and circumstances available at the time of indictment showed a substantial probability that Plaintiff had committed the crimes charged. *Id*. at *27. The test for probable cause "is an objective one: when there is no dispute over the material facts, a court may determine as a matter of law whether a reasonable officer would have found probable cause under the circumstances." *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014); *see also A.M. v. Holmes*, 830 F.3d 1123, 1138-39 (10th Cir. 2016) and *Koch v. City of Del City*, 660 F.3d 1228, 1239 (10th Cir. 2011) (emphasizing the objective nature of a court's probable cause inquiry).

To measure the effect of falsified information, a court sets it aside and considers whether probable cause exists on the basis of the remaining "unchallenged" information. *San Agustin*, 2019 WL 4059167 at *27-28. When it reviewed the Second Amended Complaint, the Court found it "unclear exactly how Gagliardi purportedly 'manipulated' the key card data," but after construing the allegations in Plaintiff's favor, it appeared that Defendant Gagliardi "did so in a way that allowed him to present to the grand jury the key card data inculpating Plaintiff and/or withhold the data exculpating Plaintiff." *Id*. at 28. To that extent at least, the Court found his "allegations sufficient to demonstrate the indictment may have been procured through misconduct, such as fabricated evidence." *Id*. The Court repeats that finding with respect to the TAC, applying it to the new claim of influencing witnesses and extending it to Defendant Martinez. That only means this element survives Rule 12(b)(6) review.

Now the allegation also must stand against the evidentiary record. To begin with, there is no evidence that Defendants manipulated the key card data or gave the prosecutors falsified key card data for use at the grand jury proceeding. There was nothing factually incorrect about the information itself. The same information that Defendants gave to the prosecutors was in turn passed along to Plaintiff's defense attorney as discovery. The defense attorney did not seek dismissal because of errors (whether inadvertent or not) in the data. Instead, the defense attorney sought dismissal because of what that data itself showed. Correlating the times and locations when his card was used against the timeline of the Trull interview indicates that Plaintiff physically left the second floor (where the interview and arrest conference was taking place) and the sheriff's office building very shortly before Trull was formally arrested.

This shifts Plaintiff's claim from the *falsification* of evidence to the failure to flag a particular exculpatory point drawn from the key card data. Whether Defendants were culpably *wrong* not to highlight that fact to the prosecutors, the Court considers in the malice section. For purposes of this section, the Court determines how that allegation affects the probable cause calculus. Several reasons suggest it makes no material difference. First, Plaintiff's argument rests on the assumption that the prosecutors would have used that information. The record makes no indication that they would have. The key card data was not a feature of the prosecutors' case, even after the grand jury asked about what the key card data might reveal. It was not until the defense attorney raised this specific issue when the prosecutors explored it in depth. Second, had Defendants first flagged this particular point to the prosecutors, Plaintiff assumes it would have prompted them to abandon their effort to obtain an indictment. Again, the record evidence does not show the key card data to have been so critical or dispositive to the prosecutors' theory, at least as it existed at that time. Third, Plaintiff misconstrues the accusatorial nature of a grand jury

36

proceeding. A prosecutor has no obligation to introduce both inculpatory and exculpatory evidence in equal measure to the grand jury. *U.S. v. Williams*, 504 U.S. 36 (1992). Plaintiff attempts to impute on Defendants—law enforcement investigators acting at the prosecution's direction—the requirement of *Brady v. Maryland*, 373 U.S. 83 (1963) to reveal exculpatory evidence, but *Brady* governs prosecutors, not police:

> The prosecutor must ask such lawyer's questions as whether an item of evidence has "exculpatory" or "impeachment" value and whether such evidence is "material." It would be inappropriate to charge police with answering these same questions, for their job of gathering evidence is quite different from prosecution's task of evaluating it. This is especially true because the prosecutor can view the evidence from the perspective of the case as a whole while police officers, who are often involved in only one portion of the case, may lack necessary context.

*Jean v. Collins*, 221 F.3d 656, 660 (4th Cir. 2000). Moreover, "[t]he *Brady* duty is framed by the dictates of" an adversarial process, *id.*, which is not present in the grand jury context. Defendants are not responsible for how the prosecutors used the information they received. *Zamora*, 383 F.Supp.2d at 1134.

Ultimately, the case was the responsibility of the prosecutors, not Defendants, to present to the grand jury. The Court already has dismissed the prosecutors from this lawsuit on absolute immunity grounds. *San Agustin*, 2019 WL 4059167 at *14.

Relevant to this element, however, is the impact of the omitted information on probable cause. Case law instructs that probable cause should be recalculated with the omitted item of exculpatory information (of Plaintiff's physical absence at the time of Trull's arrest) included. *Grubbs v. Bailes*, 445 F.3d 1275, 1278 (10th Cir. 2006); *Zamora*, 383 F.Supp.2d at 1330. After factoring it in, probable cause still exists. The prosecution's theory did not rest on where and when Plaintiff physically was at the time of Trull's arrest but rather on his relationship with Sheriff Maketa and Undersheriff Presley. Plaintiff did not need to be present physically at Trull's arrest

to communicate their preference to the decisionmakers. Nor was Plaintiff wholly isolated from the matter altogether. At least some witnesses suspected him to have been around and to have played a role. Moreover, he himself admits that he was present on the second floor when the second Trull interview began.

Other cases found the probable cause calculus unaffected by relatively greater exculpatory evidence than present here. In *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996), the Tenth Circuit found probable cause to indict a sheriff's office employee for the crimes of forgery and embezzlement despite a witness's false and embellished testimony and the allegation that politics had motivated the investigation. Inconsistencies in witnesses' statements and the exclusion of some exculpatory evidence did not vitiate the basis for indicting plaintiff for rape and murder even if the prosecution dismissed the charges on later obtained direct evidence of innocence. *Taylor v. Meacham*, 82 F.3d 1556, 1562-63 (10th Cir. 1996).

Plaintiff next accuses Defendants of manipulating witness testimony by subtly influencing them to believe he was present and was the source of the Trull arrest order when the witnesses otherwise would not have thought of him. While it may serve as the basis for a malicious prosecution claim, that accusation rests on the thinnest possible evidentiary support in this particular case. Plaintiff points to a particular exchange during Defendant Martinez' interview of DDA Gerhart (which the Court recites at ¶ 20 above). Plaintiff cites it as an example of such wrongdoing (ECF 145 at ¶¶ 35-36), but with little explanation of how it had a material impact on establishing probable cause. No reasonable reading of the full exchange suggests that Defendant Martinez caused DDA Gerhart to change her opinion about whether probable cause existed for the Trull arrest. DDA Gerhart already regarded the matter as dubious. The only other example Plaintiff gives is the interview of Sgt. Jaworski. At one particular point (cited above at ¶ 21), Defendant

Martinez asked him if the arrest order could have come from Plaintiff (or others in the chain of command). How that question turned Sgt. Jaworski against Plaintiff is unclear. It could not have been the first time Sgt. Jaworski ever had reason to associate Plaintiff with the Trull matter, and Sgt. Jaworski's later grand jury testimony was overall consistent with the greater record evidence. Nor is simply asking a witness about the potential involvement of a particular person unduly suggestive.

This allegation of wrongdoing remains conclusory. As such, it is difficult to know what corrected version of the testimony of DDA Gerhart and Sgt. Jaworski should be included in a probable cause redetermination.

Thirdly, the Court considers the allegation that Defendants "purposefully withheld Kelly Trull's prior interviews with Detective Kaiser from the prosecutors and the Grand Jury," (TAC, ECF 136 at ¶ 177), an allegation he repeats in his Response (ECF 145 at 18). However, Plaintiff points to no facts that show Defendants withheld *any* information from the prosecutors. Consequently, Plaintiff fails to show the lack of probable cause on this basis.

This is not the first time Plaintiff has asked a court to determine if probable cause still exists (at least against the key card data). Plaintiff argued that same point to the state criminal court, and it concluded that it did. When it considered a similar situation, the *Zamora* court declined to "undermine the state court's ruling and hold that the grand jury's indictment was not based on probable cause." 383 F.Supp.2d at 1336. Even if the Court were to accept Plaintiff's invitation to do so here, it would agree with the state criminal court and find probable cause still to exist. There is no plausible claim, supported by any evidence, that Defendants manipulated witnesses or withheld evidence in a way that if corrected would vitiate probable cause. The physical absence of Plaintiff at the time of Trull's formal arrest is a point that runs more strongly in his favor. However,

39

when considered against the extensive record—a record which left unclear exactly who had ordered Ms. Trull's arrest and a record to which Plaintiff declined to add any of his own contrary testimony—the impact of that particular exculpatory fact is not so great as to vitiate probable cause. A substantial possibility remained that he (either singly or in conjunction with others) caused Trull's arrest.

A reasonable jury could not find on this record an insufficient basis to charge Plaintiff. Nor was the lack of probable cause the reason why the criminal case against him ended in his favor.

(4)   <u>Malice</u>

The motive element of a malicious prosecution claim requires more than mere negligence and an intent beyond the desire to bring an offender to justice. *San Agustin*, 2019 WL 4059167 at *30. Previously, this Court found "Plaintiff's allegations that Gagliardi manipulated evidence and presented it to the grand jury sufficient at the [pleading] stage of the litigation to show Gagliardi acted with malice." *Id*. Now, without evidence of manipulation or falsification, there is little basis by which to infer malicious intent.

In its previous ruling, this Court noted the lack of "allegations against Gagliardi demonstrating he had a specific animus against Plaintiff (as Plaintiff does with other Defendants [who no longer are party to this lawsuit])." *San Agustin*, 2019 WL 4059167 at *29. For the TAC, Plaintiff does include allegations that might indirectly imply animus against him by Defendants. However, the mere fact that Plaintiff was critical of investigations generally and that Plaintiff and Defendants may have had been involved in a prior investigation (albeit only tangentially) remains too little to demonstrate malicious intent. The record does not explain why Defendants would want to obtain a false indictment against Plaintiff.

40

It is possible to infer malice from the lack of probable cause. *Mglej v. Gardner*, 974 F.3d 1151, 1171 (10th Cir. 2020). However, *Mglej* involved far more egregious facts. Mglej was arrested after he had "declined to give the [defendant] deputy his ID before consulting with an attorney" on charges of "obstructing justice" (even though that criminal offense did not apply to the circumstances) and the "failure to disclose identity" (even though the detention was unjustified). Moreover, the defendant arrested him *after* the underlying report of theft (which prompted the interaction) was withdrawn. *Id*. at 1158-59, 1171.

Plaintiff's theory rests primarily on the key card data. He presents it in at light as favorable to his position as possible, but it still falls short of showing any sort of wrongful, culpable conduct by Defendants. First, Plaintiff portrays in a negative light the way in which Defendants presented the key card data to the prosecutors. He describes it as a "data dump," done at the last minute with inadequate briefing and insufficient time for the prosecutors to conduct their own independent review. In other words, Defendants gave the "information without a meaningful chance to discover this exculpatory needle [that Plaintiff was not physically present when Trull was arrested] in a haystack in time [for the prosecutors] to make use of it." ECF 145 at ¶ 29.

However, the record does not confirm Plaintiff's characterization that Defendant Gagliardi "simply handed [the prosecutors] a huge stack of materials shortly before they were to continue their presentation to the grand jury [with] no time to meticulously comb through the data" (ECF 145 at 18) or otherwise buried it (*id*. at 19). While the data may have comprised a lengthy print-out, there is no indication that Defendants created a document larger than necessary for the purpose of hindering the prosecutors' review of it. This certainly is not the situation in *U.S. v. Hsia*, 24 F.Supp.2d 14, 29-30 (D.D.C. 1998) in which the defense attorney was told to find the exculpatory information in a 600,000-document production. If Defendants had intended to hinder the

41

prosecutors, Plaintiff does not explain why they converted it into digital format and organized it. Nor was the data too technical for the prosecutors to parse on their own. Presumably, the defense attorney later received that same information without complaint about its format.

Likewise, the timing of the production implies no malicious intent, contrary to Plaintiff's negative characterization. It was not until the day before the last grand jury session when the prosecutors even asked for key card data. The prosecutors had the information at least an hour that next day before the start of that final grand jury meeting, and Plaintiff concedes Defendants did walk them through it at least to some extent. In other words, the circumstances were not that Defendants simply sat on the information.

Plaintiff argues that Defendants were wrong not to flag one particular aspect of the key card data: how, when correlated with the timeline of Trull's interview and arrest, it demonstrated (or at least suggested) his absence when Trull was arrested. The parties agree that Defendant Gagliardi was aware that the data showed Plaintiff's departure but that the prosecutors did not ask about it.

To support his argument, Plaintiff refers to Defendant Gagliardi's later grand jury testimony about the key card data. Even if his witness testimony could be used to prove culpability, it provides an insufficient basis by which to infer malice. Plaintiff highlights how Defendant Gagliardi testified to the grand jury that the data placed Plaintiff in the conference *room*. It does not, but if he was deliberately attempting to make that false point, he did not do so clearly. There is ambiguity in his answers over whether he meant the room or the floor where the room is. Nor was his testimony wholly inaccurate. The data shows (and Plaintiff essentially concedes) that he was present on the floor that morning (even if he had left by the time Trull was formally arrested).

If Defendant Gagliardi simply did not appreciate that the data was floor- and not room-specific or did not realize how card readings correlated with the timing of Trull's arrest, then it was a mistake or negligence, not malice. If Defendant Gagliardi had acted with knowing and malicious intent at the grand jury proceeding to mischaracterize what the key data showed, then Plaintiff does not explain why Defendants undertook an investigation of that same issue following the defense attorney's inquiry.

Lastly, Plaintiff complains that Defendants continued to advocate for his guilt post-indictment, thereby prolonging his criminal prosecution. He points to the report they prepared after revisiting the key card data, pulling telephone records, and gathering other relevant evidence. The purpose of that report was to ascertain Plaintiff's activities and whereabouts that day and to see with whom he (and other potential decisionmakers) had communicated. However, there is nothing about the report, itself, that reveals a malicious intent. They prepared it at the prosecutors' request following the defense attorney's inquiry. Plaintiff does not accuse Defendants of basing it on manipulated or false data. Plaintiff does complain that Defendants use it to suggest alternative ways he could have caused Trull's arrest. However, if Defendants drafted the report for the purpose of misleading the prosecutors, it is a very subtle effort indeed. It did not convince the prosecutors to persist in the criminal prosecution after other flaws in the state's case-in-chief developed.

Malice may be inferred from intentional or reckless behavior. *Wilkins v. DeReyes*, 528 F.3d 790, 800-01 (10th Cir. 2008). However, this case does not present the kind of egregious conduct that warranted drawing the inference in *Wilkins*. The arrest of Wilkins for a quadruple murder rested solely on false statements wrongfully coerced from fellow gang members, conduct sufficient to create a dispute of fact over the defendant's intentions in attempting to pin the crime on him. *Id.* at 793, 800-01.

Although Plaintiff alleges malice, he does not show how a reasonable factfinder could find it from this record. Many of his arguments do not rise much above the conclusory or speculative level, and for that reason, summary judgment should be entered in Defendants' favor. *Carbajal v. McCann*, 808 F. App'x 620, 633 (10th Cir. 2020). The most substantive allegation concerns the key card data, but it was a minor part of the overall record before the grand jury and not even relevant to the prosecution's theory. Had Defendants intended to cause a wrongful indictment, then they focused their effort on an aspect of the case that at the time was an ancillary point. Even if they did bear ill will against Plaintiff and used the key card data as an opportunity to influence the evidentiary record, it did not impact the outcome in a material way, as the Court's probable cause discussion explains above. Simply put, there was far more to the case than whether Plaintiff was physically present at the time of Trull's arrest.

Taken altogether, Plaintiff points to no set of facts, if found to be true, that would prove the constitutional violation of malicious prosecution as the law defines it.

## II.     Conspiracy

As pleaded in the Second Amended Complaint, the Court found the "allegations of Gagliardi assisting and working with the prosecutors to 'fabricate evidence' and use it in the criminal proceeding . . . sufficient to state a plausible claim that Gagliardi conspired to maliciously prosecute the Plaintiff." *San Agustin*, 2019 WL 4059167 at *29. The TAC no longer asserts a plausible claim of *fabrication* of false evidence. It also adds Defendant Martinez to the alleged conspiracy. Even if the Court were to extend its previous Rule 12(b)(6) ruling to his present conspiracy claim and find it also plausible, Plaintiff does not show how he could prevail on the merits on this evidentiary record.

44

An unlawful civil conspiracy requires (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) an unlawful overt act, and (5) damages as the proximate result. *Sensoria, LLC v. Kaweske*, No. 18-cv-02646-MEH, 2021 WL 103020 (D. Colo. Jan. 12, 2021) (citing *Powell Prods., Inc. v. Marks*, 948 F. Supp. 1469, 1480 (D. Colo. 1996)). Thus, Plaintiff must establish that Defendants acted in concert with some sort of mutual agreement or conspiratorial objective. *Brooks v. Gaenzle*, 614 F.3d 1213, 1227-28 (10th Cir. 2010).

Obviously Defendants worked together as CBI colleagues participating in the Maketa investigation, but the fact of their common employment and assignment does not mean they acted as a conspiracy. Merely grouping the Defendants together is insufficient. *Leatherwood v. Rios*, 705 F. App'x 735, 739 (10th Cir. 2017) (noting that "plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants") (citing *Brooks*, 614 F.3d at 1228). Concerted action alone is insufficient to establish the claim. Conspiracy liability requires a meeting of the minds—an acknowledged agreement—to cause the harm, and it entails each conspirator acting independently towards accomplishing that unlawful goal. *Sensoria*, 2021 WL 103020 at *11. The evidence does not show in a concrete and specific way how a *conspiracy* lay behind Defendants' actions.

Nevertheless, even if Plaintiff did raise a dispute of fact over whether Defendants had a meeting of the minds, the claim would fail because there was no underlying malicious prosecution to serve as the conspiracy's wrongful object.

## III.    Qualified Immunity

A reasonable factfinder could not find Defendants liable under a malicious prosecution theory (or a conspiracy to commit that constitutional violation) on this evidentiary record. For that

reason, Defendants are entitled to summary judgment on both claims. Because Plaintiff does not establish a constitutional violation, neither does he overcome their qualified immunity defense.

Defendants limit their qualified immunity argument to the failure to establish a constitutional violation and do not address the second prong of that defense: the violation of a clearly established right. ECF 142 at 38-39. Plaintiff does address the "clearly established right" element. ECF 145 at 35-38. "'No one could doubt'" that the prohibition on falsification in or omission of evidence from an arrest warrant was firmly established," Plaintiff emphasizes (*id*. at 35), and in its prior dismissal ruling, the Court agreed. The Court found "that Plaintiff's right against law enforcement officers' procurement and use of false evidence to seek an indictment and prosecute criminal charges was clearly established by [*Sanchez v. Hartley*, 810 F.3d 750 (10th Cir. 2016)] (and, possibly, prior opinions cited therein)." *San Agustin*, 2019 WL 4059167 at *24. However, that no longer is the nature of Plaintiff's malicious prosecution theory. Rather than the fabrication or omission of evidence, his malicious prosecution claim is for the failure to flag to the prosecutor a potentially exculpatory fact in the information produced. Other than noting the general rule that a case need not be directly on point to place the unconstitutionality of alleged conduct beyond debate, Plaintiff provides no explanation why *Sanchez* should extend to this particular act as he now reframes it.

Even if there were a dispute of fact that warrants sending his malicious prosecution claim to the factfinder to decide, Defendants still would be entitled to qualified immunity. That is because Plaintiff does not demonstrate how the obligation to highlight an item of exculpatory evidence (that the prosecutor does not independently see and regard as exculpatory) and ensure its introduction into the record (even if the prosecutor does not present it) was clearly established at the time.

46

**IV.**     **Sovereign Immunity**

Defendants argued that Plaintiff's official capacity claims are barred by Eleventh Amendment immunity. In his Response, Plaintiff acknowledges that he makes no claim for damages that the Eleventh Amendment bars. Because the TAC contains no requests for relief other than damages, the official capacity claims should be dismissed on sovereign immunity grounds.

## <u>CONCLUSION</u>

Plaintiff is aggrieved over being subjected to a criminal prosecution, and if he played no role in Trull's arrest, as his lawsuit implies, the frustration is fully understandable. However, in his attempt to hold Defendants constitutionally liable for it, he in effect treats them as the prosecutors. *See Zamora*, 383 F.Supp.2d at 1335 (making the same observation). His theory of relief requires assigning them the responsibility of determining how the gathered information could run in his favor and ensuring that the grand jury hears it. His theory of malicious prosecution also requires converting the grand jury from a probable cause inquiry into a trial on the merits. The indictment itself does not indicate guilt; it shows only the existence of enough evidence to suspect the charged offense. *Id*. at 1328. Plaintiff later challenged those charges, and ultimately, they were dismissed in his favor. However, that does not mean the act of securing the underlying indictment violated the law.

Accordingly, the Defendants' Combined Motion to Dismiss and Motion for Summary Judgment [filed August 11, 2021; ECF 142] is **granted**. Summary judgment is granted in Defendants' favor on both Plaintiff's malicious prosecution and conspiracy claims.

The Clerk of Court shall enter Final Judgment in Defendants' favor and close this civil action. The Trial Preparation Conference currently set for January 10, 2022 is vacated.

Dated at Denver, Colorado, this 3rd day of January, 2022.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge

48